# In the United States Court of Federal Claims

**No. 16-1517V**
**Filed: August 11, 2026**
**Reissued for Publication: September 3, 2026**[1]

| | |
|---|---|
| **BERNADETTE SKORUPSKA, Mother and natural guardian of N.S., a minor,** | * |
| **Petitioner,** | * |
| **v.** | * |
| **SECRETARY OF HEALTH AND HUMAN SERVICES,** | * |
| **Respondent.** | * |

**Phyllis Widman**, Widman Law Firm LLC, Linwood, NJ, for petitioner.

**Ryan D. Pyles**, Senior Trial Attorney, Torts Branch, Civil Division, United States Department of Justice, Washington, DC, for respondent. With him were **Lara A. Englund**, Assistant Director, Torts Branch, Civil Division, **Heather L. Pearlman**, Deputy Director, Torts Branch, Civil Division, **Jonathan D. Guynn**, Deputy Assistant Attorney General, Torts Branch, Civil Division, and **Brett A. Shumate**, Assistant Attorney General, Civil Division, United States Department of Justice, Washington, DC.

## O P I N I O N

**<u>HORN, J.</u>**

On November 15, 2016, petitioner, Bernadette Skorupska, filed a request for compensation on behalf of her minor son, N.S., with the National Vaccine Injury Compensation Program (the Vaccine Program), under the National Childhood Vaccine Injury Act of 1986, 42 U.S.C. §§ 300aa-1 to 300aa-34 (2012) (the Vaccine Act), "for injuries caused-in-fact, (a 'cause-in-fact' or 'off-Table' injury) to her son," N.S., "by the haemophilus influenza ('Hib') vaccine that [N.S.] received on November 16, 2013" at eight

---

[1] This Opinion was issued under seal on August 11, 2026. The parties did not propose any redactions to the August 11, 2026 Opinion, and the court, therefore, issues the Opinion without redactions for public distribution.

months of age.[2] (alteration added). According to Ms. Skorupska's petition, "[a]mong the injures [N.S.] suffered as a result of receiving the Hib vaccine are infantile spasm, seizure disorder, and neurological injury resulting in multiple injuries, manifesting as developmental disorder, developmental delay and developmental injury." (alterations added). Ms. Skorupska also alleged, "[i]n addition, or in the alternative, as a result of the effects of the Hib vaccination, [N.S.] suffered a significant aggravation of a preexisting condition." (alterations added).

On February 10, 2026, Special Master Christian J. Moran issued a decision finding that Ms. Skorupska was not entitled to compensation because "she failed to present persuasive evidence that N.S. responded to the vaccine in a way consistent with her expert's theory" and because she "has not shown with preponderant evidence that the Hib vaccine harmed N.S." See Skorupska v. Sec'y of Health & Hum. Servs., No. 16-1517V, 2026 WL 674607, at *1 (Fed. Cl. Spec. Mstr. Feb. 10, 2026). The Special Master also stated, hypothetically, "even if it were found that Ms. Skorupska met her burden of presenting a persuasive case" of causation, "the evidence preponderates in favor of finding that N.S.'s genetic [E1211K] variant was the sole cause of his neurologic problems, including the infantile spasms and developmental delay." Id. at *19 (alteration added). Subsequently, on March 12, 2026, petitioner filed a timely Motion for Review of the Special Master's decision in the United States Court of Federal Claims, which was assigned to the undersigned. Petitioner's Motion for Review has been fully briefed, and oral argument has been held.

## FINDINGS OF FACT

According to the records before this court, petitioner's minor son N.S. was born on March 7, 2013 and he had no noted issues as a newborn. On July 3, 2013, N.S. received the first round of the Hepatitis B (Hep B) vaccine without recorded incident, which is not the vaccine at issue in this case. Two months later, over the course of September 2013, N.S. underwent three early intervention developmental evaluations to determine eligibility for services provided through the New York City Early Intervention Program after N.S. was referred due to "concerns regarding his gross motor skills and development." On September 12, 2013, around six months of age and prior to the Hib vaccination at issue in this case, N.S. underwent the first related early intervention evaluation. Dr. Selina Cali conducted the Peabody Developmental Motor Scale (PDMS-2) test and used clinical observation and a parent interview for her findings. Dr. Cali stated that testing occurred in the bedroom of N.S.'s home in the presence of his mother and "[t]esting conditions were adequate with respect to space and lighting with ample room for examination and movement/play. Mom reported that [N.S.'s] performance and all skills observed were typical of his usual behaviors, performance level and abilities." (alterations added). Dr.

[2] In some of the medical records, expert opinions, and briefs before this court, Ms. Skorupska's minor son is referred to by his legal first name. To preserve the minor's anonymity in this Opinion, this court will refer to the minor only as N.S. and make alterations as appropriate.

Cali concluded N.S. had delays in gross motor development and prone skill development with his prone skill being consistent with the development of a one-to-two-month-old child when N.S. was six months old. On the PDMS-2, N.S. was found to be "functioning at -2.00 standard deviations below the mean than that of his peers."[3] At this evaluation, there is no mention of cognitive development besides that N.S. demonstrated "appropriate eye contact and response to stimuli. He demonstrated a moderate amount of interest in toys presented to him."

The second early intervention evaluation occurred the following day, on September 13, 2013, and N.S. was evaluated by Ms. Melissa Gianquinto, a board-certified behavior analyst and developmental evaluator, using the Developmental Assessment of Young Children-Second Edition (DAYC-2).[4] The September 13, 2013 DAYC-2 results measured N.S.'s development in the cognitive, communication (both receptive and expressive), motor (both gross and fine), social/emotional, and adaptive developmental areas. N.S. was found to be average and within the standard deviation for the receptive communication and adaptive areas; above average in the expressive communication area; below average in the cognitive, fine motor, and social/emotional areas; and in the poor development range for the gross motor area. Cognitive developmental services were not recommended at the time. Petitioner asserts in her Motion for Review that, at the time, September 13, 2013, there was no mention of seizures or epilepsy.

On September 25, 2013, at his six-month checkup with pediatrician Dr. Joanna B. Lis, N.S.'s constitutional, musculoskeletal, and neurological findings were generally normal according to the pediatrician's notes. N.S. also received the second Hep B vaccine without recorded incident and had some immunizations deferred.

On September 27, 2013, N.S. underwent the third early intervention evaluation and was evaluated using the PDMS-2 assessment for the second time, this time by an occupational therapist, Elizabeth Esposito. N.S.'s behavior during the evaluation was typical according to his parents, although his mother said he was tired. On this evaluation, N.S. scored -2.40 standard deviations below the mean, scoring in the first percentile for visual motor, the fifth percentile for grasping, and in the very poor range overall. N.S. was remarked to have "low muscle tone throughout with decreased muscle strength throughout" and was unable to perform grasping tasks expected for a two-month-old at six months old. Generally, it was observed that N.S. "made little eye contact" and "did not always appear to be aware of others in his environment and was not social." Ms. Esposito

---

[3] A standard deviation is a measure of the amount by which each value deviates from the mean. <u>See</u> Standard Deviation, DORLAND'S ILLUSTRATED MED. DICTIONARY 497 (33rd ed. 2020).

[4] According to Ms. Gianquinto's notes from the September 13, 2013, evaluation, "[*t*]*he Developmental Assessment of Young Children-Second Edition (DAYC-2) is a norm referenced standardized measure with a mean of 100 (average score) and a standard deviation (SD) of 15 points.*" (alteration added; italics in original).

concluded that "**Occupational Therapy is highly recommended at this time.**" (emphasis in original).

At an October 19, 2013, routine checkup at the age of seven months with N.S.'s pediatrician, Dr. Lis, N.S. had abnormal findings in the constitutional and neurological categories as he could not make eye contact or follow a toy and could not yet sit up or roll over. N.S. was found to have an unspecified delay in development and hypotonia, or low muscle tone.[5]

On November 1, 2013, N.S. was brought to the Staten Island University Hospital for a crying spell that lasted for three hours. According to the hospital records, N.S. had "an affect that is playful" and was "behaving in an age appropriate manner and speaking appropriately for age."[6] The hospital records mention Dr. Lis's recommendation that N.S. see a neurologist for concerns regarding developmental delay in the neurological system review section.

On November 13, 2013, N.S. was seen by pediatric neurologist, Dr. Steven B. Schwartzberg, on referral from his pediatrician, Dr. Lis. Dr. Schwartzberg's neurologic examination found that "[t]he patient was alert and quiet" but "[m]otor exam showed diffusely diminished tone in all four extremities." (alterations added). Dr. Schwartzberg's overall impression stated, in part:

> [N.S.] is an eight month old male with diffuse hypotonia and developmental delay predominantly affecting motor skills. I advise he have an increase in his therapy services. He is currently getting physical therapy and occupational therapy each once a week. I gave prescriptions to the mother to go to three times a week each. Additionally, speech and hearing and feeding evaluation referrals were given as well as a special instructional evaluation to be done through early intervention. I suggest a pediatric ophthalmologist evaluate [N.S.] as well to assure a normal visual function.

---

[5] Hypotonia is "a condition of diminished tone of the skeletal muscles," which may cause the limbs or head to appear to be limp when lifted against gravity. See Hypotonia, DORLAND'S ILLUSTRATED MED. DICTIONARY 896.

[6] From the medical records before the court, the quoted phrase "behaving in an age appropriate manner and speaking appropriately for age" is used frequently and generally by the Staten Island University Hospital's emergency department to describe N.S.'s "[m]ental status." (alteration added). The phrase also was used at N.S.'s November 22, 2013 hospital visit, at which N.S.'s infantile spasms were diagnosed, and again at a June 2, 2014 emergency department visit, at which N.S. was notated to be "cooperative with an affect that is appropriate. The patient is behaving in an age appropriate manner and speaking appropriately for age," despite N.S.'s documented and uncontested developmental and motor delay in June of 2014.

(alterations added). Dr. Schwartzberg also stated N.S. would undergo a number of tests, including a magnetic resonance imaging (MRI), thyroid tests, blood tests, and genetic testing to "rule out Fragile X."[7] N.S. also had well-documented problems with feeding and gastroesophageal reflux (colloquially acid reflux) prior to the Hib vaccination according to his medical reports. In a November 1, 2013 hospital record, it is notated that "[p]atient diagnosed with gastric reflux recently." (alteration added). In a November 13, 2013 report to N.S.'s pediatrician, N.S.'s neurologist Dr. Schwartzberg wrote, "[t]he patient has gastroesophageal reflux for which [he] is taking Zantac, being managed by a gastroenterologist." (alterations added).

On November 16, 2013, N.S. received from his pediatrician the Haemophilus influenza type b (Hib) vaccination, which is the vaccination at issue in this case. Six days after receiving the Hib vaccination, on November 22, 2013, N.S. was brought to the Staten Island University Hospital emergency department for concerns of worsening of N.S.'s chronic vomiting, three days of projectile vomiting after feeding, and irritability. A November 22, 2013, hospital patient intake form stated that N.S.'s mother "also reports a 2 day history of new onset spasms. Mom & dad had a video of spasms," which appears to place the onset of N.S.'s infantile spasms four days after the Hib vaccination and two days before hospitalization. In one contemporaneous hospital chart note, a registered nurse, Ms. Diana Romano, recorded "vomiting for three days; chokes after he eats; I watched a video of baby and while sitting in carriage baby experiences involuntary muscle movements consisting of eyes staring, eyes raising up, torso jerking downward, then baby cries from incident." In the November 22, 2013 hospital documentation, N.S. was noted to be "afebrile," or without a fever. N.S.'s progress notes from the November 22, 2013 hospital visit also stated that "Mom denies recent illness, fevers . . . ." (omission added). Further, in the November 22, 2013 hospital documentation, N.S. was noted to be hypotonic and not able to "turn over, crawl, or reach for toys." N.S. was cleared to be discharged for out-patient workup, but was admitted to the hospital upon the request of his mother.

This court notes that there is some conflict between Ms. Skorupska's allegations and the contemporaneous medical records regarding when N.S.'s spasms began and whether N.S. had a fever after N.S.'s vaccination on November 16, 2013. Petitioner alleged, in both her original petition and amended petition, that N.S. "began having infantile spasm type seizures accompanied by fever, nausea, irritability and other symptoms shortly after receiving the Hib vaccination." In an attempt to support the allegation, petitioner cited to a December 3, 2013 letter from Dr. Nwanneka A. Okolo of New York Epilepsy & Neurology's Pediatric Neurology Clinic, the doctor who did a follow up visit with N.S. after N.S.'s November 22, 2013 hospitalization, sent to N.S.'s pediatrician Dr. Lis, as well as a December 4, 2013 letter from Dr. Schwartzberg also sent to N.S.'s pediatrician Dr. Lis. Neither of those letters, however, stated that N.S. had a fever. In fact, Dr. Okolo's December 3, 2013 letter to Dr. Lis stated "[o]n further review of systems he [N.S.] has not had any fevers." (alterations added). Moreover, according to

[7] Fragile X Syndrome is an inherited disorder "characterized by intellectual disability." See Fragile X Syndrome, DORLAND'S ILLUSTRATED MED. DICTIONARY 1800.

an affidavit from Ms. Skorupska, which she submitted to the Special Master on September 18, 2017, nearly four years after N.S. received the Hib vaccination at issue in this case, "[t]he night after [N.S.] got the Hib shot, he was crying more than usual and presented with a mild fever." (alterations added). In Ms. Skorupska's September 18, 2017 affidavit submitted to the Special Master, she also alleged that N.S. "had been having spasms for at least two days, maybe more," prior to his November 22, 2013 hospitalization. However, in petitioner's Reply to the Motion for Review in this court, petitioner states that it is an "undisputed fact that N.S.'s seizures were **afebrile**." (emphasis in original). In his decision, the Special Master acknowledged, in both the Special Master's description of the factual history of the case, and also in his timing analysis, this tension regarding whether N.S. had any fever, mild or otherwise, between the contemporaneous medical records, as discussed more fully below, and Ms. Skorupska's later presented affidavit. The Special Master ultimately concluded that the contemporaneous medical records are more credible than Ms. Skorupska's affidavit on the matter of when spasms began and whether N.S. had a fever. See Skorupska v. Sec'y of Health & Hum. Servs., 2026 WL 674607, at *4 n.3, *13; see also Cucuras v. Sec'y of Dep't of Health & Hum. Servs., 993 F.2d 1525, 1528 (Fed. Cir. 1993); Kirby v. Sec'y of Health & Hum. Servs., 997 F.3d 1378, 1382 (Fed. Cir. 2021). In a footnote, the Special Master stated:

> Ms. Skorupska asserts that N.S. started suffering from "infantile spasm type seizures accompanied by fever." Pet'r's Br. at 2. The Secretary disputed this assertion. Resp't's Br. at 33. Ms. Skorupska did not counter the Secretary's arguments. See Pet'r's Reply. In the hospital, Ms. Skorupska denied fevers. Exhibit 29 at 149 (Nov. 22, 2013).

Skorupska v. Sec'y of Health & Hum. Servs., 2026 WL 674607, at *4 n.3. The Special Master established as a factual finding that "N.S. started having spasms on November 20, 2013 (or four days after vaccination)" and that N.S. was "afebrile," or without a fever, during his November 22, 2013 hospitalization. See id. at *4, *13.

N.S. was discharged from the Staten Island University Hospital on November 27, 2013. According to a November 27, 2013 pediatric inpatient discharge summary form, N.S. underwent a video EEG (electroencephalogram) that recorded his brain activity and showed infantile spasms, as well as a non-contrast MRI that produced "[u]nremarkable" results. (alteration added). According to the November 27, 2013 pediatric inpatient discharge summary form, N.S. was diagnosed with infantile spasms and started on adrenocorticotropic hormone (ACTH).[8] As indicated above, Dr. Okolo of New York

[8] When discussing N.S.'s November 22, 2013 hospital visit and subsequent November 27, 2013 discharge, the Special Master stated in his decision that N.S. "was diagnosed with spasms and epileptic encephalopathy. Exhibit 38 at 5." See Skorupska v. Sec'y of Health & Hum. Servs., 2026 WL 674607, at *4. Page 5 of Exhibit 38, however, is a discharge form from Beth Israel Medical Center, dated May 8, 2014. As indicated above, the pediatric inpatient discharge summary form from the Staten Island University Hospital indicated only "infantile spasms" as N.S.'s diagnosis when he was discharged on November 27, 2013.

Epilepsy & Neurology's Pediatric Neurology Clinic did the hospital follow up and initial five-week plan of ACTH to address N.S.'s "Cryptogenic Infantile Spasms."

The parties, and their respective experts, contest the state and severity of N.S.'s developmental delays in the period before the allegedly harmful Hib vaccination was administered to N.S. on November 16, 2013. This disagreement is reflected in a series of back-and-forth responsive expert reports, raising issues regarding the relative impact of the Hib vaccination on N.S.'s health profile. In a July 21, 2021 expert report, petitioner's expert neurologist, Dr. Georges A. Ghacibeh, conceded that it is "evident and unquestionable" that N.S. "was already exhibiting symptoms related to his genetic mutation"[9] prior to the Hib vaccination and there was "no doubt that [N.S.'s] underlying genetic mutation was the cause of his early delay." (alteration added). Petitioner's expert Dr. Ghacibeh characterized N.S.'s pre-vaccination symptoms as "mild developmental delay affecting primarily his motor function, most likely due to his genetic mutation." Petitioner's expert Dr. Ghacibeh noted that "the pediatric neurologist who originally saw him [N.S.], doctor Steven Schwartzberg, prior to the vaccination and the onset of seizures, was somewhat worried about his motor development, as indicated in his consultation note but was not excessively worried about his cognitive development." (alteration added; internal reference omitted). Petitioner's expert Dr. Ghacibeh remarked that Dr. Schwartzberg's notes from the examination of N.S. on November 13, 2013 were "consistent with nearly normal cognitive skills." Petitioner's expert Dr. Ghacibeh also remarked that N.S.'s "cognitive and motor skills took a severe dive right after the onset of seizures" with "[a]ll subsequent evaluations by neurologists and other physicians" describing N.S. as "profoundly disabled," a word usually reserved by neurologists for "every severe cases [sic] where neurological function is deeply and severely impaired." (alterations added). Petitioner's expert Dr. Ghacibeh continued to explain that he believed that "[N.S.] would have had mild delay related to his mutation, but the vaccine that he received on November 16, 2013 resulted in severe aggravation of his underlying condition, causing seizures and developmental regression." (alteration added). Petitioner's expert Dr. Ghacibeh further stated that the "temporal relationship is compelling" to the worsening of N.S.'s developmental delay. Petitioner's expert Dr. Ghacibeh summarized his conclusions and impressions as follows:

> To reiterate, there is no doubt that [N.S.'s] underlying genetic mutation was the cause of his early delay. However, as we see from the referenced literature, mutations on the SCN2A gene can result in a spectrum of disorder, [sic] ranging from the mild and benign, to the severe. While it is impossible to know for sure what would have been [N.S.'s] ultimate phenotype as related to his mutation, the course of his development up to the day he had received the vaccine was taking a fairly favorable trajectory, which suggests that he would have most probably had mild delay. However,

[9] As discussed further below, N.S. was discovered to have an E1211K variant of a SCN2A genetic mutation on July 11, 2014, approximately eight months after N.S.'s Hib vaccination and infantile spasms first appeared.

> after receiving the HiB vaccine, he developed refractory epilepsy and severe developmental regression.

(alterations added).[10]

Dr. AHM Mahbubul Huq, a geneticist and pediatric neurologist, and also an expert for the petitioner, agreed that N.S. was "not severely delayed" prior to vaccination. Specifically, in a February 28, 2023 expert report, Dr. Huq stated that "[p]rior to Hib immunizations at 8 months of age, NS was a healthy child with some developmental concerns mainly in the motor domain, but he was not severely delayed." (alteration added). Dr. Huq did not, however, expand on his reasoning for why he concluded N.S. was not severely delayed prior to the Hib vaccination besides restating in his expert report the findings from the DAYC-2 exam conducted by Ms. Melissa Gianquinto on September 13, 2013.

Respondent's expert neurologist and geneticist, Dr. Gerald V. Raymond, disagreed with both of petitioner's experts, Dr. Ghacibeh and Dr. Huq. In a November 2, 2023 expert report, Dr. Raymond stated that "when seen by a pediatric neurologist Dr. Schwartzberg on November 13, 2013, at 8 months and prior to any immunization, he [N.S.] was very clearly severely delayed in all domains." (alteration added; internal reference omitted). Respondent's expert Dr. Raymond disputed petitioner's expert Dr. Huq's opinion that N.S. was not severely delayed and cautioned against Dr. Huq's reliance on the DAYC-2 evaluation from September 13, 2013, stating:

> His [N.S.'s] "average" adaptive function consisted of maintaining his body temperature, being able to feed by mouth, and sleeping for at least 4 hours. His "above average" expressive language appears to be due solely to parental report and included producing strings of consonants such as "mama". She [Ms. Gianquinto] found him to be below average for fine motor and below average (-1.4 SD) [Standard Deviation] for gross motor.
>
> The major issue with this evaluation is that it is unclear what was scored from observation and what was credited by parental report. This becomes even more appreciable in the discrepancy between what the evaluators found in terms of gross motor and fine motor where one can only be scored for actions performed. On the DAYC-2, NS was only -1.13 SD below the mean, but when actually assessed using the Peabody, he was -2.40 SD below the mean and profoundly delayed in that assessment.

(alterations added). Respondent's expert Dr. Raymond framed the three September 2013 early intervention evaluations as "to some extent immaterial" given the report from the pediatric neurologist, Dr. Schwartzberg, on November 13, 2013. Dr. Raymond emphasized that at this November 13, 2013 appointment with treating neurologist Dr.

---

[10] Refractory seizures are seizures that are resistant to treatment. See Refractory, DORLAND'S ILLUSTRATED MED. DICTIONARY 1591.

Schwartzberg that occurred prior to the Hib vaccination, N.S. "would fix and track; smiled but did not laugh; would not reach for objects; not yet rolling over or sitting." Dr. Raymond asserted in his expert opinion that "these are not the expected developmental milestones for an 8 month old but more appropriate for a child of 1-2 months." Moreover, in an earlier December 2, 2022 expert report, respondent's expert Dr. Raymond pointed to Dr. Schwartzberg's recommendation to increase N.S.'s therapies to three times a week, instructions for further evaluations for speech, hearing, feeding, and a planned brain MRI, as well as biochemical, and genetic evaluations, as further evidence of the severity of N.S.'s developmental delays prior to the Hib vaccination.

According to the Special Master's decision, in the months that followed the Hib vaccination, N.S. underwent genetic testing and numerous medication changes amidst his doctors' struggle to control his infantile spasms. See Skorupska v. Sec'y of Health & Hum. Servs., 2026 WL 674607, at *4. N.S.'s initial clinical course was treated first by Dr. Okolo, and later by Dr. Steven M. Wolf, and involved: ACTH, then Sabril, then a combination of ACTH and Sabril, which was discontinued when the ACTH caused dangerous hypertension, a trial of Topamax, and then Onfi with Sabril, and Vitamin B6. In a retrospective medical history from September of 2014, Sabril was noted to be the most effective and the "only medicine that helps" control N.S.'s seizures.

In December 2013, shortly after the onset of N.S.'s infantile spasms, Dr. Wolf at Beth Israel Medical Center began treating N.S. Dr. Wolf wrote, "[w]e viewed a video before and after the spasms. The spasms are exactly the same, but he is clearly regressing." (alteration added). On January 10, 2014, Dr. Wolf's notes discuss the partial history of treatment courses, stating:

> Patient had undergone treatment with ACTH in Staten Island then weaned off rapidly and started sabril with some mild no improvement [sic]. Added topamax last week – had shown fewest spasms while on ACTH/sabril combination- was admitted repeat treatment with ACTH and now on Day #4 of ACTH at new dose[.]

(alterations added). At a January 15, 2014 visit, Dr. Wolf notated that after one week of ACTH, N.S. had at least a five-day seizure free period. In January of 2014, N.S. was receiving Sabril, Topamax, Vitamin B-6, and Cosyntropin (ACTH). His ACTH therapy induced hypertension. A January 22, 2014 emergency room visit to Beth Israel Medical Center occurred when N.S. was having "almost constant seizures (every 10-13 seconds)" and elevated blood pressure. He was started on Neurontin and his ACTH and Topamax doses were altered. An EEG was performed which, according to Dr. Wolf, was "a very abnormal EEG due to the diffuse background slowing." A few days later on January 28, 2014, it was remarked that "[h]is spasms did improve, but at the time of that [January 22, 2014] visit he also was reported to have a new type of spell with left arm flexion to the point of hitting his head." (alterations added).

On April 18, 2014, N.S.'s doctor, Dr. Wolf, notated that intravenous immunoglobulin (IVIG) and/or a ketogenic diet should be considered for N.S.'s treatment.

In May 2014, N.S. began on a course of IVIG on the recommendation of Dr. Wolf. A month later it was notated by Dr. Wolf that: "IVIG, in hospital last month with great result of no spasm for 1.5 week only then they returned at 1 cluster per day. But then more recently with more cranky [sic]." (alteration added). Dr. Wolf's notes also stated that "[N.S.] appears to have had a good response to IVIG. The seizures seem to have returned but the next treatment with IVIG SQ [subcutaneous] is scheduled." (alterations added). At the time, N.S. also was receiving other medications including 2.5 mg/ml of Onfi Suspension, 500mg of Sabril twice a day, and 250 mg/5ml of Gabapentin Solution. The day after N.S.'s second dose of IVIG, Dr. Wolf notated, "[h]e [N.S.] continues with numerous clusters of spasms with no improvement." (alterations added).

The effect of IVIG treatment on reducing N.S.'s spasms is mentioned or discussed in numerous medical records included in the record before the Special Master, often in the context of medical history provided by N.S.'s parents to new healthcare providers. In one medical record, dated July 24, 2014, a provider described that N.S.'s parents had begun a ketogenic diet and reported:

> He [N.G.] is also receiving IVIg q monthly with improvement in the duration of his spasms. The week after he received the first infusion, he was seizure-free, but also had an illness where he was fasting for 3 days, so mother thinks that ketosis may have contributed to his seizure-free period.

(alteration added). A few days later, on July 28, 2014, Dr. Wolf, as part of a larger treatment plan, determined that N.S. would "[c]ontinue IVIG for few more courses since mom sees improvement with development" while continuing other medications. (alteration added). Years later, on April 26, 2017, a nurse practitioner noted, "[h]e [N.S.] was admitted in February for IVIG which Mom notes has contributed to improvement in his overall tone, eye contact and seems more alert." (alterations added).

N.S. was referred to Dr. Ethylin Wang Jabs, a clinical geneticist at the Clinical Genetics Program at the Icahn School of Medicine at Mount Sinai Medical Center, to assess whether his infantile spasms had a genetic etiology. According to Dr. Jabs's notes from N.S.'s clinical genetics consultation on April 18, 2014, Dr. Jabs "sent a CGH [comparative genomic hybridization] microarray to evaluate for possible microdeletions or duplications that may be associated with his [N.S.'s] spasms and developmental delays." (alterations added). The CGH microarray results indicated that N.S. had a "paternally inherited 160.1 kB duplication of 2p23.1" that is likely benign. Dr. Jabs also recommended N.S. undergo an infantile epilepsy panel from Gene Dx. On July 11, 2014, the Gene Dx genetic testing results were returned, indicating a positive result for a mutation in N.S.'s SCN2A gene. According to a May 26, 2020 expert report from respondent's expert Dr. Raymond, N.S.'s specific SCN2A variation, E1211K, is a "missense mutation" in which amino acids are changed. In particular, respondent's expert Dr. Raymond explained that N.S. "has been determined to have a pathogenic variation in his *SCN2A* gene," such that N.S. "has a transition from guanine to adenine at the position 3631 in his DNA which results in a change in the resultant protein of glutamic acid to lysine at amino acid position 1211." (italics in original).

The Gene Dx report ordered by Dr. Jabs stated that "[s]ome individuals with SCN2A mutations may never experience seizures" but that the E1211K variant is a "pathogenic mutation,[11] and its presence is consistent with the diagnosis of a SCN2A-related disorder in this patient [N.S]." (footnote and alterations added). Further, the Gene Dx report explained that the mutation's lack of presence in a genetic sequencing project is indicative that "it is not a common benign variant" in those of European and African American ancestry. At a July 23, 2014, Clinical Genetics follow up hospital visit, after receiving the Gene Dx report, Dr. Jabs, N.S.'s treating clinical geneticist, explained to N.S.'s parents that N.S.'s variant has been reported in a medical study as causing infantile spasms in another individual with the E1211K variant of the SCN2A gene. See Ogiwara et al., De novo mutations of voltage-gated sodium channel alpha II gene SCN2A in intractable epilepsies, 73 NEUROLOGY 1046 (2009) (the Ogiwara study). Referencing the Ogiwara study, Dr. Jabs's notes from the July 23, 2014 Clinical Genetics hospital visit stated that "[t]his mutation in *SCN2A* has been reported as a deleterious mutation in one other child with infantile spasms which progressed to generalized epilepsy." (alteration added; italics in original). According to Dr. Jabs's notes from the July 23, 2014 Clinical Genetics hospital visit, Dr. Jabs provided N.S.'s parents a copy of the Ogiwara study at their appointment. Both treating physician Dr. Jabs and respondent's expert Dr. Raymond noted that SCN2A is an evolutionary well-conserved gene. In his May 26, 2020 expert report, respondent's expert Dr. Raymond explained the significance of evolutionary conservation as follows: "Conservation or the same amino acid across similar channels in different species indicates that variations are not tolerated. This region in SCN2A is highly conserved across both vertebrate and invertebrate species."

As Dr. Ghacibeh, an expert for petitioner, explained in his July 21, 2021 expert report:

> Genetic testing revealed that [N.S.] carried a variant of the SCN2A gene. SCN2A is one of many genes responsible for encoding the sodium channels. Sodium channels are extremely important in neuronal transmission and interneuronal communication and their role spans the spectrum of early neuronal development as well as ongoing brain function in adults. Disorders in sodium channel, referred to as channelopathies, produce a spectrum of clinical disorders, ranging from asymptomatic carries to severe epilepsy and developmental delays.

(alteration added). In his May 26, 2020 expert report, Dr. Raymond, an expert for respondent, expanded on the specific functioning of sodium channels and how SCN2A mutations impact neurological function as follows:

> The gene *SCN2A* encodes a portion of the channel $Na_V1.2$ that controls the transport of sodium molecules across cell membranes in the neurons.

[11] A pathogenic mutation is a mutation that causes disease or morbid symptoms. See Pathogenic, DORLAND'S ILLUSTRATED MED. DICTIONARY 1375.

> Sodium, a charged molecule, needs to be tightly regulated in the flow across the cell membrane to maintain a gradient so that the neuron may send information in an appropriate way. This sodium channel is composed of three proteins, an α subunit and two β subunits, β1 and β2. The α subunit, the portion that is encoded by *SCN2A*, is a large molecule that forms a pore or opening across the membrane. It is important to recognize that this is not simply a hole in the fabric of the cell, but a highly complex chemical environment that allows the net passage of sodium from one side to another. In addition, it is not just a single pore, but is rather four subunits or domains which are numbered by the Roman numerals - I through IV. Each of these domains is made of up of six segments that span the entire width of the membrane. The region between segments five and six serves as the sodium pore for each of the domains while the preceding segment serves as the voltage responsive switch. When the voltage is at a certain level, the pores (space between segments five and six) “opens” and sodium ions are allowed through.
>
> Mutations in the SCN2A gene have been associated with several neurologic conditions. This is not unusual for genetic diseases and we are presently aware of multiple examples of this in medicine. Initially epilepsy causing mutations were seen in benign neonatal epilepsy but soon expanded to include severe phenotypes such [sic] Ohtahara syndrome, epilepsy of infancy with migrating focal seizures, infantile spasms or West syndrome, as well as others. The reason for this variation in diseases resulting from alterations in SCN2A rests on the structure of the channel and how the genetic mutation affects the function. Mutations that result in a complete loss of function or affect the primary function of the channel such as the pore region have been demonstrated to have a more severe disease or phenotype associated with them.

(alteration added; italics in original; internal citation omitted).

Following the discovery of N.S.’s genetic mutation, his seizures were still uncontrolled, but improving. On July 23, 2014, at the Clinical Genetics follow up visit, Dr. Jabs wrote, “[h]is spasms have improved with his current medical management, but he was currently experiencing clusters daily.” (alteration added). Dr. Jabs further described N.S. as “having 1-3 spasms daily that last 3-10 minutes, but occasionally has seizure free days. His development has improved and he is now sitting independently, laughs in response to stimuli, and reaches for objects.” Under the heading “Current Medications,” Dr. Jabs indicated that N.S. is taking vitamin D2, omeprazole, and vigabatrin (Sabril). In the same report, Dr. Jabs noted that N.S. has a clinical response to vigabatrin, that he is receiving IVIG monthly, and that he should continue his current therapies to improve and maintain his skills.

On March 30, 2015, two-year-old N.S. was described to have a “long standing history of global neurodevelopmental impairments, hypotonia and medically difficult to

control epilepsy" during his initial visit with pediatric neurologist Dr. Judith Bluvstein of NYU Langone Medical Center. Meaningful seizure control was parentally reported to Dr. Bluvstein to have occurred around December of 2014, a year after the infantile spasms began in November of 2013. N.S.'s current treatment regimen at the time of the visit with Dr. Bluvstein was Vigabatrin (Sabril), a low-carbohydrate gluten-free diet, and cannabidiol. N.S.'s prior anticonvulsant history was parentally reported, and it was notated that ACTH and Valproic acid were ineffective, Topiramate and Onfi worsened seizures, and IVIG had been received monthly for close to a year. At the March 30, 2015, visit, Dr. Bluvstein recommended N.S. complete his immunizations. On May 25, 2015, a nurse practitioner at NYU Langone Medical Center notated:

> His last IVIG was in April 2015 and since then Mom has noted regression in many areas of developmental. [sic] His tone has been more hypotonic, not sitting up like he used to. His speech, he has been making more sounds, eye contact is better but overall health and coordination have been the main concern. Parents are scheduled to be tested for the SCN2A variant. Mom wants another course of IVIG.

(alteration added). At a follow up visit with Dr. Bluvstein on June 29, 2016, Dr. Bluvstein indicated that N.S. was "outgrowing" his Sabril dose given recent breakthrough seizures.

According to medical records from an April 19, 2016 psychological evaluation of N.S., conducted by Dr. V. Kishinevsky of the Challenge Early Intervention Center, N.S. was diagnosed with severe autism-spectrum disorder. On November 16, 2020, during a virtual health visit, it was reported "[o]verall, [N.S.] has remained stable with no clinical seizures observed. He has not received IVIG in almost a year and Mom has noticed a decline in his strength and core." (alterations added). On March 7, 2021, N.S. was noted to be receiving Clobazam and a monthly IVIG infusion that was interrupted by COVID-19. Moreover, according to an Individualized Education Program plan for N.S., as of May 17, 2024, N.S. still was unable to speak or walk on his own.

**Proceedings before the Special Master**

On November 15, 2016, petitioner, represented by Robert J. Krakow, filed the petition for Ms. Skorupska for vaccine compensation with the Office of the Special Masters. On November 16, 2016, the case was assigned to Special Master Moran. While initially represented by Mr. Krakow, Ms. Skorupska also filed a number of medical records and an affidavit signed by her on September 18, 2017 with the Special Master. On July 24, 2019, Mr. Krakow requested permission to withdraw because "petitioner and counsel are at an impasse about the appropriate way to proceed in this case." On August 7, 2019, the Special Master approved Mr. Krakow's motion to withdraw his representation and Ms. Skorupska proceeded pro se for approximately 13 months. While appearing pro se, Ms. Skorupska filed an expert report from Dr. Arthur E. Brawer, a rheumatologist. In response, respondent submitted an initial expert report from Dr. Gerald V. Raymond, a neurologist and geneticist referred to above. Also while appearing pro se, Ms. Skorupska submitted

a second report from Dr. Brawer responding to the opinion of respondent's expert Dr. Raymond.

Thereafter, on September 28, 2020, attorney Phyllis Widman began representing Ms. Skorupska in the case she had brought on behalf of N.S. After respondent objected to Dr. Brawer's lack of expertise in a field relevant to petitioner's case, Ms. Widman obtained an additional expert report from Dr. Georges A. Ghacibeh, a neurologist, see Skorupska v. Sec'y of Health & Hum. Servs., 2026 WL 674607, at *5-6, leading respondent to submit a second report from its expert, Dr. Raymond, responding to the remarks of petitioner's expert Dr. Ghacibeh. Ms. Skorupska filed a second report from her expert Dr. Ghacibeh (her fourth report total), which respondent answered with Dr. Raymond's third report. Shortly thereafter, Ms. Widman requested the opportunity to obtain the report of a geneticist and subsequently submitted an expert report from Dr. AHM M. Huq, a geneticist and pediatric neurologist. In total, petitioner submitted seven expert reports: two from Dr. Brawer, three from Dr. Ghacibeh, and two from Dr. Huq. Respondent submitted five expert reports, all from Dr. Raymond.

On September 16, 2024, Ms. Skorupska filed an amended petition before the Special Master. Like her original petition, Ms. Skorupska alleged in her amended petition a "cause-in-fact" or "off-Table" injury to N.S. "by the haemophilus influenza ('Hib') vaccine that [N.S.] received on November 16, 2013." (alteration added). Also like her original petition, Ms. Skorupska alleged, "[i]n addition, or in the alternative, as a result of the effects of the Hib vaccination, [N.S.] suffered a significant aggravation of a preexisting condition." (alterations added). According to Ms. Skorupska's amended petition, "[a]mong the injuries [N.S.] suffered as a result of receiving the Hib vaccine are infantile spasm, seizure disorder, and neurological injury resulting in multiple injuries, manifesting as developmental disorder, developmental delay, developmental injury, <u>as well as vision loss as a result of taking anti-seizure medication (as a sequela)</u>." (emphasis in original; alterations added).[12]

After briefing was complete, the case was decided by Special Master Moran on February 10, 2026, in a "<u>**DECISION DENYING ENTITLEMENT TO COMPENSATION**</u>." See Skorupska v. Sec'y of Health & Hum. Servs., 2026 WL 674607, at *1 (all emphasis in original). Special Master Moran's decision included several sections, including a factual background and procedural history on the case, the legal standards for adjudication, and a determination of the "appropriate diagnosis" for N.S., before considering the ultimate question of causation and compensation. See id. at *1-8. With respect to the legal standards for adjudication, the Special Master explained that, pursuant to the Vaccine Act, petitioner bore the initial burden to establish her case by a preponderance of the evidence, which requires "a 'trier of fact to believe that the existence of a fact is more probable than its nonexistence before [he] may find in favor of the party who has the

[12] It appears that the only difference between Ms. Skorupska's original petition and her amended petition was the new allegation, in the amended petition, that N.S. suffers from "<u>vision loss as a result of taking anti-seizure medication (as a sequela).</u>" (emphasis in original).

burden to persuade the judge of the fact's existence.'" See id. at *7 (alteration in original) (citing 42 U.S.C. § 300aa-13(1)(a); and quoting Moberly ex rel. Moberly v. Sec'y of Health & Hum. Servs., 592 F.3d 1315, 1322 n.2 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2010)). The Special Master also indicated, as an initial matter, that there was some disagreement in the record before the Special Master with respect to whether N.S.'s appropriate diagnosis was "developmental and epileptic encephalopathy 11 (DEE11),"[13] as suggested by respondent's expert Dr. Raymond, or "infantile spasms," as suggested by petitioner's expert Dr. Huq. See Skorupska v. Sec'y of Health & Hum. Servs., 2026 WL 674607, at *7-8. The Special Master concluded, "for the ease of analysis, this decision will proceed upon the assumption that an appropriate diagnosis for N.S. is infantile spasms" because "it is not readily apparent that any difference in nomenclature would change the analysis." Id. at *8.

As indicated above, in her amended petition, Ms. Skorupska alleged that the Hib vaccine administered to N.S. on November 16, 2013 resulted in "infantile spasm, seizure disorder, and neurological injury" that caused N.S. developmental injury. Moreover, Ms. Skorupska alleged, "[i]n addition, or in the alternative," that N.S. "suffered a significant aggravation of a preexisting condition" as a result of the Hib vaccination. (alteration added). According to the Special Master, in cases in which the petitioner advances both an initial onset claim and a significant aggravation claim, "the test is whether the vaccinee manifested problems before the vaccination." See Skorupska v. Sec'y of Health & Hum. Servs., 2026 WL 674607, at *8 (citations omitted). The Special Master categorized Ms. Skorupska's claim as an off-Table[14] significant aggravation claim, rather than an off-Table initial onset claim. See id. Specifically, the Special Master concluded that "it is appropriate to categorize Ms. Skorupska's case as presenting a significant aggravation claim" because "ample evidence shows that N.S. was experiencing at least some neurologic problems / developmental delay before the vaccination." Id.

The Special Master explained that the elements necessary to demonstrate an off-Table, significant aggravation claim were articulated in Loving ex rel. Loving v. Secretary of the Department of Health and Human Services, 86 Fed. Cl. 135, 144 (2009), and were adopted by the United States Court of Appeals for the Federal Circuit in W.C. v. Secretary of Health and Human Services, 704 F.3d 1352, 1357 (Fed. Cir. 2013). See Skorupska v. Sec'y of Health & Hum. Servs., 2026 WL 674607, at *8-9. As the Special Master explained in his decision, regarding Loving:

> the Court blended the test from Althen v. Sec'y of Health & Hum. Servs., 418 F.3d 1274, 1279 (Fed. Cir. 2005), which defines off-Table causation

---

[13] Encephalopathy is a general term for any degenerative disease of the brain. See Encephalopathy, DORLAND'S ILLUSTRATED MED. DICTIONARY 608.

[14] It is undisputed by the parties before the court that Ms. Skorupska's claim on behalf of N.S. is an off-Table claim. Both petitioner's original petition and amended petition requested compensation under the Vaccine Program "for injuries caused-in-fact, (a 'cause-in-fact' or 'off-Table' injury) to her son, NS . . . ." (omission added).

> cases, with a test from Whitecotton v. Sec'y of Health & Hum. Servs., 81 F.3d 1099, 1107 (Fed. Cir. 1996), which concerns on-Table significant aggravation cases.

Skorupska v. Sec'y of Health & Hum. Servs., 2026 WL 674607, at *8. The Special Master stated that the Loving test's six prongs, as originally identified by a Judge of the United States Court of Federal Claims, are as follows:

> (1) the person's condition prior to administration of the vaccine, (2) the person's current condition (or the condition following the vaccination if that is also pertinent), (3) whether the person's current condition constitutes a "significant aggravation" of the person's condition prior to vaccination, (4) a medical theory causally connecting such a significantly worsened condition to the vaccination, (5) a logical sequence of cause and effect showing that the vaccination was the reason for the significant aggravation, and (6) a showing of a proximate temporal relationship between the vaccination and the significant aggravation.

Skorupska v. Sec'y of Health & Hum. Servs., 2026 WL 674607, at *8-9 (quoting Loving ex rel. Loving v. Sec'y of Dep't of Health & Hum. Servs., 86 Fed. Cl. at 144). The Special Master further explained that, "[i]n addressing a significant aggravation claim, Special Masters may focus upon the last three elements in the Loving test, which correspond to the three prongs of the well-established Althen test."[15] Skorupska v. Sec'y of Health & Hum. Servs., 2026 WL 674607, at *9 (alteration added; citations omitted). Accordingly, the Special Master focused his decision on "Loving Prong 4 / Althen Prong 1," "Loving Prong 5 / Althen Prong 2," and "Loving Prong 6 / Althen Prong 3." See Skorupska v. Sec'y of Health & Hum. Servs., 2026 WL 674607, at *9, *12, *14.[16]

---

[15] In Althen v. Secretary of Health and Human Services, the United States Court of Appeals for the Federal Circuit stated that, in the context of an off-Table initial onset claim, it is the petitioner's burden to show, by preponderant evidence, that the vaccination caused the injury "by providing: (1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of a proximate temporal relationship between vaccination and injury." Althen v. Sec'y of Health & Hum. Servs., 418 F.3d at 1278.

[16] As indicated above, in his decision, the Special Master notes that the last three prongs in the Loving test "correspond to" the three prongs in the Althen test and, therefore, the Special Master refers to the various prongs throughout his decision as the Loving / Althen prongs. See Skorupska v. Sec'y of Health & Hum. Servs., 2026 WL 674607, at *9, *12, *14. Although the last three Loving prongs were derived from, and are very similar to, the Althen prongs, this court notes that the last three Loving prongs are not identical to the Althen prongs. Compare Althen v. Sec'y of Health & Hum. Servs., 418 F.3d at 1278 (identifying the required elements to prove an off-Table initial onset claim as "(1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause

In his decision, under the heading "Loving Prong 4 / Althen Prong 1," Special Master Moran stated that "[t]he first Althen prong, which corresponds to the fourth Loving prong, requires a petitioner to present a reliable and persuasive medical theory." Skorupska v. Sec'y of Health & Hum. Servs., 2026 WL 674607, at *14 (alteration added) (citing Boatmon v. Sec'y of Health & Hum. Servs., 941 F.3d 1351, 1359 (Fed. Cir. 2019)). The Special Master explained his understanding of Ms. Skorupska's medical theory of the case as follows: "Ms. Skorupska presents the theory that the Hib vaccine caused inflammation, which 'caused altered connectivity, which in turn, caused epilepsy'" and that while N.S.'s underlying SCN2A genetic mutation "made him more likely to have the particular reaction to the vaccine," the SCN2A mutation alone does not explain N.S.'s infantile spasms. See Skorupska v. Sec'y of Health & Hum. Servs., 2026 WL 674607, at *14. The Special Master reiterated respondent's position on petitioner's medical theory, stating that "[t]he Secretary argues that 'there is an utter lack of evidence in this case that the Hib vaccine can cause proinflammatory cytokines that ultimately, and deleteriously, affect voltage-gated sodium channels encoded by SCN2A.'" Id. (alteration added). The Special Master did not, however, base his discussion on whether petitioner "presented a reliable and persuasive medical theory," as required by Althen prong one and Loving prong four. The Special Master instead stated that "a fulsome analysis of the [medical] theory is not necessary" because "[a] finding that a petitioner has not met one element of the Althen prongs justifies a denial of compensation" and because "Ms. Skorupska has not carried her burden under the other Loving / Althen prongs." See Skorupska v. Sec'y of Health & Hum. Servs., 2026 WL 674607, at *14 (alterations added).

---

and effect showing that the vaccination was the reason for the injury; and (3) a showing of a proximate temporal relationship between vaccination and injury"), with Loving ex rel. Loving v. Sec'y of Health & Hum. Servs., 86 Fed. Cl. at 144 (identifying the required elements to prove an off-Table significant aggravation claim to include "(4) a medical theory causally connecting such a significantly worsened condition to the vaccination, (5) a logical sequence of cause and effect showing that the vaccination was the reason for the significant aggravation, and (6) a showing of a proximate temporal relationship between the vaccination and the significant aggravation."). Therefore, the Althen prongs apply more specifically to off-Table initial onset claims, whereas the Loving prongs apply to off-Table significant aggravation claims. See W.C. v. Sec'y of Health & Hum. Servs., 704 F.3d at 1357 (holding that "the Loving case provides the correct framework for evaluating off-table significant aggravation claims"). Regardless of the confusing terminology chosen by the Special Master in his decision, however, as discussed more fully below, the Special Master's decision illustrates that the Special Master fully considered the record before him when concluding that petitioner had failed to carry her burden of showing causation for either an initial onset claim or a significant aggravation claim. See, e.g., Skorupska v. Sec'y of Health & Hum. Servs., 2026 WL 674607, at *11 ("Overall, Ms. Skorupska has not presented a logical sequence of cause and effect connecting the Hib vaccination to the change in N.S.'s health in November 2013 (regardless of whether this change is categorized as a new injury for Althen or the significant aggravation of a pre-existing problem for Loving).").

Under the heading "Loving Prong 5 / Althen Prong 2," Special Master Moran stated that "special masters may consider whether the vaccinee responds in a way predicted by the expert's theory." Skorupska v. Sec'y of Health & Hum. Servs., 2026 WL 674607, at *9 (citing Hibbard v. Sec'y of Health & Hum. Servs., 698 F.3d 1355, 1364 (Fed. Cir. 2012); and La Londe v. Sec'y of Health & Hum. Servs., 110 Fed. Cl. 184, 205 (2013), aff'd sub nom. LaLonde v. Sec'y of Health & Hum. Servs., 746 F.3d 1334 (Fed. Cir. 2014)). The Special Master found that Ms. Skorupska did not meet her burden to demonstrate a logical sequence of cause and effect connecting the Hib vaccination to N.S.'s injuries because "Ms. Skorupska has not persuasively established that N.S. suffered deleterious inflammation within a relevant time of the vaccination" as petitioner's offered evidence of N.S.'s IVIG response, blood tests, and hospital intake forms were not persuasive. See Skorupska v. Sec'y of Health & Hum. Servs., 2026 WL 674607, at *10. Under the heading "Loving Prong 5 / Althen Prong 2," the Special Master also considered whether the opinions and commentary of N.S.'s treating doctors supported vaccine causation generally, outside of the specific context of inflammation. See Skorupska v. Sec'y of Health & Hum. Servs., 2026 WL 674607, at *11. According to Special Master Moran, the parties "say relatively little about treating doctors" in their briefs submitted to the Special Master. See id. The Special Master did reference the July 23, 2014 report from clinical geneticist Dr. Jabs, who advised N.S.'s parents that his genetic mutation "may be causative" and who called N.S.'s SCN2A mutation "deleterious," which the Special Master found provided "[s]trong support for the Secretary's opinion" that "the treating physicians statements heavily weigh against causation in this case[.]" See id. (alterations added).

Under the heading "Loving Prong 6 / Althen Prong 3," Special Master Moran began by stating that "[a] petitioner must show the 'timeframe for which it is medically acceptable to infer causation' and that the onset of the disease occurred in this period." See Skorupska v. Sec'y of Health & Hum. Servs., 2026 WL 674607, at *12 (alteration added) (quoting Shapiro v. Sec'y of Health & Hum. Servs., 101 Fed. Cl. 532, 542-43 (2011), recons. denied after remand on other grounds, 105 Fed. Cl. 353 (2012), aff'd, 503 F. App'x 952 (Fed. Cir. 2013)). The Special Master found that "N.S. started having spasms on November 20, 2013 (or four days after vaccination)," based on the contemporaneous medical records. See Skorupska v. Sec'y of Health & Hum. Servs., 2026 WL 674607, at *4, *13. According to the Special Master, Ms. Skorupska attempted to offer evidence for a timeframe for inferable causation of "within the first 72 hours – six days," including two medical articles which discussed febrile seizure onset within 72 hours and which, therefore, did not support petitioner's suggested timeframe of up to six days. See id. at *12-13.[17] The Special Master found that, even if he credited up to 72 hours as a temporally

[17] The medical articles in question are by Blanca Tro-Baumann et al., which the Special Master describes as finding "that the majority of children with Dravet's syndrome experienced febrile seizures within 72 hours of a vaccination against diphtheria-tetanus-pertussis" and by Neinke E. Verbeek et al., which the Special Master describes as finding "febrile seizures within 24 hours of a vaccination in children with Dravet's syndrome." See Skorupska v. Sec'y of Health & Hum. Servs., 2026 WL 674607, at *12 (citing Blanca Tro-Baumann et al., A retrospective study of the relation between vaccination and occurrence of seizures in Dravet syndrome, 52 EPILEPSIA 175 (2011); and Neinke E. Verbeek et al.,

significant onset period, Ms. Skorupska had not established N.S.'s symptoms developed within a 72-hour, or three-day, timeframe post-vaccination because the record demonstrated infantile spasm onset at four days after the Hib vaccination was administered to N.S. See id. at *13. Therefore, the Special Master concluded that "Ms. Skorupska has failed to meet her burden regarding timing" and "[r]egardless, if Ms. Skorupska were found to have prevailed on the timing element, she would still not be entitled to compensation due to deficiencies in other parts of her case." See id. (alteration added).

Moreover, the Special Master explained that, hypothetically, "[i]f, for the sake of argument, it were assumed that Ms. Skorupska had met her burden of proof" under the Loving / Althen prongs, then the burden would have shifted to respondent to show by a preponderance of the evidence that "N.S.'s 'condition . . . is due to factors unrelated to the administration of the vaccine.'" See Skorupska v. Sec'y of Health & Hum. Servs., 2026 WL 674607, at *15 (omission in original; alteration added) (quoting 42 U.S.C. §300aa-13(1)(B)). Before the Special Master, respondent asserted that N.S.'s condition was due to his E1211K variant of the SCN2A gene, a "factor unrelated" to the vaccination, and asserted that respondent's expert Dr. Raymond had provided eleven case studies or examples in the medical literature documenting this genetic variant. See Skorupska v. Sec'y of Health & Hum. Servs., 2026 WL 674607, at *15. The Special Master explained to petitioner in his decision why he, theoretically, could find that the mutation could be a persuasive sole cause of N.S.'s condition, writing that "[t]he lack of unaffected individuals contrasts with the number of examples in the literature of children with the same mutation and who developed neurologic problems similar to N.S.'s problems." Id. at *17 (alteration added). The Special Master continued that although some SCN2A variants may have different outcomes, the Special Master agreed with respondent's expert Dr. Raymond's opinion that E1211K, N.S.'s variant, "appears to lead to neurologic problems always," given the consistency of outcomes in the literature. See id. at *19. Thus, the Special Master stated that, hypothetically, had Ms. Skorupska indeed succeeded on the Loving / Althen factors in support of her case and had the burden shifted to respondent to prove a "factor unrelated," the Special Master believed that respondent might well have succeeded in proving a "factor unrelated," which, according to the Special Master, also would have precluded Ms. Skorupska from receiving compensation because "a preponderance of the evidence supports the finding that N.S.'s genetic variant caused and was the sole cause of his neurologic problem." See Skorupska v. Sec'y of Health & Hum. Servs., 2026 WL 674607, at *19. In sum, the Special Master wrote, "even if it

---

Prevalence of SCN1A-related dravet syndrome among children reported with seizures following vaccination: a population-based ten-year cohort study, 8 PLOS ONE 1 (2013)). According to the Special Master, N.S. did not have febrile seizures. See Skorupska v. Sec'y of Health & Hum. Servs., 2026 WL 674607, at *13. As discussed later in this Opinion, the Special Master was skeptical in his decision regarding whether "Tro-Baumann and Verbeek, two articles about febrile seizures, provide information about the time that afebrile seizures develop after vaccination[.]" See id. (alteration added). Moreover, in her Reply in this court, Ms. Skorupska indicated that it is an "undisputed fact that N.S.'s seizures were **afebrile**." (emphasis in original).

were found that Ms. Skorupska met her burden of presenting a persuasive case for each of the Loving prongs, she would remain not entitled to compensation because the Secretary would have met his burden to present a factor unrelated to the vaccination caused N.S.'s condition." Skorupska v. Sec'y of Health & Hum. Servs., 2026 WL 674607, at *19.

**Proceedings before this Court**

After the Special Master issued his decision, petitioner filed a Motion for Review of the decision.[18] Ms. Skorupska raised eight objections in an attempt to support her position that "the Special Master's Decision was arbitrary, capricious, an abuse of discretion and/or otherwise not in accordance with the law." As discussed further below, Ms. Skorupska primarily objected to the Special Master's findings that N.S. did not suffer from inflammation, that N.S. did not have symptom onset within an appropriate timeframe, and that the Special Master improperly considered N.S.'s SCN2A mutation as a potential alternative cause of N.S.'s injury.

On March 17, 2026, respondent filed a Motion to Strike Ms. Skorupska's Motion for Review because it totaled 28 pages, exceeding the 20-page limit without leave of the court and allegedly impairing respondent's ability to fully respond within 20 pages. This court denied the Motion to Strike on March 23, 2026, stating that the Motion to Strike was "a waste of resources for the respondent, the petitioner, and the court," and indicating that the court could consider a motion for enlargement or motion to exceed the page limit by the respondent if necessary. On April 13, 2026, respondent filed its response to petitioner's Motion for Review addressing the eight objections raised by petitioner in the Motion for Review. Respondent asserted that petitioner's Motion for Review "is an attempt to relitigate the case" and that petitioner fails to show the Special Master committed reversible error.

In her first objection, Ms. Skorupska alleges that the Special Master committed legal error by relying on N.S.'s three early intervention reports as "definitive evidence" of delay and asserted that the three early intervention reports should be "viewed as interpretive and provisional, rather than definitive evidence of persistent deficits." In her second objection, Ms. Skorupska asserts the Special Master abused his discretion by "**giving more weight to Dr. Raymond's opinion that N.S. was severely delayed based on the frequency of therapy treatment**" because therapy frequency is an "administrative adjustment" which is not based on "clinical determination of disorder

---

[18] Petitioner's Memorandum in support of her Motion for Review and Petitioner's Reply before this court state they are "Respectively Submitted" by Bernadette Skorupska, "[s]oon to be pro se." (alteration added). Below these statements on both documents, however, Ms. Widman signed below the statement: "Current attorney of record and electronically filed by." There has not been a motion to withdraw representation of Ms. Widman before this court and Ms. Widman has continued to appear for petitioner and argued petitioner's case at the oral argument on petitioner's Motion for Review in the above captioned case.

severity." (emphasis in original). In response to petitioner's first two objections, respondent asserts that this does not meet the "not wholly implausible" high bar for reversible error articulated in Cedillo v. Secretary of Health and Human Services, as "the record clearly supports the Special Master's findings" and "there is no dispute" that N.S.'s mutation "was clinically manifest prior to vaccination in the form of developmental delay." (citing Cedillo v. Sec'y of Health & Hum. Servs., 617 F.3d 1328, 1338 (Fed. Cir. 2010)). Respondent recounts the findings from N.S.'s November 13, 2013 pre-vaccination appointment with neurologist Dr. Schwartzberg and argues "[t]he fact that a brain MRI, EEG, and chromosomal testing were planned" goes to support the Special Master's finding that the agreed upon delay was not mild and was instead significant prior to vaccination. (alteration added).

In her third numbered objection, Ms. Skorupska alleges the Special Master was arbitrary and capricious when he found that IVIG offered only brief improvement because it is a "selective reading of the medical record," as "[l]ater progress notes reflect significant and sustained seizure control, eventual discontinuation of adjunct anti-seizure medications, and long-term maintenance of stability attributable to IVIG." (alteration added). In response to petitioner's third objection, respondent asserts that, "[a]t base, Dr. Ghacibeh [petitioner's expert] cited IVIG therapy to argue that N.S. had an autoimmune condition, and now, petitioner only provides attorney argument to allege that a response to IVIG evidences vaccine-related inflammation, unrelated to an autoimmune condition." (alterations added).

In her fourth numbered objection, Ms. Skorupska alleges Special Master Moran "**erred by incorrectly holding that the treating physicians uniformly attributed** [N.S.]**'s condition to his genetic variant. This is contradicted by the record**." (emphasis in original; alteration added). Ms. Skorupska points to the recognition by both N.S.'s pediatrician, Dr. Lis, and N.S.'s treating neurologist, Dr. Schwartzberg, of "the temporal relationship between the Hib vaccination and the onset of seizures," particularly referencing a January 29, 2016, letter written by Dr. Lis, which petitioner argues was "explicitly linking the reaction to the vaccination."[19] In response to petitioner's fourth objection, respondent argues that the Special Master acted within his right to consider, but not be bound by, treating physicians' statements, that the two cited doctors' letters from Dr. Schwartzberg and Dr. Lis do not actually support causation, and that "no specialist attributed N.S.'s condition to vaccination"[20] but some specialists did attribute his condition to N.S.'s genetic mutation.

---

[19] Dr. Lis's January 29, 2016 letter was addressed "To Whom It May Concern" and stated that N.S. "received the HIB immunization (PMC, Lot#UH868AB, Exp. Date: 12/01/2014) on 11/16/2013 which resulted in him having infantile spasm type seizures." (capitalization in original).

[20] As discussed more fully below, although Dr. Lis's January 29, 2016, first letter suggested that the Hib vaccination "resulted in him [N.S.] having infantile spasm type seizures," (alteration added), this court notes that, on February 1, 2016, three days after Dr. Lis's first letter referenced above, Dr. Lis wrote a second "To Whom It May Concern"

In her fifth numbered objection, Ms. Skorupska objects to the Special Master's timing analysis as arbitrary and capricious. Ms. Skorupska asserts:

> To suggest that Petitioner's affidavit implies N.S. was experiencing seizures prior to his vaccination is absolutely unfounded. It was N.S.'s unusual reaction following the vaccination that prompted Petitioner to seek medical care. Following his pediatrician's instructions, Petitioner gave him Tylenol when he developed a fever the night after vaccination and was told to take him to the hospital if the symptoms persisted. Petitioner strictly followed this medical advice. Further, the letter from his pediatrician confirms that [N.S.'s] post-vaccination reaction led to further evaluation and treatment. Therefore, it is inaccurate to claim that the timing of his injury is not established; the onset clearly occurred after the vaccination.

(alteration added). In response to petitioner's fifth objection, respondent notes this is petitioner's "only objection concerning Althen's third prong" and "appears to be premised on an incorrect belief that the Special Master found that N.S.'s spasms began prior to vaccination" when "[i]n fact, the Special Master explicitly found that spasms began four days after vaccination." (alteration added).

In her sixth numbered objection, Ms. Skorupska claims the Special Master **"erred in holding that Dr. Raymond's expert opinion outweighed the causation analysis of Petitioner's experts**" as "[t]he referenced cases in the literature differ meaningfully from N.S.'s clinical course, in both outcome and treatment." (emphasis in original; alteration added). In response to petitioner's sixth objection, respondent asserts that "[t]he evidentiary value of the case reports is not that N.S.'s course was identical to those subjects," but instead "they show that, as predicted with a switch of nucleic acids from guanine to adenine, the uniform outcome of the E1211K variant is devastatingly pathological and is consistent with N.S.'s course," meaning there is no mild phenotype.[21] (alteration added).

In her seventh numbered objection, Ms. Skorupska asserts that the Special Master "**incorrectly rejected the** [inflammation] **theory**" because the Special Master's "conclusion that N.S. did not experience such inflammation relies heavily on diagnostic methods that are not capable of reliably detecting it." (emphasis in original; alteration added). Ms. Skorupska points to the limitations of a non-contrast MRI, the elevated lymphocytes in the emergency room "complete blood count (CBC)," which, according to Ms. Skorupska, were dismissed "without meaningful analysis," and the blood work in the

---

letter indicating that "[t]he child [N.S.] is severely delayed due to a genetic mutation (SCN2A) causing epilepsy, hypotonia, sensory, communication and motor impairments." (alterations added).

[21] A phenotype is the observable morphologic, biochemical, and physiologic characteristics of an individual. See Phenotype, DORLAND'S ILLUSTRATED MED. DICTIONARY 1410.

record with "markers consistent with encephalopathy."[22] In response to petitioner's seventh objection, respondent argues that that "the record amply supports" a finding that N.S. was not experiencing inflammation as "no treating physician, and importantly, no expert for either party maintained that there was case-specific evidence of acute inflammation (whether inflammation was caused by vaccination or not)." Respondent further contends that petitioner's reliance on the singular CBC "is completely lacking in record support," and further that N.S.'s lymphocytes "were in the normal range," that his MRI was normal, and that, per Dr. Raymond, "[t]here is no evidence presented that NS had a breach in his blood-brain barrier," which separates the central nervous system from the rest of the body, all lending to the Special Master's conclusion there was no inflammatory state. (alteration added).

In her eighth and final numbered objection, petitioner asserts that "[**t**]**he Special Master erred in not giving enough weight to the expert opinion of** [her expert] **Dr. Ghacibeh because he is credible and his opinions are supported by the record**." (emphasis in original; alterations added). In support, petitioner first points to the timing of spasm onset:

> If the SCN2A mutation were solely responsible for N.S.'s condition, his seizures would have been expected to appear far earlier, within the first weeks or months of life, consistent with the medical literature on pathogenic SCN2A variants. Instead, N.S.'s seizures began precisely on the day he received the Hib vaccine, which represents a medically significant temporal link. The decision fails to meaningfully address this timing element, despite its recognized importance in causation analysis under the Althen and Loving frameworks.

In response to petitioner's first assertion in her eighth objection regarding medical literature that petitioner alleges demonstrates that mutation-caused spasm onset would have occurred earlier, respondent writes, "the allegation lumps in <u>other</u> genetic mutations of the SCN2A gene and is not specific to E1211K, like here." (emphasis in original). To address petitioner's second assertion about spasm onset, respondent states that "the record does not preponderantly support" petitioner's assertion that "'N.S.'s seizures began precisely on the day he received the Hib vaccine.'" Respondent asserts that "the Special Master explicitly found that spasms began four days after vaccination, consistent with the medical records."

Petitioner filed a Reply to the Motion for Review on April 24, 2026, in which petitioner asserts that the Special Master's findings "relied on non-probative evidence, selectively ignored critical record support, and improperly elevated alternative causation evidence into a dispositive finding," which, according to petitioner, constitutes reversible error. Ms. Skorupska asserts for the first time in her Reply that the Special Master "relied

[22] The paragraphs of Ms. Skorupska's Motion for Review discussing the alleged evidence of inflammation do not have any citations to support her argument that N.S.'s blood markers are evidence of inflammation.

on literature concerning febrile seizures, despite the undisputed fact that N.S.'s seizures were **afebrile**," which created error in his timing analysis. (emphasis in original). In her Reply to the Motion for Review, petitioner summarizes the findings of three medical studies not previously entered into the record in this court or before the Special Master in an attempt to further support her claim that the Special Master mischaracterized the role of N.S.'s genetic mutation. Ms. Skorupska claims that these three studies demonstrate that "distinct loss-of-function (LoF) mechanisms (including variants like E1211K) are associated with broad phenotypic ranges, but relationships between biophysical dysfunction and clinical outcome remain 'unclear' and not reliably predictive." Ms. Skorupska, therefore, asserts that "[N.S.]'s clinical course (apparent discordance between typical developmental delay and seizure concordance in other E1211K cases) does not align with the 'clear' determinism claimed by [respondent's expert] Dr. Raymond," which is "consistent with the broader literature" in which SCN2A mutations are described as a spectrum. (alterations added).

In her Reply in this court, Ms. Skorupska also asserts that the Special Master acted contrary to United States Court of Appeals for the Federal Circuit precedent that "alternative cause evidence may be considered but cannot replace the required causation analysis." (citing Stone v. Sec'y of Health & Hum. Servs., 676 F.3d 1373 (Fed. Cir. 2012); and Doe v. Sec'y of Health & Hum. Servs., 601 F.3d 1349 (Fed. Cir. 2010)). Ms. Skorupska emphasizes that "[t]he presence of pre-vaccination developmental delays does not establish that catastrophic regression, particularly of the magnitude seen here, was inevitable" and that seizure onset shortly after vaccination represents a "distinct inflection point" that supports a "theory of triggering or acceleration." (alteration added). Additionally, Ms. Skorupska asserts for the first time in her Reply that the Special Master was arbitrary in his evaluation of the testimony of petitioner's experts generally as "[r]espondent's expert relied on literature that was not directly comparable to N.S.'s case, while Petitioner's experts provided a coherent and biologically plausible explanation supported by the record." (alteration added). Ms. Skorupska alleges that the Special Master inadequately considered her experts' reasoning before rejecting their testimony which "constitutes reversible Error."

## DISCUSSION

In order for compensation to be awarded under the Vaccine Program, a Special Master or court must find, based on the record as a whole,

> (A) that the petitioner has demonstrated by a preponderance of the evidence the matters required in the petition by section 300aa-11(c)(1) of this title, and
>
> (B) that there is not a preponderance of the evidence that the illness, disability, injury, condition, or death described in the petition is due to factors unrelated to the administration of the vaccine described in the petition.

42 U.S.C. §§ 300aa-13(a)(1)(A)-(B) (2024). There are generally two ways a petitioner can receive compensation under the Vaccine Program. See 42 U.S.C. § 300aa-11(c)(1). One way is for the petitioner to prove that petitioner suffered a vaccine related injury included in the Vaccine Injury Table from a vaccine also included in the Vaccine Injury Table. See 42 U.S.C. § 300aa–11(c)(1)(A); see also 42 U.S.C. § 300aa-11(c)(1)(C)(i). Another way to receive compensation under the Vaccine Program is for petitioner to prove that petitioner sustained, or had significantly aggravated, an illness, disability, injury, or condition not set forth in the Vaccine Injury Table, but which was caused by a vaccine that is listed on the Vaccine Injury Table. See 42 U.S.C. § 300aa–11(c)(1)(C)(ii)(I). If the petitioner establishes a prima facie case of causation, the respondent then has an opportunity to show by a preponderance of the evidence that the injury is caused by "factors unrelated to the administration of the vaccine" and defeat the claim. See 42 U.S.C. § 300aa-13(a)(1)(B); see also Shalala v. Whitecotton, 514 U.S. 268, 270-71 (1995); White v. Sec'y of Health & Hum. Servs., 163 F.4th 1356, 1361 (Fed. Cir. 2025); Deribeaux ex rel. Deribeaux v. Sec'y of Health & Hum. Servs., 717 F.3d 1363, 1367 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2013); Locane v. Sec'y of Health & Hum. Servs., 685 F.3d 1375, 1379 (Fed. Cir. 2012); de Bazan v. Sec'y of Health & Hum. Servs., 539 F.3d 1347, 1351 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2008).

As the United States Court of Appeals for the Federal Circuit stated in Althen v. Secretary of Health and Human Services:

> The Act provides for the establishment of causation in one of two ways: through a statutorily-prescribed presumption of causation upon a showing that the injury falls under the Vaccine Injury Table ("Table Injury"), see 42 U.S.C. § 300aa–14(a); or where the complained-of injury is not listed in the Vaccine Injury Table ("off-Table injury"), by proving causation in fact, see 42 U.S.C. §§ 300aa–13(a)(1), –11(c)(1)(C)(ii)(I).

Althen v. Sec'y of Health & Hum. Servs., 418 F.3d 1274, 1278 (Fed. Cir. 2005); see also Gamboa-Avila v. Sec'y of Health & Hum. Servs., 166 F.4th 1318, 1321 (Fed. Cir. 2026); White v. Sec'y of Health & Hum. Servs., 163 F.4th at 1361; Cerrone v. Sec'y of Health & Hum. Servs., 146 F.4th 1113, 1120 (Fed. Cir. 2025); Milik v. Sec'y of Health & Hum. Servs., 822 F.3d 1367, 1379 (Fed. Cir. 2016); Broekelschen v. Sec'y of Health & Hum. Servs., 618 F.3d 1339, 1346 (Fed. Cir. 2010); Walther v. Sec'y of Health & Hum. Servs., 485 F.3d 1146, 1149 (Fed Cir. 2007); Pafford v. Sec'y of Health & Hum. Servs., 451 F.3d 1352, 1355 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2006), cert. denied, 551 U.S. 1102 (2007); Correira v. Sec'y of Health & Hum. Servs., 179 Fed. Cl. 286, 293 (2025); Exum v. Sec'y of Health & Hum. Servs., 175 Fed. Cl. 681, 701 (2025); Record v. Sec'y of Health & Hum. Servs., 175 Fed. Cl. 673, 676 (2025); Gonzalez v. Sec'y of Health & Hum. Servs., 173 Fed. Cl. 728, 734 (2024); Flowers v. Sec'y of Health & Hum. Servs., 173 Fed. Cl. 613, 621-22 (2024). The United States Supreme Court also explained that:

> Claimants who show that a listed injury first manifested itself at the appropriate time are prima facie entitled to compensation. No showing of

> causation is necessary; the Secretary bears the burden of disproving causation. A claimant may also recover for unlisted side effects, and for listed side effects that occur at times other than those specified in the Table, but for those the claimant must prove causation.

Bruesewitz v. Wyeth LLC, 562 U.S. 223, 228-29 (2011) (footnotes omitted). As mentioned above, the burden of proof for on-Table and off-Table claims under the Vaccine Program is by preponderance of the evidence. See 42 U.S.C. § 300aa-13(a)(1)(A). The preponderance of the evidence standard required by the Vaccine Act is "one of proof by a simple preponderance, of 'more probable than not' causation." See Althen v. Sec'y of Health & Hum. Servs., 418 F.3d at 1279-80 (citing Hellebrand v. Sec'y of Dep't of Health & Hum. Servs., 999 F.2d 1565, 1572-73 (Fed. Cir. 1993) (Newman, J. concurring)).

In the case at bar, it is undisputed by the parties that the injury alleged from the Hib vaccination is not on the Vaccine Injury Table. See 42 U.S.C. § 300aa-14. Therefore, petitioner must show causation for this off-Table claim. The United States Court of Appeals for the Federal Circuit in Althen v. Secretary of Health and Human Services specified a three-prong test which a petitioner must meet in order to establish causation in the context of an off-Table initial onset claim:

> To meet the preponderance standard, she [petitioner] must "show a medical theory causally connecting the vaccination and the injury." Grant v. Sec'y of Health & Human Servs., 956 F.2d 1144, 1148 (Fed. Cir. 1992) (citations omitted). A persuasive medical theory is demonstrated by "proof of a logical sequence of cause and effect showing that the vaccination was the reason for the injury[,]" the logical sequence being supported by "reputable medical or scientific explanation [,]" i.e., "evidence in the form of scientific studies or expert medical testimony[.]" Grant, 956 F.2d at 1148. Althen may recover if she shows "that the vaccine was not only a but-for cause of the injury but also a substantial factor in bringing about the injury." Shyface [v. Sec'y, Health & Hum. Servs.], 165 F.3d [1344,] 1352–53 [(Fed. Cir. 1999)]. Although probative, neither a mere showing of a proximate temporal relationship between vaccination and injury, nor a simplistic elimination of other potential causes of the injury suffices, without more, to meet the burden of showing actual causation. See Grant, 956 F.2d at 1149. Concisely stated, Althen's burden is to show by preponderant evidence that the vaccination brought about her injury by providing: (1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of a proximate temporal relationship between vaccination and injury.

Althen v. Sec'y of Health & Hum. Servs., 418 F.3d at 1278 (first, fifth, sixth, and seventh alterations added; other alterations in original); see also Cerrone v. Sec'y of Health & Hum. Servs., 146 F.4th at 1120; Winkler v. Sec'y of Health & Hum. Servs., 88 F.4th 958, 961-62 (Fed. Cir. 2023); Trystan Sanchez by & Through Sanchez v. Sec'y of Health &

Hum. Servs., 34 F.4th 1350, 1353 (Fed. Cir. 2022); Demore v. Sec'y of Health & Hum. Servs., 175 Fed. Cl. 756, 761 (2025); Exum v. Sec'y of Health & Hum. Servs., 175 Fed. Cl. at 702; Flowers v. Sec'y of Health & Hum. Servs., 173 Fed. Cl. at 622; Hoffman v. Sec'y of Health & Hum. Servs., 172 Fed. Cl. 477, 492 (2024).

To prove the first Althen prong, petitioner must provide "a reputable medical theory," that shows that the vaccine petitioner received can cause the type of injury alleged. See Pafford v. Sec'y of Health & Hum. Servs., 451 F.3d at 1355-56; see also Kirby v. Sec'y of Health & Hum. Servs., 997 F.3d at 1384; Moberly ex rel. Moberly v. Sec'y of Health & Hum. Servs., 592 F.3d at 1322; Andreu ex rel. Andreu v. Sec'y of Dep't of Health & Hum. Servs., 569 F.3d 1367, 1379 (Fed. Cir. 2009). The United States Court of Appeals for the Federal Circuit has stated that the first Althen prong cannot be satisfied by a showing "that the vaccine only 'likely caused' the injury" and has "reiterated that a 'plausible' or 'possible' causal theory does not satisfy the standard." Boatmon v. Sec'y of Health & Hum. Servs., 941 F.3d at 1360 (alteration added) (quoting Moberly ex rel. Moberly v. Sec'y of Health & Hum. Servs., 592 F.3d at 1322); see also LaLonde v. Sec'y of Health & Hum. Servs., 746 F.3d at 1339 ("[I]n the past we have made clear that simply identifying a 'plausible' theory of causation is insufficient for a petitioner to meet her burden of proof." (alteration added) (citing Moberly ex rel. Moberly v. Sec'y of Health & Hum. Servs., 592 F.3d at 1322)).

The first Althen prong permits the petitioner to offer medical opinion as proof of their injury and does not require petitioner to demonstrate "objective confirmation" obtained from medical literature. See Althen v. Sec'y of Health & Hum. Servs., 418 F.3d at 1279-80. Indeed, the United States Court of Appeals for the Federal Circuit determined in Simanski v. Secretary of Health and Human Services:

> Although a finding of causation "must be supported by a sound and reliable medical or scientific explanation," causation "can be found in vaccine cases . . . without detailed medical and scientific exposition on the biological mechanisms." Knudsen v. Sec'y of the Dep't of Health & Human Servs., 35 F.3d 543, 548–49 (Fed. Cir. 1994). It is not necessary for a petitioner to point to conclusive evidence in the medical literature linking a vaccine to the petitioner's injury, as long as the petitioner can show by a preponderance of the evidence that there is a causal relationship between the vaccine and the injury, whatever the details of the mechanism may be. Moberly [ex rel. Moberly v. Sec'y of Health & Hum. Servs.], 592 F.3d at 1325; Andreu v. Sec'y of Health & Human Servs., 569 F.3d 1367, 1378 (Fed. Cir. 2009).

Simanski v. Sec'y of Health & Hum. Servs., 671 F.3d 1368, 1384 (Fed. Cir. 2012) (alteration added; omission in original); see also Andreu ex rel. Andreu v. Sec'y of Dep't of Health & Hum. Servs., 569 F.3d at 1378 ("Requiring 'epidemiologic studies . . . or general acceptance in the scientific or medical communities . . . impermissibly raises a claimant's burden under the Vaccine Act and hinders the system created by Congress, in which close calls regarding causation are resolved in favor of injured claimants.'" (omissions in original) (quoting Capizzano v. Sec'y of Health & Hum. Servs., 440 F.3d

1317, 1325-26 (Fed. Cir. 2006))); Knudsen by Knudsen v. Sec'y of Dep't of Health & Hum. Servs., 35 F.3d 543, 549 (Fed. Cir. 1994) ("[T]o require identification and proof of specific biological mechanisms would be inconsistent with the purpose and nature of the vaccine compensation program." (alteration added)); Shapiro v. Sec'y of Health & Hum. Servs., 105 Fed. Cl. 353, 358-59 (2012). The first Althen prong does not require the petitioner to provide a theory that is "medically or scientifically certain," the theory need only be "legally probable." See Moberly ex rel. Moberly v. Sec'y of Health & Hum. Servs., 592 F.3d at 1322 (quoting Knudsen by Knudsen v. Sec'y of Dep't of Health & Hum. Servs., 35 F.3d at 548-59). The United States Court of Appeals for the Federal Circuit has recently stated, however, that "Althen does not prohibit a special master from considering medical literature when weighing the scientific evidence underlying a claimant's causation theory" and that a Special Master "may properly consider the weakness of medical literature support when evaluating the overall reliability of scientific evidence." Gamboa-Avila v. Sec'y of Health & Hum. Servs., 166 F.4th at 1318 (citing Moberly ex rel. Moberly v. Sec'y of Health & Hum. Servs., 592 F.3d at 1324).

The second prong of the Althen test requires the petitioner to demonstrate "a logical sequence of cause and effect showing that the vaccination was the reason for the injury" by a preponderance of the evidence. See Althen v. Sec'y of Health & Hum. Servs., 418 F.3d at 1278; see also Cerrone v. Sec'y of Health & Hum. Servs., 146 F.4th at 1121 ("The second Althen factor underscores the need for a reputable—as opposed to merely plausible—medical theory explaining how the vaccine caused the petitioner's injury."); Capizzano v. Sec'y of Health & Hum. Servs., 440 F.3d at 1326 ("'A logical sequence of cause and effect' means what it sounds like—the claimant's theory of cause and effect must be logical."). The United States Court of Appeals for the Federal Circuit has held that causation-in-fact for Vaccine Act purposes is the same as the "legal cause" in the general tort law context. See Shyface v. Sec'y, Health & Hum. Servs., 165 F.3d at 1351-52; see also Wright v. Sec'y of Health & Hum. Servs., 22 F.4th 999, 1002 (Fed. Cir. 2022); Walther v. Sec'y of Health & Hum. Servs., 485 F.3d at 1150; Pafford v. Sec'y of Health & Hum. Servs., 451 F.3d at 1355. The United States Court of Appeals for the Federal Circuit also has ruled that the vaccine is a cause-in-fact "when it is 'a substantial factor in bringing about the harm.'" de Bazan v. Sec'y of Health & Hum. Servs., 539 F.3d at 1351 (quoting Restatement (Second) of Torts § 431(a) (1965)); see also Deribeaux ex rel. Deribeaux v. Sec'y of Health & Hum. Servs., 717 F.3d at 1367 ("To prove causation, a petitioner must show that the vaccine was 'not only a but-for cause of the injury but also a substantial factor in bringing about the injury.'" (quoting Shyface v. Sec'y, Health & Hum. Servs., 165 F.3d at 1352-53)). A temporal association alone is not sufficient to establish causation-in-fact under the second prong of Althen. See Moberly ex rel. Moberly v. Sec'y of Health & Hum. Servs., 592 F.3d at 1323 ("'[A] proximate temporal association alone does not suffice to show a causal link between the vaccination and the injury.'" (alteration added) (quoting Grant v. Sec'y of Dep't of Health & Hum. Servs., 956 F.2d at 1148)); cf. Capizzano v. Sec'y of Health & Hum. Servs., 440 F.3d at 1326 (stating that "if close temporal proximity, combined with the finding that hepatitis B vaccine can cause RA [rheumatoid arthritis], demonstrates that it is logical to conclude that the vaccine was the cause of the RA (the effect), then medical opinions to this effect are quite probative" (alteration added)). The logical sequence of events can be supported by "reputable

medical or scientific explanation" or "evidence in the form of scientific studies or expert medical testimony." See Althen v. Sec'y of Health & Hum. Servs., 418 F.3d at 1278 (quoting Grant v. Sec'y of Dep't of Health & Hum. Servs., 956 F.2d at 1148). If an expert theory of causation necessarily results in the occurrence of a biological mechanism or state, "it [is] plainly necessary for [petitioner] to make that showing in order to satisfy the second of the Althen factors, which requires demonstrating 'a logical sequence of cause and effect showing that the vaccination was the reason for the injury[.]'" See Hibbard v. Sec'y of Health & Hum. Servs., 698 F.3d at 1364 (alterations added) (citing Althen v. Sec'y of Health & Hum. Servs., 418 F.3d at 1278). When a petitioner's medical theory suggests a certain health outcome or biological marker will be present in a patient, the absence of this marker "is a break in the logical sequence of cause and effect." See La Londe v. Sec'y of Health & Hum. Servs., 110 Fed. Cl. at 205; see also Stone v. Sec'y of Health & Hum. Servs., 676 F.3d at 1384-85 (holding that a Special Master did not impermissibly consider the lack of evidence that a brain injury existed because petitioner's medical theory was that brain injury lowered seizure threshold). The United States Court of Appeals for the Federal Circuit also has held that Special Masters should consider the opinions of treating physicians when making a determination as to Althen prong two. See Capizzano v. Sec'y of Health & Hum. Servs., 440 F.3d at 1326 (finding "the chief special master erred in not considering the opinions of the treating physicians" and "medical records and medical opinion testimony are favored in vaccine cases, as treating physicians are likely to be in the best position to determine whether 'a logical sequence of cause and effect show[s] that the vaccination was the reason for the injury'" (alteration in original) (quoting Althen v. Sec'y of Health & Hum. Servs., 418 F.3d at 1280)); see also Cucuras v. Sec'y of Health & Hum. Servs., 993 F.2d at 1528 (finding that "[m]edical records, in general, warrant consideration as trustworthy evidence" in part because "[t]hese records are also generally contemporaneous to the medical events" (alterations added)); Moberly ex rel. Moberly v. Sec'y of Health & Hum. Servs., 592 F.3d at 1325 ("While testimony from treating physicians is not required in Vaccine Act cases, it can provide supporting evidence of causation . . . ." (omission added)). Although medical records and medical opinion testimony shall be considered by the Special Master, they are not binding on the Special Master. See 42 U.S.C. § 300aa-13(b)(1) ("Any such diagnosis, conclusion, judgment, test result, report, or summary shall not be binding on the special master or court. In evaluating the weight to be afforded to any such diagnosis, conclusion, judgment, test result, report, or summary, the special master or court shall consider the entire record and the course of the injury, disability, illness, or condition until the date of the judgment of the special master or court.").

The third prong of the Althen test requires the petitioner to demonstrate, by a preponderance of the evidence, "a proximate temporal relationship between vaccination and injury." See Althen v. Sec'y of Health & Hum. Servs., 418 F.3d at 1278. As noted by the United States Court of Appeals for the Federal Circuit in Pafford v. Secretary of Health and Human Services, "without some evidence of temporal linkage, the vaccination might receive blame for events that occur weeks, months, or years outside of the time in which scientific or epidemiological evidence would expect an onset of harm." Pafford v. Sec'y of Health & Hum. Servs., 451 F.3d at 1358. The United States Court of Appeals for the Federal Circuit also has determined that "the proximate temporal relationship prong

requires preponderant proof that the onset of symptoms occurred within a timeframe for which, given the medical understanding of the disorder's etiology, it is medically acceptable to infer causation-in-fact." de Bazan v. Sec'y of Health & Hum. Servs., 539 F.3d at 1352 (citing Pafford v. Sec'y of Health & Hum. Servs., 451 F.3d at 1358; and Althen v. Sec'y of Health & Hum. Servs., 418 F.3d at 1281).

The United States Court of Appeals for the Federal Circuit additionally ruled in Capizzano v. Secretary of Health and Human Services that evidence used to satisfy one of the Althen prongs may overlap with and be used to satisfy another prong. See Capizzano v. Sec'y of Health & Hum. Servs., 440 F.3d at 1326 ("We see no reason why evidence used to satisfy one of the Althen III prongs cannot overlap to satisfy another prong."); see also Graves v. Sec'y of Dep't of Health & Hum. Servs., 101 Fed. Cl. 310, 334 (2011). If the petitioner satisfies all three prongs articulated in Althen by a preponderance of the evidence, the petitioner is "entitled to recover unless the [government] shows, also by a preponderance of evidence, that the injury was in fact caused by factors unrelated to the vaccine." Althen v. Sec'y of Health & Hum. Servs., 418 F.3d at 1278 (alteration in original) (quoting Knudsen by Knudsen v. Sec'y of Dep't of Health & Hum. Servs., 35 F.3d at 547); see also Stone v. Sec'y of Health & Hum. Servs., 676 F.3d at 1379-80; de Bazan v. Sec'y of Health & Hum. Servs., 539 F.3d at 1352; Pafford v. Sec'y of Health & Hum. Servs., 451 F.3d at 1355; Rus v. Sec'y of Health & Hum. Servs., 129 Fed. Cl. 672, 680 (2016) (citing 42 U.S.C. § 300aa–13(a)(1)(B)). It has additionally been determined that "regardless of whether the burden of proof ever shifts to the respondent, the special master may consider the evidence presented by the respondent in determining whether the petitioner has established a prima facie case." Rus v. Sec'y of Health & Hum. Servs., 129 Fed. Cl. at 680 (citing Stone v. Sec'y of Health & Hum. Servs., 676 F.3d at 1379); see also de Bazan v. Sec'y of Health & Hum. Servs., 539 F.3d at 1352.

Moreover, in Loving ex rel. Loving v. Secretary of the Department of Health and Human Services, a Judge of the United States Court of Federal Claims crafted a six-pronged test to be used for off-Table significant aggravation claims. See Loving ex rel. Loving v. Sec'y of Dep't of Health & Hum. Servs., 86 Fed. Cl. at 144. The Loving test "combines the first three Whitecotton factors,[23] which establish significant aggravation,

[23] In Whitecotton by Whitecotton v. Secretary of Health and Human Services, the United States Court of Appeals for the Federal Circuit indicated that, when reviewing a petitioner's on-Table significant aggravation claim, the special master must:

> (1) assess the individual's condition prior to administration of the vaccine, i.e., evaluate the nature and extent of the individual's preexisting condition, (2) assess the individual's current condition after administration of the vaccine, (3) predict the individual's condition had the vaccine not been administered, and (4) compare the individual's current condition with the predicted condition had the vaccine not been administered.

with the Althen factors, which establish causation." W.C. v. Sec'y of Health & Hum. Servs., 704 F.3d at 1357 (footnote added); see also Sharpe v. Sec'y of Health & Hum. Servs., 964 F.3d 1072, 1081-82 (Fed. Cir. 2020). According to the United States Court of Appeals for the Federal Circuit, "the Loving case provides the correct framework for evaluating off-table significant aggravation claims." W.C. v. Sec'y of Health & Hum. Servs., 704 F.3d at 1357. Therefore, according to the Loving case, a Special Master must consider the following six elements when reviewing an off-Table significant aggravation claim:

> (1) the person's condition prior to administration of the vaccine, (2) the person's current condition (or the condition following the vaccination if that is also pertinent), (3) whether the person's current condition constitutes a "significant aggravation" of the person's condition prior to vaccination, (4) a medical theory causally connecting such a significantly worsened condition to the vaccination, (5) a logical sequence of cause and effect showing that the vaccination was the reason for the significant aggravation, and (6) a showing of a proximate temporal relationship between the vaccination and the significant aggravation.

Loving ex rel. Loving v. Sec'y of Dep't of Health & Hum. Servs., 86 Fed. Cl. at 144; see also W.C. v. Sec'y of Health and Hum. Servs., 704 F.3d at 1357; Sharpe v. Sec'y of Health & Hum. Servs., 964 F.3d at 1080; Hodge by Elson v. Sec'y of Health & Hum. Servs., 168 Fed. Cl. 117, 124-25 (2023); Mager v. Sec'y of Health & Hum. Servs., 166 Fed. Cl. 414, 433 (2023). The first and second Loving prongs, the person's condition prior to and after vaccination, are factual matters to be determined by the Special Master from the record. See W.C. v. Sec'y of Health and Hum. Servs., 704 F.3d at 1356. The third Loving prong, whether the person's current condition constitutes a "significant aggravation" of the person's condition prior to vaccination, "only requires a comparison of a petitioner's current, post-vaccination condition with her pre-vaccination condition." See Sharpe v. Sec'y of Health & Hum. Servs., 964 F.3d at 1082. The inquiry for the last three Loving prongs mimics the legal inquiry and standards of the Althen test. See Loving ex rel. Loving v. Sec'y of Dep't of Health & Hum. Servs., 86 Fed. Cl. at 143 ("Given the Federal Circuit's propensity for this symmetry in vaccine cases . . . the Althen analysis of causation should also be applied in off-Table significant-aggravation claims." (citation omitted; omission added)). Moreover, "[a] failure to establish any one of the required elements set forth in Althen or Loving, 'is necessarily fatal to a petitioner's case.'" See Vinesar v. Sec'y of Health & Hum. Servs., 170 Fed. Cl. 681, 692 (2024) (alteration added) (quoting Hodge by Elson v. Sec'y of Health & Hum. Servs., 168 Fed. Cl. at 124), aff'd, No. 2024-1787, 2025 WL 2945665 (Fed. Cir. Oct. 17, 2025); see also Paluck v. Sec'y of Health & Hum. Servs., 104 Fed. Cl. 457, 469 (2012) (finding it unnecessary to consider the additional "Whitecotton-Loving" elements if petitioner could not show causation under the "shared Althen-Loving framework").

Whitecotton by Whitecotton v. Sec'y of Health & Hum. Servs., 81 F.3d 1099, 1104 (Fed. Cir. 1996).

Whether a petitioner has presented an initial onset claim, or a significant aggravation claim, the United States Court of Appeals for the Federal Circuit further has indicated that "the function of a special master is not to 'diagnose' vaccine-related injuries, but instead to determine 'based on the record evidence as a whole and the totality of the case, whether it has been shown by a preponderance of the evidence that a vaccine caused the [petitioner's] injury.'" See Andreu ex rel. Andreu v. Sec'y of Dep't of Health & Hum. Servs., 569 F.3d at 1382 (alteration added) (quoting Knudsen by Knudsen v. Sec'y of Dep't of Health & Hum. Servs., 35 F.3d at 549); see also Porter v. Sec'y of Health & Hum Servs., 663 F.3d at 1249-50; Lombardi v. Sec'y of Health & Hum. Servs., 656 F.3d 1343, 1351 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2011). Generally, in instances in which the parties disagree about the nature of the alleged vaccine injury, the United States Court of Appeals for the Federal Circuit has concluded it is proper for the Special Master to "opine on the nature of the petitioner's injury." See Contreras v. Sec'y of Health & Hum. Servs., 844 F.3d 1363, 1368 (Fed. Cir. 2017) (citing Hibbard v. Sec'y of Health & Hum. Servs., 698 F.3d at 1365); see also Lombardi v. Sec'y of Health & Hum. Servs., 656 F.3d at 1352 ("[I]f the existence and nature of the injury itself is in dispute, it is the special master's duty to first determine which injury was best supported by the evidence presented in the record before applying the Althen test to determine causation of that injury." (alteration added)); Fisher v. Sec'y of Health & Hum. Servs., 172 Fed. Cl. 26, 36 (2024) (quoting Broekelschen v. Sec'y of Health & Hum. Servs., 618 F.3d at 1346). The United States Court of Appeals for the Federal Circuit in Broekelschen and Lombardi identified and articulated the factual circumstances under which Special Masters may identify, or "diagnose," petitioner's injury prior to conducting a causation analysis. See Broekelschen v. Sec'y of Health & Hum. Servs., 618 F.3d at 1346; Lombardi v. Sec'y of Health & Hum. Servs., 656 F.3d at 1352-53; but see Hunt v. Sec'y of Health & Hum. Servs., 123 Fed. Cl. 509, 519 (2015) (finding that a Special Master's diagnosis was improper because the facts of that case were readily distinguishable from Broekelschen and Lombardi); Contreras v. Sec'y of Health & Hum. Servs., 844 F.3d at 1368 (agreeing with United States Court of Federal Claims that Special Master's diagnosis was improper, but disagreeing that such an improper diagnosis was harmless error). The Broekelschen exception occurs when "the injury itself is in dispute, the proposed injuries differ significantly in their pathology, and the question of causation turns on which injury [the petitioner] suffered." Broekelschen v. Sec'y of Health & Hum. Servs., 618 F.3d at 1346 (alteration added); see also Hunt v. Sec'y of Health & Hum. Servs., 123 Fed. Cl. at 518. The Lombardi exception permits a Special Master to attempt diagnosis when "(1) the petitioner presents conflicting diagnoses of her alleged vaccine injury; (2) the experts have 'extreme disagreement' as to the malady suffered; and, (3) the diagnoses are not along a continuum of similar conditions." Contreras v. Sec'y of Health & Hum. Servs., 107 Fed. Cl. 280, 294 (2012) (quoting Lombardi v. Sec'y of Health & Hum. Servs., 656 F.3d at 1352-53). The Lombardi exception also has been described as applicable when a petitioner fails to present evidence of "'the very existence of any specific injury.'" See Hunt v. Sec'y of Health & Hum. Servs., 123 Fed. Cl. at 518-19 (quoting Lombardi v. Sec'y of Health & Hum. Servs., 656 F.3d at 1353).

When reviewing a Special Master's decision, the assigned Judge of the United States Court of Federal Claims shall:

> (A) uphold the findings of fact and conclusions of law of the special master and sustain the special master's decision,
>
> (B) set aside any findings of fact or conclusion of law of the special master found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and issue its own findings of fact and conclusions of law, or
>
> (C) remand the petition to the special master for further action in accordance with the court's direction.

42 U.S.C. § 300aa-12(e)(2). The legislative history of the Vaccine Act states: "The conferees have provided for a limited standard for appeal from the [special] master's decision and do not intend that this procedure be used frequently, but rather in those cases in which a truly arbitrary decision has been made." H.R. Rep. No. 101–386, at 517 (1989) (Conf. Rep.), reprinted in 1989 U.S.C.C.A.N. 3018, 3120 (alteration added). The standard of review under the Vaccine Act was articulated in Markovich v. Secretary of Health and Human Services, in which the United States Court of Appeals for the Federal Circuit stated, "the Court of Federal Claims reviews the Special Master's decision to determine if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.'" Markovich v. Sec'y of Health & Hum. Servs., 477 F.3d 1353, 1355-56 (Fed. Cir.) (citing 42 U.S.C. § 300aa–12(e)(2)(B)), cert. denied, 552 U.S. 816 (2007); see also Lozano v. Sec'y of Health & Hum. Servs., 958 F.3d 1363, 1368 (Fed. Cir. 2020); Boatmon v. Sec'y of Health & Hum. Servs., 941 F.3d at 1358 (citing LaLonde v. Sec'y of Health & Hum. Servs., 746 F.3d at 1338); Deribeaux ex rel. Deribeaux v. Sec'y of Health & Hum. Servs., 717 F.3d at 1366 ("[W]e 'perform[ ] the same task as the Court of Federal Claims and determine[ ] anew whether the special master's findings were arbitrary or capricious.'" (first alteration added; other alterations in original) (quoting Lampe v. Sec'y of Health & Hum. Servs., 219 F.3d 1357, 1360 (Fed. Cir. 2000))); Hibbard v. Sec'y of Health & Hum. Servs., 698 F.3d at 1363; Moberly ex rel. Moberly v. Sec'y of Health & Hum. Servs., 592 F.3d at 1321 (citing Munn v. Sec'y of Dep't of Health & Hum. Servs., 970 F.2d 863, 870 n.10 (Fed. Cir. 1992)); de Bazan v. Sec'y of Health & Hum. Servs., 539 F.3d at 1350; Althen v. Sec'y of Health & Hum. Servs., 418 F.3d at 1277; Dodd v. Sec'y of Health & Hum. Servs., 114 Fed. Cl. 43, 47 (2013); Taylor v. Sec'y of Health & Hum. Servs., 108 Fed. Cl. 807, 817 (2013). Therefore, this court may only set aside a Special Master's decision if the court determines that the "findings of fact or conclusion of law of the special master . . . [are] arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . ." See 42 U.S.C. § 300aa–12(e)(2)(B) (alteration and omissions added); see also Lombardi v. Sec'y of Health & Hum. Servs., 656 F.3d at 1350 (citing Capizzano v. Sec'y of Health & Hum. Servs., 440 F.3d at 1324); Moberly ex rel. Moberly v. Sec'y of Health & Hum. Servs., 592 F.3d at 1321; Markovich v. Sec'y of Health & Hum. Servs., 477 F.3d at 1356-57; Lampe v. Sec'y of Health & Hum. Servs., 219 F.3d at 1360. The standard of review applied in Vaccine Program cases is "uniquely deferential for what is essentially a judicial process." Hodges v. Sec'y of Dep't of Health & Hum. Servs., 9 F.3d 958, 961 (Fed. Cir. 1993); see also

Broekelschen v. Sec'y of Health & Hum. Servs., 618 F.3d at 1345 ("'Thus, although we are reviewing as a matter of law the decision of the Court of Federal Claims under a non-deferential standard, we are in effect reviewing the decision of the special master under the deferential and capricious standard on factual issues.'" (quoting Lampe v. Sec'y of Health & Hum. Servs., 219 F.3d at 1369 (Plager, J., dissenting))); Munn v. Sec'y of Health & Hum. Servs., 970 F.2d at 869 ("The findings of fact and conclusions of law of the special master may be set aside only if found violative of the standard of review set forth in the statute, a standard of review which is highly deferential to the factual findings of the special master."); Hines on Behalf of Sevier v. Sec'y of Dep't of Health & Hum. Servs., 940 F.2d 1518, 1528 (Fed. Cir. 1991) (stating that "'arbitrary and capricious' is a highly deferential standard of review" in vaccine cases); Correira v. Sec'y of Health & Hum. Servs., 179 Fed. Cl. at 293. Indeed, the United States Court of Appeals for the Federal Circuit has noted:

> Congress assigned to a group of specialists, the Special Masters within the Court of Federal Claims, the unenviable job of sorting through these painful cases and, based upon their accumulated expertise in the field, judging the merits of the individual claims. The statute makes clear that, on review, the Court of Federal Claims is not to second guess the Special Masters [sic] fact-intensive conclusions; the standard of review is uniquely deferential for what is essentially a judicial process. Our cases make clear that, on our review . . . we remain equally deferential. That level of deference is especially apt in a case in which the medical evidence of causation is in dispute.

Deribeaux ex rel. Deribeaux v. Sec'y of Health & Hum. Servs., 717 F.3d at 1366-37 (alteration and omission in original) (quoting Hodges v. Sec'y of Dep't of Health & Hum. Servs., 9 F.3d at 961); see also Hibbard v. Sec'y of Health & Hum. Servs., 698 F.3d at 1363; Locane v. Sec'y of Health & Hum. Servs., 685 F.3d at 1380.

The Special Master has discretion to determine the relative weight of evidence presented, including between contemporaneous medical records and oral testimony. See Hibbard v. Sec'y of Health & Hum. Servs., 698 F.3d at 1368-69 (finding that it was not arbitrary or capricious for the Special Master to weigh conflicting treating physicians' conclusions against each other); see also Burns by Burns v. Sec'y of Dep't of Health & Hum. Servs., 3 F.3d 415, 417 (Fed. Cir. 1993) (finding that the Special Master had discretion whether to hold evidentiary hearings or not and determining that the Special Master gave thorough and careful consideration to the record). Further, a Special Master is "not required to discuss every piece of evidence or testimony in [his or] her decision." Snyder ex rel. Snyder v. Sec'y of Health & Hum. Servs., 88 Fed. Cl. 706, 728 (2009) (alteration added); see also Beckwith v. Sec'y of Health & Hum. Servs., 180 Fed. Cl. 368, 384 (2026) ("A special master need not 'discuss every item of evidence in the record' when making a factual finding 'so long as the decision makes clear that the special master fully considered a party's position and arguments on point.'" (quoting Snyder by Snyder v. Sec'y of Dep't of Health & Hum. Servs., 36 Fed. Cl. 461, 466 (1996), aff'd sub nom. Synder by Snyder v. Sec'y of Health & Hum. Servs., 117 F.3d 545 (Fed. Cir. 1997)));

Paluck ex rel. Paluck v. Sec'y of Health & Hum. Servs., 104 Fed. Cl. 457, 467 (2012) ("[W]hile the special master need not address every snippet of evidence adduced in the case, see id. [Doe v. Sec'y of Health & Hum. Servs., 601 F.3d at 1355], he cannot dismiss so much contrary evidence that it appears that he 'simply failed to consider genuinely the evidentiary record before him[.]'" (alterations added) (quoting Campbell v. Sec'y of Health & Hum. Servs., 97 Fed. Cl. 650, 668 (2011))).

The United States Court of Appeals for the Federal Circuit has further explained that, on review, this court does not "reweigh the factual evidence, assess whether the special master correctly evaluated the evidence, or examine the probative value of the evidence or the credibility of the witnesses—these are all matters within the purview of the fact finder." Porter v. Sec'y of Health & Hum. Servs., 663 F.3d 1242, 1249 (Fed. Cir. 2011); see also Winkler v. Sec'y of Health & Hum. Servs., 88 F.4th at 963; Lozano v. Sec'y of Health & Hum. Servs., 958 F.3d at 1368; Broekelschen v. Sec'y of Health & Hum. Servs., 618 F.3d at 1349 (citing Munn v. Sec'y of Health & Hum. Servs., 970 F.3d at 871); Cedillo v. Sec'y of Health & Hum. Servs., 617 F.3d at 1338 (quoting Lampe v. Sec'y of Health & Hum. Servs., 219 F.3d at 1363); Hodges v. Sec'y of Dep't of Health & Hum. Servs., 9 F.3d at 961 ("The statute makes clear that, on review, the Court of Federal Claims is not to second guess the Special Masters [sic] fact-intensive conclusions." (alteration added)). The United States Court of Appeals for the Federal Circuit also has held that "[i]f the special master has considered the relevant evidence of record, drawn plausible inferences and articulated a rational basis for the decision, reversible error will be extremely difficult to demonstrate." Hines on Behalf of Sevier v. Sec'y of Dep't of Health & Hum. Servs., 940 F.2d at 1528 (alteration added); see also Porter v. Sec'y of Health & Hum. Servs., 663 F.3d at 1253-54; Cedillo v. Sec'y of Health & Hum. Servs., 617 F.3d at 1338; Lampe v. Sec'y of Health & Hum. Servs., 219 F.3d at 1360; Dodd v. Sec'y of Health & Hum. Servs., 114 Fed Cl. at 56-57. So long as "the special master's conclusion [is] based on evidence in the record that [is] not wholly implausible, we are compelled to uphold that finding as not being arbitrary and capricious." Deribeaux ex rel. Deribeaux v. Sec'y of Health & Hum. Servs., 717 F.3d at 1367 (alterations in original) (quoting Lampe v. Sec'y of Health & Hum. Servs., 219 F.3d at 1363); see also Hibbard v. Sec'y of Health & Hum. Servs., 698 F.3d at 1363 (citing Cedillo v. Sec'y of Health & Hum. Servs., 617 F.3d at 1338). "Finders of fact are entitled—indeed, expected—to make determinations as to the reliability of the evidence presented to them and, if appropriate, as to the credibility of the persons presenting that evidence." Moberly ex rel. Moberly v. Sec'y of Health & Hum. Servs., 592 F.3d at 1326. Special Masters, however, "may not 'cloak the application of an erroneous legal standard in the guise of a credibility determination, and thereby shield it from appellate review.'" Id. at 1325 (quoting Andreu ex rel. Andreu v. Sec'y of Dep't of Health & Hum. Servs., 569 F.3d at 1379); see also Porter v. Sec'y of Health & Hum. Servs., 663 F.3d at 1250; Chu v. Sec'y of Health & Hum. Servs., 180 Fed. Cl. 37, 67 (2026); Davis v. Sec'y of Health & Hum. Servs., 94 Fed. Cl. 53, 61 (2010), aff'd, 420 F. App'x 973 (Fed. Cir. 2011).

The United States Court of Appeals for the Federal Circuit has additionally determined that, "[u]nder the Vaccine Act, Special Masters are accorded great deference in determining the credibility and reliability of expert witnesses. Indeed, we have held that

a Special Master's 'credibility determinations are virtually unreviewable.'" Cedillo v. Sec'y of Health & Hum. Servs., 617 F.3d at 1347 (alteration added) (quoting Hanlon v. Sec'y of Health & Hum. Servs., 191 F.3d 1344, 1349 (Fed. Cir. 1999)); see also Cerrone v. Sec'y of Health & Hum. Servs., 146 F.4th at 1124-25); Porter v. Sec'y of Health & Hum. Servs., 663 F.3d at 1253-54 ("'[R]eversible error will be extremely difficult to demonstrate' [when] the special master 'has considered the relevant evidence of record, drawn plausible inferences and articulated a rational basis for the decision.'" (alterations added) (quoting Hines on Behalf of Sevier v. Sec'y of Dep't of Health & Hum. Servs., 940 F.2d at 1528)); Lombardi v. Sec'y of Health & Hum. Servs., 656 F.3d at 1353; Holt v. Sec'y of Health & Hum. Servs., 132 Fed. Cl. 194, 199 (2017); Anderson v. Sec'y of Health & Hum. Servs., 131 Fed. Cl. 735, 752 (2017). The United States Court of Appeals for the Federal Circuit has stated that when both petitioner and respondent offer one or more experts, "[t]he special master's decision often times is based on the credibility of the experts and the relative persuasiveness of their competing theories" and, therefore, "the special master's credibility findings 'are virtually unchallengeable on appeal.'" Broekelschen v. Sec'y of Health & Hum. Servs., 618 F.3d at 1347 (alterations added) (quoting Lampe v. Sec'y of Health & Hum. Servs., 219 F.3d at 1362); see also Milik v. Sec'y of Health & Hum. Servs., 822 F.3d at 1381-82 (finding that the Special Master was not arbitrary and capricious when determining that the government's expert's specific medical qualifications made his testimony more reliable than testimony of petitioner's expert); Porter v. Sec'y of Health & Hum. Servs., 663 F.3d at 1250 ("[S]pecial masters are expected to consider the credibility of expert witnesses in evaluating petitions for compensation under the Vaccine Act." (alteration added)); Moberly ex rel. Moberly v. Sec'y of Health & Hum. Servs., 592 F.3d at 1325-26 ("Assessments as to the reliability of expert testimony often turn on credibility determinations."). Additionally, nothing requires a Special Master to accept an expert's conclusion "only by the ipse dixit of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." Snyder ex rel. Snyder v. Sec'y of Health & Hum. Servs., 88 Fed. Cl. at 743 (quoting Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997)); see also Cedillo v. Sec'y of Health & Hum. Servs., 647 F.3d at 1339. The Special Master also may inquire into the scientific reliability of expert testimony and make determinations as to whether the proffered science is sufficiently reliable in light of any submitted medical literature of epidemiological studies. See Terran ex rel. Terran v. Sec'y of Health & Hum. Servs., 195 F.3d 1302, 1316 (Fed. Cir. 1999); see also Copenhaver v. Sec'y of Health & Hum. Servs., 129 Fed. Cl. 176, 183 (2014); Tompkins v. Sec'y of Health & Hum. Servs., 117 Fed. Cl. 713, 719 (2014); Holmes v. Sec'y of Health & Hum. Servs., 115 Fed. Cl. 469, 490-91 (2014); Locane v. Sec'y of Health & Hum. Servs., 99 Fed. Cl. 715, 727 (2011), aff'd, 685 F.3d 1375 (Fed. Cir. 2012).

The United States Court of Appeals for the Federal Circuit has recognized that "'[a] Special Master is not bound to follow the opinions of other Special Masters.'" Boatmon v. Sec'y of Health & Hum. Servs., 941 F.3d at 1358 (alteration in original) (quoting Boatmon v. Sec'y of Health & Hum. Servs., 138 Fed. Cl. 566, 571 (2018)); see also Hanlon v. Sec'y of Health & Hum. Servs., 40 Fed. Cl. 625, 630 (1998) ("Special masters are neither bound by their own decisions nor by cases from the Court of Federal Claims, except, of course, in the same case on remand."), aff'd, 191 F.3d 1344 (Fed. Cir. 1999); Snyder ex rel. Snyder v. Sec'y of Health & Hum. Servs., 88 Fed. Cl. at 720 (finding that "special masters

were free to reach different conclusions based on the same evidence"); Sharpnack, By & Through Sharpnack v. Sec'y of Dep't of Health & Hum. Servs., 27 Fed. Cl. 457, 461 (1993) (noting that Special Masters have the "discretion to evaluate the utility of the [evidence] differently in the light of all facts relevant in a specific claim" and "[s]uch variations in the analyses of the special masters are within [Vaccine] Program standards" (alterations added)), aff'd, 17 F.3d 1442 (Fed. Cir. 1994); but see Gamboa-Avila v. Sec'y of Health & Hum. Servs., 166 F.4th at 1323-24 (affirming a Special Master's decision but also stating "[w]e are troubled by inconsistent findings on identical facts by different special masters" (alteration added)). Special Masters may, however, still rely upon Vaccine Program case law as an analytical tool to aid them in their decision making. See Deribeaux ex rel. Deribeaux v. Sec'y of Health & Hum. Servs., 717 F.3d at 1366-67 ("'Congress assigned to a group of specialists, the Special Masters within the Court of Federal Claims, the unenviable job of sorting through these painful cases and, based upon their accumulated expertise in the field, judging the merits of the individual claims.'" (quoting Hodges v. Sec'y of Dep't of Health & Hum. Servs., 9 F.3d at 961)); see also Nunez v. Sec'y of Health & Hum. Servs., 144 Fed. Cl. 540, 548 (2019) (finding the Special Master's decision to deny compensation had a rational basis when petitioner's theory had been unsuccessfully litigated in the Vaccine Program previously and that the petitioner did not present any new persuasive evidence as to why the theory should now be accepted), aff'd, 825 F. App'x 816 (Fed. Cir. 2020).

With respect to a motion for review of a Special Master's decision, Rule 8(f)(1) (2026) of the Vaccine Rules of the United States Court of Federal Claims (Vaccine Rules) states: "Any fact or argument not raised specifically in the record before the special master will be considered waived and cannot be raised by either party in proceedings on review of a special master's decision." Vaccine Rule 8(f)(1). As stated by multiple Judges of the United States Court of Federal Claims, "the Federal Circuit has routinely held that arguments not made before the special master are waived on appeal" pursuant to Vaccine Rule 8(f)(1). See Pulsipher v. Sec'y of Health & Hum. Servs., 179 Fed. Cl. 268, 282 (2025) (citing Davis v. Sec'y of Health & Hum. Servs., 409 F App'x 342, 344 (Fed. Cir. 2011); and Weddel v. Sec'y of Health & Hum. Servs., 23 F.3d 388, 390 n.2 (Fed. Cir. 1994)); see also Austin v. Sec'y of Health & Hum. Servs., 141 Fed. Cl. 268, 277 (2018), aff'd, 818 F. App'x 1005 (Fed. Cir. 2020); Spahn v. Sec'y of Health & Hum. Servs., 138 Fed. Cl. 525, 259 (2018).

The United States Court of Appeals for the Federal Circuit has also held that a Special Master's error is harmless if it does not affect the outcome of the case. See Cedillo v. Sec'y of Health & Hum. Servs., 617 F.3d at 1343 ("[T]he Special Master's reasoned conclusion that he would have reached the same result in the absence of the [objectionable] testimony supports a conclusion that any error in considering the [objectionable] testimony was, in fact harmless, as it did not affect the outcome of the proceeding." (alterations added)); see also W.C. v. Sec'y of Health & Hum. Servs., 704 F.3d at 1358 ("While this court disagrees with the special master's suggestion that Althen could be bypassed in this case, the Court of Federal Claims correctly determined the error was harmless."); Hazlehurst v. Sec'y of Health & Hum. Servs., 604 F.3d 1343, 1351 (Fed. Cir. 2010); Hines on Behalf of Sevier v. Sec'y of Dep't of Health & Hum. Servs., 940 F.2d

at 1526 (holding even if there was an error by Special Master such error was harmless because Special Master's decision rested on a number of unrelated factors and correction would not change the outcome); Nieves v. Sec'y of Health & Hum. Servs., 167 Fed. Cl. 422, 429 (2023); Heller v. Sec'y of Health & Hum. Servs., 162 Fed. Cl. 621, 645 (2022); Braun v. Sec'y of Health & Hum. Servs., 144 Fed. Cl. 72, 77-78 (2019).

In her petition submitted to the Special Master, Ms. Skorupska alleged that the Hib vaccine administered to N.S. resulted in "infantile spasm, seizure disorder, and neurological injury" that caused N.S. developmental injury. Ms. Skorupska also alleged, "[i]n addition, or in the alternative, as a result of the effects of the Hib vaccination, [N.S.] suffered a significant aggravation of a preexisting condition." (alterations added). As an initial matter, as discussed above, the Special Master found that "it is appropriate to categorize Ms. Skorupska's case as presenting a significant aggravation claim" because "ample evidence shows that N.S. was experiencing at least some neurologic problems / developmental delay before the vaccination." See Skorupska v. Sec'y of Health & Hum. Servs., 2026 WL 674607, at *8. Accordingly, the Special Master's decision to deny compensation in N.S.'s case was based on his analysis of the Althen components of the Loving off-Table significant aggravation test, with, as noted above, the Special Master frequently referring to a prong as the "Loving / Althen prong." See Skorupska v. Sec'y of Health & Hum. Servs., 2026 WL 674607, at *11, *13-14. Petitioner, in her Motion for Review before this court, does not appear to challenge, in her filings or at oral argument, the Special Master's finding that "it is appropriate to categorize Ms. Skorupska's case as presenting a significant aggravation claim." Instead, in her Motion for Review, petitioner objects to the Special Master's findings that N.S. did not suffer from inflammation after vaccination and that there was not a temporal relationship between spasm onset and vaccination. In addition, petitioner argues that the Special Master improperly considered the role of N.S.'s genetic mutation in his decision to deny compensation. As discussed below, this court concludes that the Special Master's conclusion to deny compensation was not in error, nor arbitrary or capricious, based primarily on the Special Master's two dispositive findings that petitioner did not establish a logical sequence of cause and effect between the Hib vaccination and N.S.'s injury, and that petitioner did not establish a proximate temporal relationship between the Hib vaccination and N.S.'s injury, because N.S. did not suffer from inflammation as predicted by petitioner's expert theory and petitioner did not demonstrate that N.S's spasms began in a medically acceptable timeframe after vaccination.

**The Special Master's Loving Prong Five (Althen Prong Two) Analysis: A Logical Sequence of Cause and Effect**

As indicated above, in her Motion for Review, petitioner objects to the Special Master's conclusion that she did not demonstrate a "logical sequence of cause and effect showing that the vaccination was the reason for the injury" by a preponderance of the evidence and to the factual findings the Special Master made in determining petitioner had not met her burden of proof. See Althen v. Sec'y of Health & Hum. Servs., 418 F.3d at 1278. As correctly explained by the Special Master in his decision, when determining whether the petitioner has demonstrated a logical sequence of cause and effect, Special

Masters "may consider whether the vaccinee responds in a way predicted by the expert's theory" and "may also consider the views of treating doctors." Skorupska v. Sec'y of Health & Hum. Servs., 2026 WL 674607, at *9; see also Cedillo v. Sec'y of Health & Hum. Servs., 617 F.3d at 1343-44; Capizzano v. Sec'y of Health & Hum. Servs., 440 F.3d at 1326. A petitioner's petition for entitlement fails if the petitioner cannot demonstrate, by a preponderance of the evidence, the causation theory advanced by the petitioner's experts. See Hibbard v. Sec'y of Health & Hum. Servs., 698 F.3d at 1364; see also La Londe v. Sec'y of Health & Hum. Servs., 110 Fed. Cl. at 205.

As the Special Master explained in his decision, petitioner's causation theory "relied on the presence of cytokine-driven inflammation" and the Special Master was correct when he concluded that "[w]ithout a showing that this inflammation did occur, she [petitioner] cannot establish a logical sequence of cause and effect under the fifth Loving prong / second Althen prong." See Skorupska v. Sec'y of Health & Hum. Servs., 2026 WL 674607, at *11 (alterations added); see also Hibbard v. Sec'y of Health & Hum. Servs., 698 F.3d at 1364 (stating, "[i]n light of [petitioner's] expert's theory of causation, which depended on a showing of autonomic neuropathy, it was plainly necessary for [petitioner] to make that showing in order to satisfy the second of the Althen factors" (alterations added)). Ms. Skorupska's theory, as described by petitioner in her brief before the Special Master, was as follows:

> Petitioner's expert geneticist, Dr. Huq's theory is that the vaccine caused inflammation and epileptic encephalopathy. The inflammation caused altered connectivity, which in turn, caused epilepsy. Inflammation can cause infantile spasms. While there are other causes of infantile spasms, such as inflammatory brain disease and stroke, inflammation plays a crucial part in epilepsy; and vaccines cause inflammation. Further, in Petitioner's case, [N.S.'s] predisposing mutation made him more susceptible to the inflammatory response.

(alteration added). Inflammation, therefore, was an essential part of Ms. Skorupska's theory. At oral argument on petitioner's Motion for Review, petitioner's counsel agreed that the question of "whether or not there was an inflammatory response" in N.S. is "the heart of the case." Indeed, it was the first step of the two-part medical theory that petitioner submitted in her brief to the Special Master: "The inflammation caused altered connectivity, which in turn, caused epilepsy." See Skorupska v. Sec'y of Health & Hum. Servs., 2026 WL 674607, at *9. Given the importance of inflammation in petitioner's theory, the Special Master used the correct standard when he proceeded on the basis that Ms. Skorupska's medical theory hinges on a showing of a specific inflammatory reaction, and the absence of a finding that N.S. had this specific inflammatory reaction is necessarily a "break in the logical sequence of cause and effect" that is required to satisfy Althen prong two or Loving prong five. See La Londe v. Sec'y of Health & Hum. Servs., 110 Fed. Cl. at 205; see also Althen v. Sec'y of Health & Hum. Servs., 418 F.3d at 1278 ("A persuasive medical theory is demonstrated by 'proof of a logical sequence of cause and effect showing that the vaccination was the reason for the injury.'" (quoting Grant v. Sec'y of Dep't of Health & Hum. Servs., 956 F.2d at 1148)); Loving ex rel. Loving v. Sec'y

of Dep't of Health & Hum. Servs., 86 Fed. Cl. at 144. Thus, Special Master Moran correctly focused his analysis on whether N.S. had "suffered deleterious inflammation" as predicted by petitioner's expert theory given that, as the Special Master stated, "Ms. Skorupska's theory is based upon inflammation." See Skorupska v. Sec'y of Health & Hum. Servs., 2026 WL 674607, at *9-10.

The Special Master, after reviewing the record in N.S.'s case, concluded that N.S. did not suffer from inflammation because he concluded that N.S.'s medical records did not actually demonstrate inflammation and N.S.'s alleged IVIG response—which petitioner and her expert, Dr. Ghacibeh, claimed was evidence of inflammation—was not persuasive or dispositive. See id. at *10. Moreover, factual findings by the Special Master are reviewed in this court using a "deferential standard" of review, see Cerrone v. Sec'y of Health & Hum. Servs., 146 F.4th at 1119, and are virtually unchallengeable on appeal unless they are demonstrated as arbitrary or capricious. See Locane v. Sec'y of Health & Hum. Servs., 685 F.3d at 1380 (quoting Lampe v. Sec'y of Health & Hum. Servs., 219 F.3d at 1362). As noted above, in Hines on Behalf of Sevier v. Secretary of the Department of Health and Human Services, the United States Court of Appeals for the Federal Circuit explained that "[i]f the special master has considered the relevant evidence of record, drawn plausible inferences and articulated a rational basis for the decision, reversible error will be extremely difficult to demonstrate." Hines on Behalf of Sevier v. Sec'y of Dep't of Health & Hum. Servs., 940 F.2d at 1528 (alteration added). Accordingly, this court must review the Special Master's discussion of inflammation through the narrow lens of whether he "considered the relevant evidence," drew "plausible inferences," and "articulated a rational basis" for his finding that N.S. did not suffer from inflammation. See id.

Petitioner argues in her Motion for Review that the Special Master ignored or improperly concluded that certain evidence in the record before the Special Master in fact did not support a finding that N.S. was suffering from deleterious inflammation. At the oral argument before this court, petitioner's counsel argued that the Special Master improperly discredited petitioner's purported evidence of inflammation, including blood test results from 2013 and 2023, and ignored chart notes from treating medical professionals commenting on the efficacy of IVIG treatment, which petitioner argued demonstrated inflammation. In her Motion for Review, petitioner also alleges that the Special Master erred in considering the lack of inflammation findings in N.S.'s non-contrast MRI because, according to petitioner, "[n]on-contrast MRI is not a reliable modality for identifying inflammatory processes driven by cytokine activity." (alteration added). The Special Master discussed the non-contrast MRI twice in his decision. See Skorupska v. Sec'y of Health & Hum. Servs., 2026 WL 674607, at *4, *10. First, in his fact section, the Special Master noted that at the November 22, 2013, hospitalization that occurred six days after vaccination, "[a] brain MRI was normal." See id. at *4 (alteration added). Second, when considering whether N.S. suffered harmful inflammation, the Special Master quoted respondent's argument on inflammation, which briefly mentioned the MRI: "Citing Dr. Raymond, the Secretary argues that there is 'no indication of inflammatory markers or MRI features in this case to suggest an inflammatory event or autoimmune injury, whether vaccine-related or not.'" Skorupska v. Sec'y of Health & Hum. Servs., 2026 WL 674607,

at *10. Moreover, contrary to petitioner's objection that the Special Master's conclusion that there was not inflammation "relies heavily on" the non-contrast MRI, the Special Master's decision reflects that his conclusion on the absence of inflammation was based on his consideration of the record as a whole. See id. at *9-11. The Special Master created a table[24] in his decision, reproduced below, that explained that the four medical records Ms. Skorupska cited in her brief before the Special Master to demonstrate that N.S. experienced inflammation do not actually support a finding that N.S. had harmful inflammation. See id. at *10-11. The Special Master's table reads as follows:

| Evidence Cited to Establish Inflammation | | | |
|---|---|---|---|
| Pg in SR | Pet'r's Cite in Ex. 148 | Actual Cite in Ex. 227 | Comment |
| 1 | 109 | 464 | Intake form. Chief complaint includes "involuntary muscle movements." Inflammation is not mentioned. |
| 2 | 172 | 550 | Blood tests from Nov. 26, 2013. Abnormally high values include bun to creatinine ratio, ammonia, and white blood cells. Ms. Skorupska has not cited any evidence in which a medical professional interpreted these results as consistent with inflammation. |
| 3 | 173 | 551 | Blood tests from Nov. 22, 2013. Abnormally high values include mean platelet value (slightly high), percentage of lymphocytes, number of lymphocytes, and number of lymphocytes. Ms. Skorupska has not cited any evidence in which a medical professional interpreted these results as consistent with inflammation. |
| 4 | 298 | 443 | Part of medical record from N.S.'s visit to the emergency room on Nov. 1, 2013. Medical professionals did not diagnose N.S. as suffering from inflammation. |

Id. at *10. In her Motion for Review, petitioner alleges the blood tests discussed in the second and third lines in the Special Master's table immediately above "demonstrate

[24] This table is helpful as Petitioner erroneously cited to Exhibit 148, a medical article, instead of Exhibit 227, N.S.'s medical records, in her brief, which was clarified later by the Special Master. See Skorupska v. Sec'y of Health & Hum. Servs., 2026 WL 674607, at *9 n.6. Ms. Skorupska made this same error—citing to a medical article in Exhibit 148, rather than N.S.'s medical records in Exhibit 227—in her Motion for Review in this court.

elevated lymphocyte levels consistent with immune activation" and "contradict the [Special Master's] conclusion that there was no objective evidence" of inflammation. (alteration added). The Special Master, however, considered the blood tests when he wrote, "[b]lood tests from Nov. 26, 2013. Abnormally high values include bun to creatinine ratio, ammonia, and white blood cells" and "[b]lood tests from Nov. 22, 2013. Abnormally high values include mean platelet value (slightly high), percentage of lymphocytes, number of lymphocytes, and number of lymphocytes [sic]." Id. (alterations added). When describing whether these blood tests from N.S.'s November 22, 2013, hospitalization following the discovery of his spasms were evidence of inflammation, as alleged by petitioner, the Special Master wrote: "Ms. Skorupska has not cited any evidence in which a medical professional interpreted these results as consistent with inflammation." See id. After concluding petitioner's proffered inflammation evidence from these blood tests did not warrant a finding of inflammation, the Special Master further addressed Ms. Skorupska's reliance on N.S.'s blood tests, stating:

> Moreover, after N.S.'s blood tests from November 2013 were returned, N.S.'s treating doctors did not diagnose him with or treat him for inflammation. Similarly, neither Dr. Ghacibeh nor Dr. Huq [petitioner's experts] pointed to the results of blood tests as evidence supporting an assertion that N.S. suffered inflammation. The omission of this type of opinion combined with Dr. Raymond's [respondent's expert] opinion that there is no evidence that N.S. suffered inflammation is a persuasive reason for finding that N.S. did not experience inflammation.

Id. at *11 (alterations added). In sum, when reviewing the records of N.S.'s medical tests from his November 22, 2013 hospitalization that occurred six days after vaccination as potential evidence, the Special Master's decision reflects that he considered the relevant evidence in the record when he concluded that "Ms. Skorupska has not persuasively established that N.S. suffered deleterious inflammation within a relevant time of the vaccination." See Skorupska v. Sec'y of Health & Hum. Servs., 2026 WL 674607, at *10. The Special Master provided a rational basis for this conclusion, specifically, that "[m]edical professionals," the contemporaneous treating doctors and the records they created, "did not diagnose N.S. as suffering from inflammation" and that no treating doctor or expert support exists to support petitioner's proposition that N.S.'s blood test results, contemporaneous with his spasm onset, demonstrated that N.S. was experiencing inflammation. See id. (alteration added). Therefore, the Special Master's conclusion that the blood tests in the record did not support that N.S. was suffering from harmful inflammation in proximity to receiving the vaccination at issue in this case was not arbitrary or capricious. Moreover, in her Motion for Review, petitioner does not counter the medical records, the expert testimony, or the literature in the record before the Special Master and this court, in order to support petitioner's burden to establish that the elevated lymphocytes evidenced harmful inflammation, as opposed to the Special Master's findings that petitioner's evidence of inflammation fell short of meeting the burden to support petitioner's case.

Petitioner additionally objects to the Special Master's lack of mention of N.S.'s test results from an encephalopathy autoimmune evaluation that was performed on October 3, 2023, almost ten years after the vaccination at issue. As reflected above, Special Masters have discretion not to explicitly mention every piece of evidence in the record in his or her decision on entitlement to compensation. See Snyder ex rel. Snyder v. Sec'y of Health & Hum. Servs., 88 Fed. Cl. at 728 (quoting Maza ex rel. Maza v. Sec'y of Dep't of Health & Hum. Servs., 67 Fed. Cl. 36, 38 (2025) ("The Special Master need not discuss every item of evidence in the record so long as her decision makes clear that she considered the petitioners' arguments.")). As indicated above, Special Master Moran concluded that "Ms. Skorupska has not persuasively established that N.S. suffered deleterious inflammation within a relevant time of the vaccination." Skorupska v. Sec'y of Health & Hum. Servs., 2026 WL 674607, at *10. Although the Special Master did not define a "relevant time," it would not be arbitrary or capricious for the Special Master to minimize or exclude the encephalopathy autoimmune evaluation that was performed on October 3, 2023, virtually ten years after the Hib vaccination at issue. See Pafford v. Sec'y of Health & Hum. Servs., 451 F.3d at 1358 (explaining that "without some evidence of temporal linkage, the vaccination might receive blame for events that occur weeks, months, or years outside of the time in which scientific or epidemiological evidence would expect an onset of harm").

Petitioner next argues that N.S.'s positive reaction to IVIG treatments, first attempted five and a half months after spasms onset, is evidence of vaccine-induced inflammation consistent with the expert opinion from petitioner's expert neurologist Dr. Ghacibeh. As indicated above, the Special Master found that IVIG treatment was not persuasive evidence that N.S. suffered from inflammation following his vaccination. See Skorupska v. Sec'y of Health & Hum. Servs., 2026 WL 674607, at *10. The Special Master's decision indicates his primary reason for rejecting N.S.'s IVIG treatment as evidence of inflammation was that petitioner's expert Dr. Ghacibeh's opinions on the IVIG treatment were unpersuasive, based in part on the several challenges from respondent's expert Dr. Raymond. See id. The Special Master arrived at the conclusion that "Dr. Ghacibeh's opinion regarding IVIG is not persuasive" after the Special Master considered the evidence in the record on IVIG therapy. Specifically, the Special Master stated in his decision:

> Ms. Skorupska has not persuasively established that N.S. suffered deleterious inflammation within a relevant time of the vaccination. To start with the last point first, IVIG is a complicated issue. Although Dr. Ghacibeh maintained that IVIG stopped the seizures (see Exhibit 59 at 2), Dr. Raymond raised several challenges, including the fact that N.S. was receiving other therapies at the same time. Exhibit K at 3. Moreover, the improvement after IVIG did not last very long. See Exhibit 15 at 26. Thus, Ms. Skorupska is oversimplifying the question.

Skorupska v. Sec'y of Health & Hum. Servs., 2026 WL 674607, at *10. Exhibit K in the record before the Special Master, which was cited by the Special Master in the above quote to support the "several challenges" to N.S.'s IVIG treatment as evidence of

inflammation, see id., is one of respondent's expert Dr. Raymond's opinions, in which Dr. Raymond explained the function of IVIG as follows:

> While there appears to be a therapeutic role in the autoimmune epilepsies and other similar neurologic conditions, it has been used in a variety of other forms of seizure disorders. The empiric use of IVIG in epilepsy dates back to the late 1970's. There are several case series suggesting that it may be effective in West syndrome, Lennox-Gastaut syndrome, and other forms of medically refractory epilepsy. A review of these cases demonstrated a very heterogeneous population including improvement in individuals with known genetic etiologies and others with areas of focal cortical dysplasia, a malformation that is developmental and not secondary to an autoimmune issue.
>
> The mechanism of action is uncertain. The heterogeneity of the populations that may improve is disparate and clearly indicates that it is not acting as an antagonist to an autoimmune process in the majority of patients. Whether it may be having a role as neuromodulator or has a local effect on inflammation to down-regulate epileptogenesis is presently unknown.
>
> Overall, the efficacy of IVIG in various forms of refractory epilepsy is unclear. A Cochrane report first reviewed in 2011, again in 2017, and most recently in 2019, evaluating the effects of IVIG in the frequency and duration of seizures, quality of life and adverse effects when used as monotherapy or as add-on therapy demonstrated no reliable conclusions concerning the efficacy of IVIG in any form of epilepsy.
>
> The specific case of NS highlights the difficulties in drawing conclusions from open studies without appropriate controls. The child did not receive IVIG alone, but is receiving other medications concurrently, so ascribing improvement to just one treatment is difficult and without clear objective evidence, actual benefit cannot be ascertained.
>
> However, if we accept that the child improved and it is felt to be secondary to IVIG, there is precedent for that in other genetic conditions, so the presumption that the etiology is an autoimmune encephalitis [autoimmune inflammation] secondary to immunization because of response is not supported.

(alteration added; internal citations omitted).

In her Motion for Review, Ms. Skorupska specifically objects to the Special Master's rejection of petitioner's expert Dr. Ghacibeh's opinion that IVIG treatment was

"irrefutable proof" that N.S. experienced harmful inflammation.[25] Petitioner argues that N.S.'s positive reaction to IVIG treatment is evidence of inflammation based in part on Dr. Ghacibeh's expert report. When considering whether N.S.'s response to IVIG treatment was evidence of inflammation, the Special Master referenced Dr. Ghacibeh's second report when he wrote "Dr. Ghacibeh maintained that IVIG stopped the seizures." See Skorupska v. Sec'y of Health & Hum. Servs., 2026 WL 674607, at *10. In Dr. Ghacibeh's second expert report, cited by the Special Master in his decision, petitioner's expert neurologist Dr. Ghacibeh writes: "[t]he fact that [N.S.] was started on IVIG therapy and had a very good clinical response in terms of seizure control and motor function provides further evidence of a chronic inflammatory state. IVIG is a treatment modality that targets specifically immune dysfunction and is used in various condition [sic] where the mechanism of disease is believed to be due to auto-antibodies." (alterations added). In Dr. Ghacibeh's third expert report, Dr. Ghacibeh stated: "IVIG therapy is not indicated and has never been proven to be effective in any form of epilepsy except immune-mediated epilepsy [immune-system driven seizures] and the response to IVIG [treatment] is an irrefutable proof that [N.S.] suffered an underlying inflammatory pathology as the cause of his epilepsy." (alterations added).

In his decision, the Special Master conclusively found that Ms. Skorupska did not demonstrate by a preponderance of the evidence that N.S. had an autoimmune condition given the lack of evidence of an autoimmune condition in his medical history. See Skorupska v. Sec'y of Health & Hum. Servs., 2026 WL 674607, at *14 n.12. Before this court, respondent explains, "[a]t base, Dr. Ghacibeh cited IVIG therapy to argue that N.S. had an autoimmune condition," which was squarely rejected by the Special Master in his decision, "and now, petitioner only provides attorney argument [in her Motion for Review] to allege that a response to IVIG evidences vaccine-related inflammation, unrelated to an autoimmune condition" since Dr. Ghacibeh's opinion on IVIG treatment was limited to the context of an autoimmune condition. (alterations added). Indeed, in his decision, the Special Master stated that "Ms. Skorupska has not adequately established that N.S. suffered from an autoimmune condition" because there was no evidence in the medical

---

[25] As indicated above, petitioner stated in her Motion for Review that "[**t**]**he Special Master erred in not giving enough weight to the expert opinion of Dr. Ghacibeh because he is credible and his opinions are supported by the record**." (emphasis in original; alteration added). Specifically, Ms. Skorupska writes:

> The Court [Special Master Moran] held, "When the treating doctors have not settled on a diagnosis, a petitioner may rely upon the report of a doctor retained in the litigation to establish, on a more likely than not basis, the condition affecting the vaccinee. has [sic] attempted to use Dr. Ghacibeh for this purpose. However, Dr. Ghacibeh's opinion is not persuasive." Decision at 17-18.

(alterations added). The above quoted language from petitioner's Motion for Review, which cites to the Special Master's decision, is not an actual quote from the Special Master's decision.

records demonstrating an autoimmune disorder. See id. Given the Special Master's conclusion that there was no medical evidence in the record that N.S. suffered from an autoimmune condition, the Special Master logically concluded that N.S. did not have an autoimmune condition and further concluded that Dr. Ghacibeh's theory that N.S.'s IVIG response was indicative of immune dysfunction, or an autoimmune condition, was unpersuasive. As such, the Special Master's rejection of petitioner's expert Dr. Ghacibeh's opinion that IVIG treatment was evidence of N.S.'s inflammation was supported by multiple reasons based on a review of the total record and was not arbitrary or capricious.

In her Motion for Review, petitioner also objects that "the assertion that intravenous immunoglobulin (IVIG) therapy 'worked only briefly' for N.S. is not supported by the full set of medical records and therefore misrepresents the clinical course." As indicated above, both the Althen test and the Loving test require a petitioner to show a medical theory demonstrating a logical sequence of cause and effect and that the alleged injury occurred within a proximate temporal period. See Althen v. Sec'y of Health & Hum. Servs., 418 F.3d at 1278; Loving ex rel. Loving v. Sec'y of Dep't of Health & Hum. Servs., 86 Fed. Cl. at 144; see also Pafford v. Sec'y of Health & Hum. Servs., 451 F.3d at 1358 ("[W]ithout some evidence of temporal linkage, the vaccination might receive blame for events that occur weeks, months, or years outside of the time in which scientific or epidemiological evidence would expect an onset of harm." (alteration added)). In his decision, Special Master Moran framed his inquiry as whether N.S. suffered deleterious inflammation in a relevant timeframe after vaccination. See Skorupska v. Sec'y of Health & Hum. Servs., 2026 WL 674607, at *10. In petitioner's case, N.S.'s IVIG treatments were first attempted five and a half months after the Hib vaccination and onset of infantile spasms. The Special Master also stated in his decision that the efficacy of IVIG treatment was a "complicated issue" because "N.S. was receiving other therapies at the same time." See id. In addition, the Special Master concluded that "the improvement after IVIG did not last very long." Id. The Special Master's finding that "improvement after IVIG did not last very long" also is supported in the record. The Special Master cited to Exhibit 15 in the record before the Special Master, which contained a medical note from treating neurologist Dr. Wolf, who wrote on June 6, 2014, that N.S. had: "IVIG [treatment], in hospital last month with great result of no spasm for 1.5 week only then they returned at 1 cluster per day. But then more recently with more cranky [sic]." (alterations added). Without more, this court does not have a basis to "reweigh the factual evidence, or [ ] assess whether the special master correctly evaluated the evidence," nor should this court "examine the probative value of the evidence or the credibility of the witnesses. These are all matters within the purview of the fact finder," see Broekelschen v. Sec'y of Health & Hum. Servs., 618 F.3d at 1349 (alteration in original), unless the Special Master acted arbitrarily or capriciously or his decision was not in accordance with the law. The Special Master provided multiple explanations in his decision for why he rejected Dr. Ghacibeh's theory that N.S.'s IVIG "response" was evidence of inflammation, with a number of citations to the medical records and the expert reports, and, in doing so, the Special Master drew a conclusion that is not "wholly implausible," arbitrary or capricious, and within the legal parameters. See Cedillo v. Sec'y of Health & Hum. Servs., 617 F.3d at 1338 ("'[If] the Special Master's conclusion [is] based on evidence in the record that [is] not wholly implausible, we are

compelled to uphold that finding as not being arbitrary or capricious.'" (alterations in original) (quoting Lampe v. Sec'y of Health & Hum. Servs., 219 F.3d at 1363)). Based on the decision issued by the Special Master, and the record before this court, this court does not disturb the Special Master's finding that N.S.'s IVIG treatment is not evidence of vaccine-induced inflammation.

In sum, the Special Master was not arbitrary or capricious in his consideration of Ms. Skorupska's evidence regarding inflammation. Moreover, the Special Master did not act in an arbitrary or capricious manner, or not in accordance with the law, when he concluded that petitioner failed to satisfy her burden to demonstrate that N.S. had deleterious inflammation. The Special Master's finding of a lack of inflammation in this case ultimately is dispositive under either Althen prong two, see Althen v. Sec'y of Health & Hum. Servs., 418 F.3d at 1278, or Loving prong five, see Loving ex rel. Loving v. Sec'y of Dep't of Health & Hum. Servs., 86 Fed. Cl. at 144, given that inflammation was an essential component of petitioner's medical theory of causation. See also Hibbard v. Sec'y of Health & Hum. Servs., 698 F.3d at 1364. As stated by a Judge of the United States Court of Federal Claims, "[a] failure to establish any one of the required elements set forth in Althen or Loving, 'is necessarily fatal to a petitioner's case.'" See Vinesar v. Sec'y of Health & Hum. Servs., 170 Fed. Cl. at 692 (alteration added) (quoting Hodge by Elson v. Sec'y of Health & Hum. Servs., 168 Fed. Cl. at 124). Based on this court's review of the Special Master's consideration of Loving prong five / Althen prong two, the Special Master's decision finding Ms. Skorupska had not met her burden to prove entitlement to compensation was not arbitrary or capricious.

**The Special Master's Loving Prong Six (Althen Prong Three) Analysis: A Proximate Temporal Relationship**

Petitioner also objects to the Special Master's timing analysis, regarding the time between the Hib vaccination and N.S.'s injury, as "flawed both legally and factually." As indicated above, the third Althen prong requires "a showing of a proximate temporal relationship between vaccination and injury." Althen v. Sec'y of Health & Hum. Servs., 418 F.3d at 1278. Similarly, the sixth Loving prong requires "a showing of a proximate temporal relationship between the vaccination and the significant aggravation." Loving ex rel. Loving v. Sec'y of Dep't of Health & Hum. Servs., 86 Fed. Cl. at 144. In his decision, the Special Master explained that, in order to demonstrate a "proximate temporal relationship," "[a] petitioner must show the 'timeframe for which it is medically acceptable to infer causation' and that the onset of the disease occurred in this period." Skorupska v. Sec'y of Health & Hum. Servs., 2026 WL 674607, at *12 (alteration added) (quoting Shapiro v. Sec'y of Health & Hum. Servs., 101 Fed. Cl. at 542-43); see also de Bazan v. Sec'y of Health & Hum. Servs., 539 F.3d at 1352 (stating that a petitioner must demonstrate that "onset of symptoms occurred within a timeframe for which, given the medical understanding of the disorder's etiology, it is medically acceptable to infer causation-in-fact"). A medically acceptable timeframe for which it is acceptable to infer causation-in-fact can be derived from medical literature, the statements of treating physicians, and/or expert opinion. See Graves v. Sec'y of Dep't of Health & Hum. Servs., 101 Fed. Cl. at 328 (holding that medically acceptable timeframe was met when expert

opinion felt onset timing made causation inferable because the opinion was supported by medical literature and treating physician statements). The court also notes that in Capizzano v. Secretary of Health and Human Services, the United States Court of Appeals for the Federal Circuit indicated that "[w]e see no reason why evidence used to satisfy one of the Althen III prongs cannot overlap to satisfy another prong." Capizzano v. Sec'y of Health & Hum. Servs., 440 F.3d at 1326 (alteration added); see also Graves v. Sec'y of Dep't of Health & Hum. Servs., 101 Fed. Cl. at 334 (citing Capizzano v. Sec'y of Health & Hum. Servs., 440 F.3d at 1326).

In his analysis of the "proximate temporal relationship" prong, the Special Master considered the opinions offered by petitioner's experts that there was a temporal relationship between the Hib vaccination and N.S.'s injury, but found petitioner's expert opinions to be unpersuasive. As an initial matter, in the Special Master's discussion of the expert opinions offered for his consideration, the Special Master identified a credibility issue with petitioner's expert Dr. Huq's expert opinion regarding N.S.'s case. The Special Master wrote:

> Ms. Skorupska's position regarding timing is not clear. Part of the lack of clarity may derive from an inconsistency in Dr. Huq's first report. Dr. Huq wrote: "As the initial brain injury occurred due to activation of the innate immunity by [the] Hib vaccine, the timing of epileptic spasms 5 days after the vaccination is appropriate." Exhibit 68 at 7-8. He repeats this sentence on page 28. But, in this context, Dr. Huq stated, "NS developed infantile spasms seven days after Hib vaccination." Id. at 28.

Skorupska v. Sec'y of Health & Hum. Servs., 2026 WL 674607, at *12 (alteration in original). As indicated above, Special Masters, as finders of fact, "are entitled—indeed, expected—to make determinations as to the reliability of the evidence presented to them and, if appropriate, as to the credibility of the persons presenting that evidence." Moberly ex rel. Moberly v. Sec'y of Health & Hum. Servs., 592 F.3d at 1326.

Petitioner argued in her brief to the Special Master that:

> Dr. Ghacibeh states, "It is hard to believe that onset of seizures within days of receiving the vaccine was a mere coincidence. The temporal relationship is compelling. It is well known that vaccines can be associated with various neurological complications, including seizures and developmental delay, probably as a result of a diffuse inflammatory response and auto-immunity."

In his decision, the Special Master addressed petitioner's argument "that the two events (vaccination and onset of infantile spasms) could not simply be viewed as a 'coincidence.'" Skorupska v. Sec'y of Health & Hum. Servs., 2026 WL 674607, at *13. The Special Master remarked that "in several cases, special masters have found that a sequence of events in which a child-vaccinee's febrile seizure occurred within one day of a vaccination did not mean that the vaccine caused the child's epilepsy." Id. The Special Master's statements in response to petitioner's "coincidence" argument were not arbitrary.

See Althen v. Sec'y of Health & Hum. Servs., 418 F.3d at 1278 ("Although probative, neither a mere showing of a proximate temporal relationship between vaccination and injury, nor a simplistic elimination of other potential causes of the injury suffices, without more, to meet the burden of showing actual causation."); see also Moberly ex rel. Moberly v. Sec'y of Health & Hum. Servs., 592 F.3d at 1323 ("'A proximate temporal association alone does not suffice to show a causal link between the vaccination and the injury.'" (quoting Grant v. Sec'y of Dep't of Health & Hum. Servs., 956 F.2d at 1148)).

The Special Master also reviewed the medical literature offered by petitioner in an attempt to establish a proximate temporal relationship between the vaccination and N.S.'s injury, or the aggravation of a preexisting condition. See Skorupska v. Sec'y of Health & Hum. Servs., 2026 WL 674607, at *12. As the Special Master explained in his decision:

> The relevant portion of Ms. Skorupska's original brief did not engage with timing. See Pet'r's Br. At 63-64. She did not identify a period for which an inference of aggravation is appropriate, and she did not state when N.S.'s preexisting condition was first aggravated. She was, accordingly, directed to clarify her position. Order, issued Oct. 7, 2024.
>
> Ms. Skorupska presented more fulsome arguments. As to the interval for which an inference of aggravation is appropriate, Ms. Skorupska stated that the appropriate range of time would be "within the first 72 hours – six days." Pet'r's Supp'l Br., filed Oct. 15, 2024, at 1.

Id. As indicated above, in petitioner's briefs to the Special Master, petitioner cited two articles, one by Tro-Baumann et al. and one by Verbeek et al., in an attempt to satisfy her burden of demonstrating a proximate temporal relationship between vaccination and injury in N.S.'s case. Relying on the Tro-Baumann et al. and Verbeek et al. articles, petitioner argued that the medically acceptable timeframe for seizure onset is "within the first 72 hours - six days" in her supplemental brief on timing before the Special Master. Regarding the Tro-Baumann et al. and Verbeek et al. articles offered by petitioner, the Special Master found:

> Although Ms. Skorupska cited two medical articles, they do not propose six days. The first is by Tro-Baumann, which found that the majority of children with Dravet's syndrome experienced febrile seizures within 72 hours of a vaccination against diphtheria-tetanus-pertussis. Exhibit 224. The second is by Verbeek, which found febrile seizures within 24 hours of a vaccination in children with Dravet's syndrome. Exhibit 225.

Skorupska v. Sec'y of Health & Hum. Servs., 2026 WL 674607, at *12 (footnotes omitted). In his decision, the Special Master continued: "[i]f it is assumed that Tro-Baumann and Verbeek, two articles about febrile seizures, provide information about the time that afebrile seizures develop after vaccination, then preponderant evidence favors a finding that the seizures would manifest within about 72 hours of the vaccination." Id. at *13 (alteration added). The Special Master, however, found that, even if seizure onset within

72 hours, or three days, was credited, "the evidence does not support a conclusion that N.S. displayed symptoms of a seizure within the first 72 hours post-vaccination" because the contemporaneous medical records indicated that N.S.'s spasms began "four-days post-vaccination." Id. at *12-13. In coming to his conclusion, the Special Master weighed the nature and findings of Ms. Skorupska's cited literature and the competing evidence, including contemporaneous medical records regarding the onset of the seizures.

Despite offering the Tro-Baumann et al. and Verbeek et al. articles, which discuss febrile seizures, as relevant medical literature in her briefs submitted to the Special Master, petitioner now asserts in her Reply to the Motion for Review that the Special Master erred in his timing analysis when he "relied on literature concerning febrile seizures, despite the undisputed fact that N.S.'s seizures were **afebrile**." (emphasis in original). Moreover, petitioner's broad objection to the use of febrile seizure literature is a new argument submitted to this court as part of her request to review the Special Master's decision—indeed, it is an abandonment of petitioner's original position that she argued before the Special Master when he reviewed the record before him. Generally, and in vaccine cases, the submission of a new argument for the first time in a reply brief before this court need not be considered by this court and raises further questions regarding the credibility of the newly raised argument. See Angel v. United States, 169 Fed. Cl. 552, 555 (2024) ("As a matter of procedural fairness, arguments raised for the first time in a reply brief are waived and the court need not consider them."); see also Giannantonio v. Sec'y of Health & Hum. Servs., 168 Fed. Cl. 84, 93 (2023) ("Further, it is well established that '[r]aising [an] issue for the first time in a reply brief does not suffice; reply briefs reply to arguments made in the response brief—they do not provide the moving party with a new opportunity to present yet another issue for the court's consideration.'" (alterations and emphasis in original; citation omitted)). Moreover, in vaccine cases, a petitioner should not be raising an argument for the first time on appeal to the United States Court of Federal Claims, especially if the information upon which the newly raised argument is based was available during the time the case was before the Special Master. See Vaccine Rule 8(f)(1) ("Any fact or argument not raised specifically in the record before the special master will be considered waived and cannot be raised by either party in proceedings on review of a special master's decision."); see also Pulsipher v. Sec'y of Health & Hum. Servs., 179 Fed. Cl. at 282. Before the Special Master, petitioner did not argue that the Special Master should not consider medical literature related to febrile seizures. Petitioner's newfound objection to the Special Master's consideration of febrile seizure literature does not direct this court, reviewing the record in the case as a whole, to reject the Special Master's conclusions. Additionally, petitioner does not appear specifically to object to the Special Master's finding that only up to 72 hours is a credited time to infer vaccine causation in her Motion for Review to this court.

Furthermore, petitioner also alleges in her Reply to the Motion for Review that "the record demonstrates that N.S. experienced systemic symptoms immediately following vaccination, including fever, vomiting, and irritability, followed by seizure onset within days," and states that "[d]espite this clear record, the Special Master concluded that petitioner failed to establish that the onset of N.S.'s condition occurred within a medically acceptable timeframe to infer vaccination causation." (alteration added). In her Reply to

the Motion for Review, petitioner further states: "petitioner argues that the onset of the seizure process began contemporaneously, or shortly after, vaccination-not four days later." The Special Master, however, found Ms. Skorupska's arguments unconvincing based on the contemporaneous medical records. See Skorupska v. Sec'y of Health & Hum. Servs., 2026 WL 674607, at *13. Specifically, the Special Master found that N.S. had afebrile (fever-less), not febrile (with fever) infantile spasms when he recounted that the contemporaneous medical records from N.S.'s November 22, 2013 visit at the Staten Island University Hospital demonstrate that "[i]n the hospital, Ms. Skorupska denied fevers. Exhibit 29 at 149 (Nov. 22, 2013)."[26] See Skorupska v. Sec'y of Health & Hum. Servs., 2026 WL 674607, at *4 n.3 (alteration added). The Special Master found that N.S.'s spasms manifested four days after vaccination pursuant to N.S.'s contemporaneous medical records in the record. The Special Master wrote:

> In an affidavit written in 2017, Ms. Skorupska averred that N.S. "had been having spasms for at least two days, maybe more" as of November 22, 2013, placing the onset at four days after vaccination, "maybe" sooner. Ms. Skorupska also states that N.S. had a fever the night of vaccination, and, "in retrospect, she felt as though N.S. had been having seizures possibly for the 'entire week,' meaning from the first day, or two, of the vaccination."
>
> Ms. Skorupska's account does not overcome the medical records created when N.S. went to the hospital in November 2013. These medical records, which were generated contemporaneously with N.S.'s illness, note only a two-day history of spasms, i.e., four-days post-vaccination. This is not to indicate that Ms. Skorupska is presenting a false narrative; special masters have often refrained from crediting accounts presented years later because of a faulty memory, not dishonesty . . . Here, Ms. Skorupska's affidavit—written nearly four years after N.S.'s vaccination and, additionally, phrased in uncertain terms—is too far-removed and too speculative to be credited over the medical records.

Skorupska v. Sec'y of Health & Hum. Servs., 2026 WL 674607, at *13 (internal references and citations omitted).[27] As demonstrated by the above quote, the Special Master explained why he credited N.S.'s contemporaneous medical records over petitioner's own

[26] At the oral argument before this court, respondent's counsel of record attested that "[a]s a medical class, infantile spasms are not febrile seizures. They just aren't. It's a type of afebrile seizure where there's what's called hypsarrhythmia on EEG, and it's very classic where there's disorganized and chaotic brainwave pattern. It's a whole different animal than febrile seizures." (alteration added).

[27] Relatedly, in her Motion for Review, Ms. Skorupska incorrectly asserts that the Special Master found seizure onset began prior to vaccination. Contrary to petitioner's challenge, the Special Master found that "preponderant evidence does not establish that N.S. was experiencing infantile spasms before the vaccination." Skorupska v. Sec'y of Health & Hum. Servs., 2026 WL 674607, at *12 n.11.

affidavit when determining when spasm onset occurred, and explained how this credibility finding is in accordance with Vaccine Program precedent in which contemporaneous medical records are favored. The Special Master's determination that N.S.'s afebrile infantile spasm onset occurred four days after vaccination was not arbitrary or capricious, was supported by the record, was in accordance with the law, and was adequately explained in his decision. Therefore, this court should not disturb the Special Master's factual findings, given the applicable deferential review by this court of the Special Master's factual conclusions on a motion for review. See Correira v. Sec'y of Health & Hum. Servs., 179 Fed. Cl. at 292 ("[T]his Court is highly deferential to the special masters' factual determinations[.]" (alterations added)). In his decision, the Special Master concluded his timing analysis as follows:

> In sum, Ms. Skorupska has not presented any persuasive evidence to justify a timeframe of up to six days. After 72 hours is credited as an acceptable timeframe, Ms. Skorupska has not demonstrated that N.S. developed symptoms within this time. Accordingly, Ms. Skorupska has failed to meet her burden regarding timing.

Skorupska v. Sec'y of Health & Hum. Servs., 2026 WL 674607, at *13. Based on the foregoing, the Special Master's conclusion that petitioner failed to satisfy her burden of demonstrating a proximate temporal relationship between the Hib vaccination and N.S.'s injury, and that petitioner is not entitled to compensation on this basis, was neither arbitrary or capricious or not in accordance with the law.

**The Special Master's Loving Prong Four (Althen Prong One) Analysis: A Reputable Medical Theory**

As indicated above, the first Althen prong requires a petitioner to demonstrate "a medical theory causally connecting the vaccination and the injury[.]" Althen v. Sec'y of Health & Hum. Servs., 418 F.3d at 1278 (alteration added). Similarly, the fourth Loving prong requires a petitioner to demonstrate "a medical theory causally connecting such a significantly worsened condition to the vaccination[.]" Loving ex rel. Loving v. Sec'y of Dep't of Health & Hum. Servs., 86 Fed. Cl. at 144 (alteration added). In her Motion for Review to this court, petitioner alleges that her medical "theory should not be rejected on the basis that cytokine-driven inflammation was not established in the record" because there is evidence of inflammation in the record. Petitioner's objection on this point is without merit because the Special Master, although analyzing the evidence in the record before the Special Master concerning the presence or absence of inflammation, ultimately did not rule on whether petitioner presented a "reliable and persuasive medical theory." See Skorupska v. Sec'y of Health & Hum. Servs., 2026 WL 674607, at *14. Specifically, the Special Master stated that "a fulsome analysis of the [medical] theory is not necessary" because "[a] finding that a petitioner has not met one element of the Althen prongs justifies a denial of compensation" and because "Ms. Skorupska has not carried her burden under the other Loving / Althen prongs." See id. (alterations added). Moreover, as discussed above, the Special Master stated in his decision:

> Ms. Skorupska's theory relied on the presence of cytokine-driven inflammation. Without a showing that this inflammation did occur, she cannot establish a logical sequence of cause and effect under the fifth Loving prong / second Althen prong. Ms. Skorupska's failure to meet her burden of proof on this element means that she is not entitled to compensation.

Skorupska v. Sec'y of Health & Hum. Servs., 2026 WL 674607, at *11. The Special Master is correct that a petitioner must demonstrate all the required components of the Althen test for an initial onset claim, or the Loving test for a significant aggravation claim, in order to be entitled to compensation. See Vinesar v. Sec'y of Health & Hum. Servs., 170 Fed. Cl. at 692 ("A failure to establish any one of the required elements set forth in Althen or Loving, 'is necessarily fatal to a petitioner's case.'" (quoting Hodge by Elson v. Sec'y of Health & Hum. Servs., 168 Fed. Cl. at 124)). The Special Master's finding that petitioner did not meet her burden under the other Loving / Althen prongs is independently sufficient to deny compensation through the Vaccine Program. Therefore, the Special Master did not err in his choice to not explicitly rule on Loving prong four or Althen prong one in his decision because, even if the Special Master had found petitioner's medical theory persuasive, petitioner still would not be entitled to compensation given her failure to demonstrate Loving prongs two and three or Althen prongs five and six.

Although the Special Master did not rule on whether petitioner's medical theory satisfied Loving prong four or Althen prong one, the Special Master nonetheless briefly discussed the credibility of petitioner's inflammation theory, stating "while Ms. Skorupska may theorize that the vaccine caused N.S.'s condition, she does not actually describe in her briefs the underlying mechanism to explain how the vaccine could have done so." Skorupska v. Sec'y of Health & Hum. Servs., 2026 WL 674607, at *14 (emphasis in original). As indicated above, the United States Court of Appeals for the Federal Circuit has indicated that "to prevail in a vaccine case a petitioner need not provide proof of the specific biological mechanism leading to the injury at issue." See Stone v. Sec'y of Health & Hum. Servs., 676 F.3d at 1384 (citing Knudsen by Knudsen v. Sec'y of Dep't of Health & Hum. Servs., 35 F.3d at 549); see also White v. Sec'y of Health & Hum. Servs., 163 F.4th at 1363 (finding legal objection meritless when petitioner argued that the Special Master erred in finding an alternative cause without evidence of the biological mechanism because the court found a requirement like this was unsupported by case law, including Althen and Knudsen). Instead, "causation can be found in vaccine cases based on epidemiological evidence and the clinical picture regarding the particular child without detailed medical and scientific exposition on the biological mechanisms" because "to require identification and proof of specific biological mechanisms would be inconsistent with the purpose and nature of the vaccine compensation program." Knudsen by Knudsen v. Sec'y of Dep't of Health & Hum. Servs., 35 F.3d at 549. To the extent that the Special Master's comment, that petitioner "does not actually describe in her briefs the underlying mechanism to explain how the vaccine could have" caused N.S.'s injury, Skorupska v. Sec'y of Health & Hum. Servs., 2026 WL 674607, at *14 (emphasis in original), improperly suggests that petitioner was required to provide proof of the specific biological mechanism leading to N.S.'s injury, the Special Master's comment appears to have been theoretical

and not critical to his decision denying compensation to the petitioner. Indeed, as discussed above, the Special Master based his decision to deny entitlement to petitioner on petitioner's failure to demonstrate "a logical sequence of cause and effect," as required by Althen prong two and Loving prong five, and "a proximate temporal relationship," as required by Althen prong three and Loving prong six. See Skorupska v. Sec'y of Health & Hum. Servs., 2026 WL 674607, at *14 ("Ms. Skorupska has not carried her burden under the other Loving / Althen prongs."); see also Althen v. Sec'y of Health & Hum. Servs., 418 F.3d at 1278; Loving ex rel. Loving v. Sec'y of Dep't of Health & Hum. Servs., 86 Fed. Cl. at 135. The Special Master therefore observed that he did not need to, and, in fact, did not, analyze whether petitioner demonstrated a "reliable and persuasive medical theory" as required by Althen prong one and Loving prong four. See Skorupska v. Sec'y of Health & Hum. Servs., 2026 WL 674607, at *14; see also Althen v. Sec'y of Health & Hum. Servs., 418 F.3d at 1278; Loving ex rel. Loving v. Sec'y of Dep't of Health & Hum. Servs., 86 Fed. Cl. at 135. The Special Master's comment that petitioner did not describe the underlying mechanism by which the Hib vaccine could have caused N.S.'s injury appears to be harmless and was not critical to the Special Master's overall review of the record and conclusions derived therefrom. See Hazlehurst v. Sec'y of Health & Hum. Servs., 604 F.3d at 1351 ("Given the abundance of other evidence" supporting the Special Master's finding, "the special master's consideration of [an expert's] evidence, even if erroneous, would not justify reversal of the special master's decision" (alteration added)); see also Hines on Behalf of Sevier v. Sec'y of Dep't of Health & Hum. Servs., 940 F.2d at 1526 (explaining that even if Special Master's action was in error "it was harmless because, as explained below, the special master's decision was based on a number of factors and [petitioner] has not shown" that the alleged error, "was likely critical to the result" of denying compensation (alteration added)).

In her Motion for Review, petitioner also asserts that the Special Master "incorrectly concluded that treating physicians uniformly attributed N.S.'s condition to his SCN2A mutation" because "Dr. Schwartzberg and Dr. Lis both acknowledged the temporal relationship between the Hib vaccination and the onset of seizures, and Dr. Lis provided a written statement explicitly linking the reaction to the vaccination." In his decision, however, the Special Master did not conclude there was "uniform attribut[ion]" of the infantile spasms to the mutation. (alteration added). When recounting respondent's argument regarding treating physicians' statements, the Special Master stated in his decision:

> The Secretary asserts that the treating doctors do not assist Ms. Skorupska. The Secretary argues: "no treating physician attributed N.S.'s condition in general, or spasms and later seizures more specifically, to vaccination. Indeed, the treating physician statements heavily weigh against causation in this case, because they did, on aggregate, attribute N.S.'s condition – without reservation – to his SCN2A mutation."

See Skorupska v. Sec'y of Health & Hum. Servs., 2026 WL 674607, at *11. The Special Master continued, "[s]trong support for the Secretary's opinion" that treating physicians' statements aggregately attribute the spasms to N.S.'s mutation "comes from the July 23,

20214 [sic] report from the clinical geneticist, Dr. Jabs," in which Dr. Jabs calls N.S.'s mutation "deleterious." Id. (alterations added).

As indicated above, petitioner alleges that a letter written by pediatric neurologist Dr. Schwartzberg "acknowledged the temporal relationship between the Hib vaccination and the onset of seizures." However, N.S. was seen by Dr. Schwartzberg on November 13, 2013, three days prior to the Hib vaccination on November 16, 2013, and one week prior to November 20, 2013, which is the date the Special Master found N.S. started having spasms. See Skorupska v. Sec'y of Health & Hum. Servs., 2026 WL 674607, at *4. In Dr. Schwartzberg's December 4, 2013 letter updating N.S.'s pediatrician, Dr. Lis, which was sent eighteen days after the Hib vaccination at issue, Dr. Schwartzberg remarked that, after speaking with N.S.'s mother, "[i]t seems [N.S.] began having infantile spasm type seizures last week, a few days after receiving an immunization." (alterations added). Petitioner also references a "To Whom it May Concern" letter written by pediatrician Dr. Lis on January 29, 2016, in which Dr. Lis wrote N.S. "received the HIB immunization (PMC, Lot#UH868AB, Exp. Date: 12/01/2014) on 11/16/2013 which resulted in him having infantile spasm type seizures" as recognizing a temporal and causal relationship. (capitalization in original). Dr. Lis's letter was dated January 29, 2016, more than two years after N.S. received the Hib vaccination at issue on November 16, 2013. Notably, on February 1, 2016, three days after Dr. Lis's first letter, the pediatrician Dr. Lis wrote another letter with a seemingly contradictory view. Dr. Lis's February 1, 2016 letter stated: "I strongly recommend [N.S]'s (D.O.B 03/07/2013) increase/initiation in services. He is a patient in our clinic since August 2013. The child is severely delayed due to a genetic mutation (SCN2A) causing epilepsy, hypotonia, sensory, communication and motor impairments." (alteration added). Respondent asserts that Dr. Schwartzberg's December 4, 2013 letter "cannot reasonably be construed as an attribution of causation." Respondent also asserts that Dr. Lis's first letter, dated January 29, 2016, is not probative because, according to respondent, "her letter appears to be written as a courtesy at the request of petitioner, given the lack of any explanation and the letter not being organic to routine medical records in the course of treatment." Unlike Dr. Lis's letters, Dr. Schwartzberg's letter is somewhat more contemporary to the Hib vaccination, as it was written on December 4, 2013, less than a month after N.S. was seen by Dr. Schwartzberg on November 13, 2013, and also less than a month after N.S.'s infantile spasms were first discovered at his November 22, 2013, hospital visit. Dr. Schwartzberg's December 4, 2013 letter, however, does not appear to be contemporaneous to N.S.'s vaccination and was not sent within the critical time in which the Special Master found it necessary to establish a temporal relationship between the Hib vaccination and N.S.'s injuries, which the Special Master credited in his decision as up to 72 hours, or three days, after the Hib vaccination. There is no indication in the record that Dr. Schwartzberg saw N.S. between the Hib vaccination on November 16, 2013 and N.S.'s November 22, 2013 hospitalization. Moreover, Dr. Schwartzberg's December 4, 2013 letter does not state that the Hib vaccination caused N.S.'s injuries. In the Vaccine Program, the medical records and opinions of treating physicians speaking to vaccine causation, especially medical records and opinions that are contemporaneous to the administration of the vaccination at issue, are favored and generally probative in the causation analysis. See Capizzano v. Sec'y of Health & Hum. Servs., 440 F.3d at 1326 (explaining that "treating physicians are likely to

be in the best position to determine whether 'a logical sequence of cause and effect show[s] that the vaccination was the reason for the injury'" (alteration in original) (quoting Althen v. Sec'y of Health & Hum. Servs., 418 F.3d at 1280)); see also Cucuras v. Sec'y of Health & Hum. Servs., 993 F.2d at 1528 (finding "[m]edical records, in general, warrant consideration as trustworthy evidence" because "[t]hese records are also generally contemporaneous to the medical events" (alterations added)). When treating physicians only note a temporal relationship, but decline to conclusively link causation to vaccination, however, their statements are far less probative. See Moberly ex rel. Moberly v. Sec'y of Health & Hum. Servs., 592 F.3d at 1323 (explaining that the record showed "[w]hile several of [the] treating physicians noted the temporal relationship . . . none offered ever a solid statement" of causation and, "[h]ad any of [the] treating physicians provided such an opinion [of vaccine causation], it could have been probative with respect to causation" (first alteration in original; other alterations and omission added)). Ms. Skorupska asserts that Dr. Schwartzberg noted a temporal relationship, but a treating physician's acknowledgement of a possible temporal relationship is less probative than a conclusive statement of vaccine causation. See id. Further, although petitioner argues that Dr. Lis's January 29, 2016 letter suggests both a temporal relationship and a link between the Hib vaccination and N.S.'s spasms, Dr. Lis's January 29, 2016 letter, written more than two years after the Hib vaccination at issue, is neither contemporaneous with the vaccination and N.S.'s alleged injury, nor is it unequivocal, especially given the second, seemingly contradictory, letter written by Dr. Lis three days later on February 1, 2016. Given the less than conclusive or probative nature of the doctors' letters cited by petitioner, the Special Master was well within his discretion not to be persuaded by those doctors' letters. The Special Master's decision reflects a consideration of the record as a whole and the Special Master was not required to refer explicitly to every piece of evidence in his decision, such as those doctors' letters. See Snyder ex rel. Snyder v. Sec'y of Health & Hum. Servs., 88 Fed. Cl. at 728. Therefore, the Special Master did not abuse his discretion when he did not elaborate on either Dr. Schwartzberg's or Dr. Lis's letters in his decision.

**The Special Master's Hypothetical Alternative Causation Analysis: A Causal "Factor Unrelated" to Vaccination**

Petitioner also advances both a factual and legal contention to the Special Master's consideration of N.S.'s SCN2A genetic mutation in his decision to deny entitlement. Ms. Skorupska argues that the Special Master imposed a legally impermissible burden when he "elevated the genetic mutation from a competing explanation to a dispositive conclusion, effectively bypassing the required evaluation of whether the vaccine was a substantial contributing factor" to N.S.'s injury. Petitioner objects to the Special Master's examination of whether the respondent would have met the "factor unrelated" burden had Ms. Skorupska preponderantly demonstrated causation and the burden shifted to the respondent. See Skorupska v. Sec'y of Health & Hum. Servs., 2026 WL 674607, at *15. In his decision, the Special Master wrote: "If, for the sake of argument, it were assumed that Ms. Skorupska had met her burden of proof, then the Secretary may show N.S.'s 'condition . . . is due to factors unrelated to the administration of the vaccine.'" Id. (omission in original) (quoting 42 U.S.C. § 300aa–13(1)(B)). As the United States Court of Appeals for the Federal Circuit recognized in Stone v. Secretary of Health and Human

Services, a case which Special Master Moran cited in his decision, see Skorupska v. Sec'y of Health & Hum. Servs., 2026 WL 674607, at *14, decisions in the Federal Circuit "support the commonsense proposition that evidence of other possible sources of injury can be relevant not only to the 'factors unrelated' defense, but also to whether a prima facie showing has been made that the vaccine was a substantial factor in causing the injury in question." See Stone v. Sec'y of Health & Hum. Servs., 676 F.3d at 1379; see also de Bazan v. Sec'y of Health & Hum. Servs., 539 F.3d at 1353 ("The government, like any [respondent], is permitted to offer evidence to demonstrate the inadequacy of the petitioner's evidence on a requisite element of the petitioner's casein-chief. [sic]" (alterations added)). Additionally, the Special Master noted that respondent had offered N.S.'s E1211K variant of the SCN2A gene as the "factor unrelated." See Skorupska v. Sec'y of Health & Hum. Servs., 2026 WL 674607, at *15. The Special Master found that Ms. Skorupska did not satisfy her burden to demonstrate "a logical sequence of cause and effect," as required by Althen prong two and Loving prong five, and "a proximate temporal relationship," as required by Althen prong three and Loving prong six, even before he considered the role of N.S.'s genetic mutation, and even though it is proper to consider respondent's "factor unrelated" arguments under the Loving / Althen prongs. See Skorupska v. Sec'y of Health & Hum. Servs., 2026 WL 674607, at *9 n.5, *11; see also Winkler v. Sec'y of Health & Hum. Servs., 88 F.4th at 963 ("Such contemplation of a potential causative agent when evaluating whether or not a petitioner has established a prima facie case is in accordance with the law."). Although petitioner argued that the Special Master "improperly elevated alternative causation evidence into a dispositive finding," the Special Master's decision demonstrates that he reached his conclusion to deny compensation not based on a consideration of N.S.'s genetic mutation, but because petitioner had not met her causation burden under Loving and Althen based on his review of the record. See Skorupska v. Sec'y of Health & Hum. Servs., 2026 WL 674607, at *14. The Special Master specifically stated in his decision that "[t]he foregoing [Loving / Althen] analysis is a basis for determining that Ms. Skorupska failed to meet her burden of proving with preponderant evidence that the Hib vaccine significantly aggravated N.S.'s neurologic problems." Skorupska v. Sec'y of Health & Hum. Servs., 2026 WL 674607, at *14-15 (alterations added). The Special Master's ultimate decision denying entitlement to compensation rested on Ms. Skorupska not meeting her burden to demonstrate "a logical sequence of cause and effect," as required by Althen prong two and Loving prong five, and "a proximate temporal relationship," as required by Althen prong three and Loving prong six, and the Special Master's hypothetical analysis did not create reversible error because it was both hypothetical and not the grounds on which the petition on behalf of N.S. for compensation was denied. See W.C. v. Sec'y of Health & Hum. Servs., 704 F.3d at 1358; see also Osenbach v. Sec'y of Health & Hum. Servs., No. 2024-1663, 2025 WL 2387944, at *5 (Fed. Cir. Aug. 18, 2025) (remarking that the Special Master's hypothetical "exploration of whether the Secretary could have established an alternative cause for [petitioner's] disorder by a preponderance of the evidence was not the basis for denying the Osenbach's petition and therefore is not grounds for reversal" (alteration added)). Therefore, the Special Master did not impose a legally impermissible burden on petitioner when he concluded that petitioner was not entitled to compensation.

Nonetheless, the court briefly reviews petitioner's objections to the Special Master's consideration of N.S.'s genetic mutation in order to fully include the explanation of what the Special Master believed would have occurred if the burden, in fact, had shifted from petitioner to respondent. In his decision, the Special Master stated:

> Ms. Skorupska maintains that the genetic mutation "primed N.S. to have the adverse reaction to the Hib vaccine." Her "position is that the variant SCN2A gene is not enough to cause Petitioner's current mental state. While he may have been at an increased risk to develop some deficits due to the genetic mutation, the vaccination (not simply the genetic mutation) is what caused his current mental state." In contrast, the Secretary maintains: "It is beyond question that N.S.'s mutation amply explains his entire course."

Skorupska v. Sec'y of Health & Hum. Servs., 2026 WL 674607, at *15 (internal references omitted). When considering the role of N.S.'s genetic mutation, the Special Master evaluated the scientific evidence provided by the parties regarding the etiology of E1211K variants of SCN2A to cause N.S.'s infantile spasms and developmental delay. The Special Master indicated in his decision that "[a]n important and foundational article is by Ogiwara and colleagues," see id. at *16 (alteration added), which is the Ogiwara study discussed above that was provided to petitioner by Dr. Jabs on July 23, 2014. The Special Master summarized the pertinent results of the Ogiwara study as follows:

> These researchers [Ogiwara et al.] discovered an *SCN2A*-E1211K mutation in a person who suffered from infantile spasms. He was born with mild asphyxia. Ogiwara at 1051. His seizures began at age 11 months. Ogiwara at 1047. The researchers compared the genetic mutation (c3613G>A) to a cohort of approximately 300 individuals. This genetic mutation was found "only in affected individuals." Id. at 1048. The researchers then conducted "whole-cell patch-clamp recordings" and other tests. ("Patch clamps" allow researchers to measure the flow of current through ion channels. Dorland's Illus. Med. Dict. at 362 (33rd ed.).) The researchers determined that E1211K is "evolutionarily conserved among vertebrae and invertebrae VGSC [voltage gated sodium channel] α subunits." Id. at 1049. The researchers also tested how the E1211K variant affected a cell's electrophysiologic property. They found "E1211K . . . markedly altered the voltage-dependence of $Na_v1.2$ indicating high pathologic potential[ ] of E1211K." Id. The researchers concluded: "our present study and others' provide solid genetic evidence implicating *SCN2A* in the etiology of human epilepsies." Id. at 1052.

Skorupska v. Sec'y of Health & Hum. Servs., 2026 WL 674607, at *16 (first alteration added; other alterations and omission in original; italics in original). The Special Master noted that the Ogiwara study was cited by treating geneticist Dr. Jabs and supports her assertion that N.S.'s SCN2A mutation was "deleterious." See id. The Special Master noted the Ogiwara study also was cited by respondent's expert Dr. Raymond to support that N.S.'s SCN2A mutation "seriously impairs the normal gating actions of the channel."

See id. The Special Master described petitioner's expert Dr. Huq's "underwhelming" response to the Ogiwara study and the Special Master explained in part in his decision why he ultimately found the Ogiwara study particularly important:

> Dr. Huq's [petitioner's expert] response to Ogiwara was underwhelming. Dr. Huq stated that: "Only one other individual with SCN2A E1211K variant has been reported but that individual also had birth asphyxia which likely contributed to or modified the pathogenesis of his epilepsy." Exhibit 68 at 4; accord Id. at 7, 10, 28. Although he highlighted the potential importance of asphyxia, Dr. Huq did not engage with other meaningful parts of Ogiwara. Dr. Huq did not contest Ogiwara's assertion that E1211K is evolutionarily conserved. Dr. Huq also did not contest the electrophysiologic consequences to an alteration in E1211K.
>
> The electrophysiologic testing carries great weight because this testing shows that the genetic variant interferes with how the sodium channel is supposed to function. See Exhibit C at 2 (Dr. Raymond's [respondent's expert] second report: "E1211K produced severely affected channels with electrophysiologic properties very different than the normal functioning voltage gated sodium channel"). In other words, the gene directed the creation of a protein that does not act as it should. Ogiwara's finding regarding the electrophysiologic dysfunction appears to be confirmed by other researchers. Exhibit E (Lauxmann). Due to this variation in how the sodium channel was created in N.S., N.S.'s sodium channel had a deficiency. It is difficult to see how the vaccination affected N.S.'s anatomy.

Skorupska v. Sec'y of Health & Hum. Servs., 2026 WL 674607, at *16 (alterations added; footnotes omitted).

The Special Master continued his discussion of the Ogiwara study, recounting that petitioner's expert Dr. Huq conceded "that the 'E1211K variant has not been detected in healthy individuals,'" but that Dr. Huq asserted the population database used was insufficient in that they "contain DNA sequence information of only a tiny percentage of healthy population." See id. at *17. The Special Master also stated that respondent's expert Dr. Raymond "persuasively refutes a concern about population databases." See id. In the Special Master's decision, and hypothetical consideration of an alternative cause, the Special Master continued to explain why he found the E1211K SCN2A mutation a persuasive cause of N.S.'s condition. The Special Master wrote that "[t]he lack of unaffected individuals contrasts with the number of examples in the literature of children with the same mutation and who developed neurologic problems similar to N.S.'s problems." Id. (alteration added). The Special Master supported his conclusion that the E1211K variant of the SCN2A gene causes neurologic problems by quoting respondent's brief to highlight eleven cases that studied or documented children with the same E1211K variant of the SCN2A gene. As quoted by the Special Master in his decision the eleven cases are:

(Case No. 1) Ex. A, Tab 1: Marcus Wolff et al., Genetic and phenotypic heterogeneity suggest therapeutic implications in SCN2A-related disorders, 140 BRAIN 1316-36 (2017). The subject with an E1211K mutation is listed as subject number 49 in Table 3. Id. at 11. The subject had West syndrome (WS) (see page 6 for abbreviation, WS) with seizure outcome noted to be intractable. Id. (last followed at 4 years of age). Cognition at both onset and follow-up was "severe intellectual disability" (SD) (see page 12 for abbreviation, SD). Id.

(Case No. 2) Ex. A, Tab 2: I. Ogiwara et al., De novo mutations of voltage-gated sodium channel [alpha II] gene SCN2A in intractable epilepsies, 73 NEUROLOGY 1046-53 (2009). This article supports Dr. Raymond's statement that "the glutamine at position 1211 is highly evolutionarily conserved among vertebrate and invertebrate voltage gated sodium channels and [the authors] went on to demonstrate that significantly altered the functional properties of the channel." Ex. A at 5 (citing Ex. A, Tab 2, at 4-5); see also Ex. T at 13 (Dr. Raymond). With regard to the E1211K subject discussed in the article, the authors state: "One de novo mutation, E1211K, was identified in a patient with sporadic infantile spasms that progressed into severe symptomatic generalized epilepsy." Ex. A, Tab 2, at 6.

(Case No. 3) Ex. D: Virginia C.N. Wong et al., SCN2A mutation in a Chinese boy with infantile spasm – response to Modified Atkins Diet, 37 BRAIN & DEV. 729-32 (2015). This is a case report of the same E1211K mutation. The subject "had developmental delay since birth. He developed flexor spasm of his upper limbs occurring in clusters since 15 months. . . . He had developmental regression and autistic features later during subsequent follow up. Electroencephalography (EEG) showed modified hypsarrhythmia." Id. at 2 (noting "severe intellectual disability" at age 6). Characterizing the nature of the mutation, the authors state, "this mutation affected highly conserved amino acid . . . and the mutation was predicted to be deleterious to protein function and pathogenic by PolyPhen-2, SIFT and Align-GVGD analysis. This mutation has been reported previously in a patient with sporadic IS, marked developmental delay and severe intellectual disability." Id. (citing Ogiwara (Ex. A, Tab 2)).

(Case No. 4) Ex. Q: Hane Lee et al., Clinical Exome Sequencing for Genetic Identification of Rare Mendelian Disorders, 312(18) JAMA 1880-87 (2014) (including relevant Supplementary Online Content). On page 27, the authors report a case of "p.Glu1211Lys" like in this case. The clinical indications are listed as "developmental delay, epilepsy, seizures, spasms, autism, [m]icrocephaly, wide palpebral fissures, hypertonia, mitochondrial [sic], complex IV, cytochrome c oxidase deficiency, Rett syndrome, Lennox Gastaut." Id.

(Cases No. 5-7) Ex. R: Qi Zeng et al., SCN2A-Related Epilepsy: The Phenotypic Spectrum, Treatment and Prognosis, 15(809951) FRONTIERS MOLECULAR NEUROSCIENCE (2022). This is a report of three cases overall. On page 5, the authors report 2 cases of E1211K, both with commensurately severe outcomes as the current case, one subject noted to be unable to sit alone or speak (last follow-up at age 6 years, 11 months), the other with delay before seizure onset, walking at 4 years, 8 months, and unable to speak (last follow-up at age 5). On page 7, the third subject was also delayed before seizure onset and could not walk or speak.

(Cases No. 8-9) Ex. V: Géza Berecki et al., Functional correlates of clinical phenotype and severity in recurrent SCN2A variants, 5(1) COMMUNICATIONS BIOLOGY 1-13 (2022) (Article No. 515) (doi: 10.1038/s42003-022-03454-1) (including Supplementary Data 1: Phenotypic data of 179 individuals with 38 recurrent SCN2A variants, and 2 individuals with unique variants (Ex. V at 14)). The authors reported two previously-unreported cases of E1211K mutation both with moderate delays prior to seizure development, like in the current case, and both with severe delay "at last review," like in the current case. Id. at 14 (also listing the cases cited in Ogiwara (Ex. A, Tab 2), Wong (Ex. D), and Wolff (Ex. A, Tab 1)).

(Case No. 10) Ex. HH: Balamurugan Nagarajan et al., Landscape of genetic infantile epileptic spasms syndrome—A multicenter cohort of 124 children from India, 00 EPILEPSIA OPEN 1-22 (2023) (doi:10.1002/epi4.12811). In Table 1, a subject is listed as having the c.3631G>A variation, like in the current case. Id. at 5. All the subjects had "infantile-onset (2 months-2 years) epileptic spasms and classical or modified hypsarrhythmia on EEG with or without developmental delay or regression." Id. at 3 (defining Infantile Epileptic Spasms Syndrome for the purpose of the report). The subject with variation c.3631G>A is coded as "Serial no. 16." Id. at 5. In the outcomes table (Table 4) on page 13, that patient had generalized tonic (GT) seizures at 6 months and epileptic spasms (ES) at 7 months. At 14 months, she developed stereotypies, and her phenotypic characteristics included central hypotonia (C HYP) and clinodactyly (CLDY). By 81 months of age, she was non-ambulatory (NAMB) and autistic (AU). Id. at 13 (see page 19 for explanation of abbreviations). The authors note that "the longterm neurodevelopmental outcome was poor in most children with SCN2A (5/6 non-ambulatory, 4/7 autistic, one progressed to LGS [Lennox-Gastaut syndrome])." Id. at 10.

(Case No. 11) Ex. II (Eye, Eye): Sylvia Vidal et al., The utility of Next Generation Sequencing for molecular diagnostics in Rett syndrome, 7:12288 SCIENTIFIC REPORTS 1-11 (2017) (doi:10.1038/s41598-017-11620-3). The patient with the same mutation as N.S. is highlighted on page 4. That study evaluated Rett syndrome-like patients, "an early-onset

> neurodevelopmental disorder that almost exclusively affects girls and is totally disabling." Id. at 1 (emphasis added) (noting characteristics to be "a period of apparently normal development (up to the age of 6–18 months), followed by a regression characterized by loss of speech and purposeful hand use and motor apraxia that may be associated with epilepsy and dysautonomic features"). Contextually, the patient with the same missense mutation as N.S. had a severe disorder. See also Id. at 5 ("we detected 2 SNVs [single nucleotide variants] . . . in SCN2A genes, which are associated with mental retardation, stereotypic movements, epilepsy, and/or cerebral malformations").

Skorupska v. Sec'y of Health & Hum. Servs., 2026 WL 674607, at *17-18 (alterations and omissions in original).

The Special Master remarked that "[t]his consistency of outcomes contributes to finding that the E1211K variant causes neurologic problems. The consistency of outcomes for this variant further weakens an argument that variations among SCN2A genes produces a variety of outcomes." Id. at *19 (alteration added). As the Special Master correctly stated, Special Masters may consider the general acceptance of an opinion in the scientific community. See id. (citing Terran v. Sec'y of Health & Hum. Servs., 195 F.3d at 1316). In this context, the Special Master also addressed the credibility of petitioner's expert Dr. Huq's opinion, noting that Dr. Huq concedes the E1211K variant is pathogenic and "Dr. Huq's opinion that this 'pathogenic variant' merely meant that [N.S.] was 'predisposed to having seizures' is not in line with the multiple researchers who have identified the mutation as causative." Skorupska v. Sec'y of Health & Hum. Servs., 2026 WL 674607, at *19 (alteration added). The Special Master indicated that although some SCN2A variants may have different outcomes, the Special Master agreed with respondent's expert Dr. Raymond's opinion that, based on the examples in the medical literature, E1211K, N.S.'s variant, "appears to lead to neurologic problems always." See id. The Special Master concluded that, hypothetically, had Ms. Skorupska succeeded in shifting the burden to respondent, respondent would have succeeded in carrying its burden of demonstrating an alternative cause because "a preponderance of the evidence supports the finding that N.S.'s genetic variant caused and was the sole cause of his neurologic problem," consistent with the "persuasive" opinion of respondent's expert Dr. Raymond. See id.

In her Motion for Review, petitioner also argues the Special Master's consideration of the early intervention reports from September 12, 2013, and September 13, 2013, which occurred two months prior to N.S. receiving the Hib vaccination, in his factual findings as "definitive evidence" of severe delay constitutes error. Petitioner does not explain how the Special Master's allegedly improper review of this evidence negatively or erroneously impacted the Special Master's analysis. Rather, petitioner argues that the Special Master's reliance on the early intervention reports "mischaracterized their purpose and evidentiary value." N.S.'s condition prior to the Hib vaccination is relevant to the Special Master's statement that E1211K SCN2A mutations have a "consistency of outcomes," see Skorupska v. Sec'y of Health & Hum. Servs., 2026 WL 674607, at *19,

because N.S.'s condition prior to the Hib vaccination provided a benchmark against which the Special Master could consider whether the onset of N.S.'s spasms in November 2013 could be associated with the Hib vaccination or N.S.'s genetic mutation. In the section of the Special Master's decision discussing the early intervention reports outlined above, the Special Master summarized N.S.'s September 12, 2013 evaluation by Dr. Cali and wrote: "N.S. was found to have delays in gross motor development, and was 'functioning at -2.00 standard deviations below the mean than that of his peers.'" Skorupska v. Sec'y of Health & Hum. Servs., 2026 WL 674607, at *1. With respect to N.S.'s September 13, 2013 appointment, the Special Master wrote: "The following day, N.S. was evaluated by occupational therapist Melissa Gianquinot [sic]," with the standardized DAYC-2 development evaluation and "N.S. scored above average in the expressive language domain; average in the communication and adaptive behavior domains; below average in the cognitive, fine motor, and social-emotional domains; and poor in the physical development domain." Id. (alteration added). These quotations demonstrate that the Special Master reviewed and analyzed the findings of the September 12, 2013, and September 13, 2013, early intervention reports without drawing any conclusion that they were "conclusive proof of developmental impairment," as alleged by petitioner.[28] Moreover, although a Special Master is not required to explicitly discuss every piece of evidence in the record, see Snyder ex rel. Snyder v. Sec'y of Health & Hum. Servs., 88 Fed. Cl. at 728, according to the statute at 42 U.S.C. § 300aa-13(b)(1), the Special Master "shall consider, in addition to all other relevant medical and scientific evidence contained in the record," "the results of any diagnostic or evaluative test which are contained in the record and the summaries and conclusions." Snyder ex rel. Snyder v. Sec'y of Health & Hum. Servs., 88 Fed. Cl. at 728 (citing 42 U.S.C. § 300aa-13(b)(1)); see also Stone v. Sec'y of Health & Hum. Servs., 676 F.3d at 1380 ("[T]he special master is entitled to consider the record as a whole in determining causation, especially in a case involving multiple potential causes acting in concert." (alteration added)); Doe v. Sec'y of Health & Hum. Servs., 601 F.3d at 1358 ("[N]either §300aa-13 nor our cases limit what evidence the special master may consider in deciding whether a prima facie case has been established." (alteration added)). The Special Master's consideration of the early intervention reports prior to N.S.'s vaccination did not create legal error in the Special Master's decision.

Petitioner also objects that the "Special Master improperly credited Dr. Raymond's [respondent's expert] opinion that the increase in N.S.'s therapy, from once per week to three times per week, demonstrated severe developmental delay." (alteration added). This objection, like the objection to the early intervention reports, likewise, does not establish how consideration of this information led to reversible error. See Snyder ex rel.

[28] Notably, petitioner also references the September 13, 2013 early intervention report in her own statement of facts before this court in markedly similar language: "[O]n September 13, 2013, N.S. underwent a developmental evaluation at Petitioner's request due to concerns regarding the development of his motor functioning. N.S. scored within normal limits in the communication and adaptive behavior domains, in the below average range in the cognitive, fine motor, and social-emotional domains, and in the poor range in the physical development domain." (alteration added; internal references omitted).

Snyder v. Sec'y of Health & Hum. Servs., 88 Fed. Cl. at 724. Ms. Skorupska particularly cites to the factual recount section of the Special Master's decision and respondent's expert Dr. Raymond's third expert report to try to support her assertion. The relevant section of the Special Master's decision stated:

> Dr. Raymond maintained his position and "continue[d] to strongly disagree with [petitioner's expert] Dr. Ghacibeh's assessment." Exhibit K at 3. He raised the point that [N.S.'s treating neurologist] Dr. Schwartzberg recommended that N.S. increase his therapies from once a week to three times per week; gave the family instructions for hearing, feeding, and special instructional evaluations; and planned for numerous tests and consultations. Id. Dr. Raymond [respondent's expert] stated: "These recommendations including the significant increase in the frequency of therapy are commensurate with the severity of this child's delays and not those of a 'mild motor delay.'" Id. at 4.

Skorupska v. Sec'y of Health & Hum. Servs., 2026 WL 674607, at *2 (first alteration in original; other alterations added). Although the Special Master was providing a recount of the opinion offered by respondent's expert in the context of sharing the expert opinions of both parties on pre-vaccination development, it appears Ms. Skorupska is really objecting to respondent's expert Dr. Raymond's opinion that N.S. had severe developmental delay prior to vaccination. The conclusion that N.S. was severely delayed prior to vaccination, however, was never explicitly adopted by the Special Master. See Skorupska v. Sec'y of Health & Hum. Servs., 2026 WL 674607, at *8. Instead, the Special Master found that "ample evidence shows that N.S. was experiencing at least some neurologic problems / developmental delay before the vaccination." Id. The Special Master, therefore, in his decision, recounted the positions of the experts and found there was "some" delay, a position consistent with the opinions of all four experts involved in the case: petitioner's expert Dr. Brawer, petitioner's expert Dr. Ghacibeh, petitioner's expert Dr. Huq, and respondent's expert Dr. Raymond. A finding that is consistent with all four experts' opinions in the case does not amount to an abuse of discretion as alleged by petitioner in her Motion for Review.

Ms. Skorupska further argues that the Special Master acted arbitrarily and capriciously when he relied on respondent's expert Dr. Raymond's literature analysis of E1211K variants of the SCN2A gene because, petitioner alleges, N.S.'s outcome and treatment differed meaningfully. Petitioner tries to support her position with an assertion that N.S. can be differentiated from the other SCN2A E1211K patients as none of these cases discuss or document the use of IVIG, which according to petitioner, "played a central role in N.S.'s recovery" and because N.S.'s seizures were not refractory. To the first point, the underpinning of petitioner's objection is that IVIG did play an important and notable role. The Special Master explicitly found this was not the case when he wrote "Dr. Ghacibeh's opinion regarding IVIG is not persuasive." Skorupska v. Sec'y of Health & Hum. Servs., 2026 WL 674607, at *10. As discussed above, neither the finding that the IVIG treatment was not evidence of inflammation, nor the finding that "the improvement after IVIG did not last very long," were arbitrary or capricious because they were

supported by the record before the Special Master. See id. Thus, N.S.'s use of IVIG treatment was not a meaningful differentiator between the E1211K SCN2A cases reported in the literature and N.S.'s case of this same mutation. Petitioner additionally argues that the Ogiwara study, credited by the Special Master as "important and foundational," see id. at *16, is irrelevant since N.S.'s seizures were successfully controlled, which is dissimilar to the Ogiwara subject whose seizures were refractory. Petitioner's assertion that N.S.'s seizures were not refractory is contrary to the opinions of all three of her experts and also contrary to the brief petitioner filed before the Special Master, in which she wrote, "[i]f N.S.' present condition were purely congenital, there would be no obvious cause for the worsening of N.S.' symptoms and his development of refractory seizures after receiving the Hib vaccine." (alteration added). The suggestion that N.S.'s seizures were not refractory was both a new argument in petitioner's Motion for Review before this court, but also is a reversal of petitioner's previous statements and, therefore, should not be considered by this court.

In his hypothetical discussion of a "factor unrelated" in his decision, the Special Master also discussed what he considered to be relevant United States Court of Appeals for the Federal Circuit precedent for a "factor unrelated" or alternative cause analysis, and how it should be applied in N.S.'s case. The Special Master noted that one case in particular, Trystan Sanchez by and Through Sanchez v. Secretary of Health and Human Services, had "introduced questions" about "cases with genetic issues." See Skorupska v. Sec'y of Health & Hum. Servs., 2026 WL 674607, at *15 (citing Trystan Sanchez by & Through Sanchez v. Sec'y of Health & Hum. Servs., 34 F.4th 1350). At the oral argument before this court on petitioner's Motion for Review, petitioner's counsel argued that the United States Court of Appeals for the Federal Circuit's opinion in Sanchez introduces "a higher standard" because now, according to petitioner, "[t]he Secretary had to show that the mutations would have caused the same progression and also severity of the syndrome absent the vaccine." (alteration added). Respondent, in turn, argues that the Sanchez case is "readily distinguishable" because (1) "it involved only one case report," (2) "there was no evidence of manifestations of the condition prior to vaccination," unlike in the case of N.S., and (3) the vaccinee in "Sanchez lacked the case-specific evidence regarding the amino acid change specifically caused by the E1211K variant here." (internal citations omitted). This court does not reach the question of whether the Special Master's alternative cause analysis is consistent with Sanchez because the alternative cause discussion was a hypothetical analysis by the Special Master that was not the basis for the Special Master's decision to deny compensation, and this court has concluded that the Special Master's denial of compensation under the Loving / Althen prongs was not arbitrary or capricious. See W.C. v. Sec'y of Health & Hum. Servs., 704 F.3d at 1358.

Finally, in her Reply to the Motion for Review in this court, petitioner tries to challenge the underpinnings of the Special Master's decision by contesting respondent's expert Dr. Raymond's expert opinion that N.S.'s variant did not require a triggering factor for expression, or manifestation, by citing medical literature that seems to describe non-variant-specific SCN2A mutations as a spectrum. Petitioner cites three medical articles

that were not in the record before the Special Master.[29] Two of the newly submitted articles were published in 2022 and 2024, prior to when briefing before the Special Master concluded on January 6, 2025. The remaining article was published in 2026, five days before the release of the Special Master's decision denying compensation on February 10, 2026. As indicated above, Vaccine Rule 8(f)(1) prohibits any new fact or argument not before the Special Master from consideration by the United States Court of Federal Claims on a motion to review. See Vaccine Rule 8(f)(1). When there is a question of whether or not to remand to a Special Master for the purpose of reopening the record in light of new information, the United States Court of Federal Claims has identified, and the United States Court of Appeals for the Federal Circuit has previously employed, four factors of consideration: "(1) the nature of the proffered new evidence; (2) the prejudice to the parties; (3) the length of the delay; and (4) the reason for the delay," with the first factor being "paramount." See Erve by Erve v. Sec'y of Health & Hum. Servs., 39 Fed. Cl. 607, 612 (1997) (hereinafter Vant Erve v. Sec'y of Health & Hum. Servs. or Vant Erve[30]); see also Stone v. Sec'y of Health & Hum. Servs., 676 F.3d at 1386 (analyzing whether petitioner's invocation of Vant Erve supported their motion). In Stone v. Secretary of Health and Human Services, the United States Court of Appeals for the Federal Circuit concluded that the Vant Erve case was "not helpful" to the petitioner because:

> Here, the petitioner waited until after he had appealed the special master's entitlement decision and the case had been remanded on a legal issue before attempting to submit the evidence. The remand order did not contemplate the submission of new evidence, and the special master found that the "new" evidence was known and available to the petitioner prior to the special master's initial decision and could have been submitted in a timely fashion. Moreover, because it was not clear that the article would have strengthened the petitioner's case or affected the special master's decision, the petitioner has not shown that he was prejudiced by the special master's denial of the motion.

Stone v. Sec'y of Health & Hum. Servs., 676 F.3d at 1386.

---

[29] The three articles are: Zeng et al., SCN2A-Related Epilepsy: The Phenotypic Spectrum, Treatment, and Prognosis, 15 FRONTIERS IN MOLECULAR NEUROSCIENCE 809951 (2022); Berg et al., Expanded Clinical Phenotype Spectrum Correlates with Variant Function in SCN2A-Related Disorders, 147(8) BRAIN 2761 (2024); and Tan et al., Mechanisms of SCN2A Loss of Function do not Predict Presence or Phenotype of Epilepsy, 67(5) EPILEPSIA 2628 (2026).

[30] This case is cited as Vant Erve v. Secretary of Health and Human Services, 39 Fed. Cl. 607 (1997) by Stone v. Secretary of Health and Human Services, 676 F.3d at 1386, but the actual name of the 1997 opinion is "Erve by Erve v. Secretary of Health and Human Services." The case has six associated decisions and each has a different name. This court will follow the United States Court of Appeals for the Federal Circuit and refer to the 1997 decision in this Opinion as "Vant Erve."

With respect to the 2022 and 2024 articles that were newly submitted in petitioner's Reply to the Motion for Review in this court, the 2022 and 2024 articles could have been submitted to the Special Master (see the Vant Erve factors three and four) as the articles had already been published for multiple years by the time the Special Master's decision was released on February 10, 2026. See Vant Erve, 39 Fed. Cl. at 612. Additionally weighing against any consideration for possible remand, neither the 2022 nor 2024 article is particularly on-point (see Vant Erve factor one), as they discuss patients with a wide variety of SCN2A variants, which the Special Master implicitly rejected by focusing on N.S.'s specific variant and it's medical understanding. See Vant Erve, 39 Fed. Cl. at 612; see also Skorupska v. Sec'y of Health & Hum. Servs., 2026 WL 674607, at *17-19. Moreover, the 2022 and 2024 articles are cumulative, as they each stand for the proposition that SCN2A mutations can cause a spectrum of outcomes, a proposition which, according to petitioner's brief submitted to the Special Master, also is represented in Exhibit 79 in the record before the Special Master, which is an article by Berecki et al. See Berecki et al., Functional Correlates of Clinical Phenotype and Severity in Recurrent SCN2A variants, 5 COMMC'N BIOLOGY 515 (2022). Therefore, none of the Vant Erve factors of: (1) the nature of the proffered new evidence; (2) the prejudice to the parties; (3) the length of the delay; and (4) the reason for the delay, weigh in petitioner's favor in order to consider or justify a remand of petitioner's case to the Special Master to consider the 2022 or 2024 articles. See Vant Erve, 39 Fed. Cl. at 612.

Moreover, with respect to the newly submitted 2026 article, Ms. Skorupska's Reply to the Motion for Review describes the 2026 article as showing that "genotype and biophysical impact correlate broadly with phenotypic group (e.g., early- vs late-onset epilepsy, ASD/ID)," and she attempts to quote from the 2026 article that "neither genotype nor biophysical impact can reliably predict outcome severity."[31] Petitioner alleges that the 2026 article "undermines the claim that E1211K and other LoF variants 'have a clear mechanism of action' that determines how seizures and encephalopathy will progress." N.S.'s channel dysfunction (whether it is total, partial, or mixed) is not contested, nor did the Special Master compare N.S.'s outcome to studies that deal with similar channel dysfunction to warrant a reconsideration of the "factor unrelated" analysis, which weighs against Vant Erve factors one and two. See Vant Erve, 39 Fed. Cl. at 612; see also Skorupska v. Sec'y of Health & Hum. Servs., 2026 WL 674607, at *16-19.

Additionally, in Anklam v. Secretary of Health and Human Services, No. 2024-2161, 2026 WL 480017 (Fed. Cir. Feb. 20, 2026), a recent, nonprecedential case issued by the United States Court of Appeals for the Federal Circuit, a panel of the Federal Circuit indicated that a remand is sometimes proper in the "unique circumstances" in which a new medical article is published while the vaccine case is on a motion for review. See id. at *3. In Anklam, the case was on appeal to the United States Court of Federal Claims when a relevant medical study corroborating petitioner's medical theory was published.

---

[31] In fact, the phrase quoted by petitioner that "neither genotype nor biophysical impact can reliably predict outcome severity" is not in the 2026 article at issue. See Tan et al., Mechanisms of SCN2A Loss of Function do not Predict Presence or Phenotype of Epilepsy, 67(5) EPILEPSIA 2628.

See id. at *2. Within two weeks, the Anklam petitioner motioned the United States Court of Federal Claims to reopen the record. See id. The Judge of the United States Court of Federal Claims denied the request to reopen the record. See id. The United States Court of Appeals for the Federal Circuit found there was no legal error on the part of this court, but nonetheless remanded so the Special Master could consider whether it would be appropriate to reopen the record, given that the study corroborated the petitioner's medical theory of the case. See id. at *3. The case currently before this court on petitioner's Motion for Review, however, does not appear to rise to the level discussed in Anklam. As an initial matter, unlike the petitioner in Anklam, Ms. Skorupska did not file a motion in this court to reopen the record. Rather, Ms. Skorupska only discusses the medical articles in her Reply to the Motion for Review without acknowledging that the three articles were not in the record before the Special Master, or the record before this court. On this basis alone, this court should not rely on the articles cited by Ms. Skorupska pursuant to Vaccine Rule 8(f)(1), which states that "[a]ny fact or argument not raised specifically in the record before the special master will be considered waived and cannot be raised by either party in proceedings on review of a special master's decision." Id. (alteration added). For these reasons, and because petitioner has not persuasively presented a case that the newly submitted articles could change the outcome of the Special Master's decision after his review of the record as a whole, including the evidence from the treating physicians, other medical literature, and expert testimony, this court does not consider the newly submitted articles and will not remand the case to the Special Master for further review of the Special Master's decision regarding entitlement.

## CONCLUSION

In the Special Master's decision in petitioner's case on behalf of her minor child, N.S., the Special Master denied Ms. Skorupska's petition for compensation because the Special Master found, based on his review of the record before the Special Master as a whole, that petitioner had failed to show by preponderant evidence that the unfortunate medical issues N.S. encountered before and after he received the Hib vaccination on November 16, 2013, were caused by, or were significantly aggravated by, the Hib vaccination that he received. This court finds, based on the record before the undersigned, that the Special Master did not act in an arbitrary or capricious manner, and did not act contrary to the law, with regard to the Loving / Althen analysis the Special Master conducted. The Special Master found that petitioner had not demonstrated a logical sequence of cause and effect connecting the Hib vaccination and N.S.'s injuries because petitioner had "not persuasively established that N.S. suffered deleterious inflammation within a relevant time of the vaccination" in line with petitioner's experts' medical theory of inflammation. See Skorupska v. Sec'y of Health & Hum. Servs., 2026 WL 674607, at *10. The Special Master found that petitioner also had not demonstrated a proximate temporal relationship between the Hib vaccination and N.S.'s injury because petitioner failed to establish that the onset of N.S.'s infantile spasms occurred in a timeframe for which it is medically acceptable to infer causation. See id. at *12. This court has the utmost sympathy for Ms. Skorupska and her son and their difficult, ongoing circumstances. The court's scope of review is limited to whether the Special Master acted

arbitrarily or capriciously when he reviewed and decided N.S.'s case which denied entitlement. Pursuant to the Vaccine Act, this court has not identified relevant issues that would direct the court to find reversible error in the Special Master's analysis of the Loving / Althen prongs and the Special Master's review of the record as a whole. For the reasons discussed above, the petitioner's Motion for Review is **DENIED**.

**IT IS SO ORDERED.**

s/Marian Blank Horn
**MARIAN BLANK HORN**
**Judge**